**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MARTIN SIEGEL, derivatively on behalf of ARES CAPITAL CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>ARES CAPITAL MANAGEMENT LLC,<br><br>Defendant. | Case No. 1:26-cv-04371-JHR<br>ORAL ARGUMENT REQUESTED |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT'S MOTION TO DISMISS**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ......................................................................................................... 1

BACKGROUND ........................................................................................................... 3

    A.    ACM's Advice Generates Outstanding Returns for ARCC Investors. ................... 3

    B.    ACM Has Been ARCC's Investment Adviser Since ARCC's Inception. .............. 3

    C.    ACM Is Compensated at Industry-Standard Rates. ................................................ 4

    D.    ARCC's Independent Board Reviews and Approves ACM's Fee Rates. .............. 5

    E.    ARCC's Valuation Process Involves Multiple Layers of Independent
        Oversight. ............................................................................................................. 6

        1.    Consistent with SEC Rules, ARCC's Board Has Appointed ACM
               as Its Valuation Designee. ................................................................... 6

        2.    Independent Valuation Providers Review and Confirm Valuations. ........... 6

        3.    ARCC's Independent Auditor Audits ARCC's Financial
               Statements, Including Its Reported Valuations. ........................................ 7

LEGAL STANDARD ................................................................................................... 8

ARGUMENT ............................................................................................................... 9

I.    THE ICA DOES NOT PROVIDE A PRIVATE RIGHT OF ACTION TO
    CHALLENGE ASSET VALUATIONS. ............................................................... 9

II.    PLAINTIFF FAILS TO PLEAD A SECTION 36(B) CLAIM UNDER THE
    CONTROLLING *JONES* STANDARD. ............................................................... 10

    A.    Plaintiff Alleges No Deficiency in ACM's High-Quality Services. ...................... 12

    B.    Plaintiff Admits That ACM's Fees Are Comparable to Its Peers. ........................ 12

    C.    ARCC's Independent Board Reviewed and Approved ACM's Fee Rates. ........... 13

    D.    ACM's Profits Are Not Properly Alleged, Let Alone Shown to Be
        Excessive. ............................................................................................................ 15

    E.    Plaintiff Fails to Allege That ACM Achieves Economies of Scale. ..................... 16

**TABLE OF CONTENTS (CONT'D)**

**Page**

F.     Plaintiff Alleges No Fall-Out Benefits Received by ACM. ................................. 17

III.     PLAINTIFF FAILS TO ALLEGE ANY UNDERLYING OVERVALUATION. .......... 18

    A.     Plaintiff Fails to Allege Any Violation of the ICA's Fair Valuation Rules.......... 19

    B.     Plaintiff's Disconnected Theories Do Not Plausibly Plead "Systematic[]" Overvaluation............................................................................................... 21

       1.     Plaintiff Fails to Plead the Amount of the Purported Overvaluation........ 21

       2.     Plaintiff Fails to Plead Fund-Wide Overvaluation.................................. 21

       3.     Independent Review Makes Overvaluation Implausible. ......................... 22

    C.     Plaintiff's Disconnected Theories Also Fail on Their Own Terms. ..................... 23

CONCLUSION............................................................................................................ 29

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*380544 Can., Inc. v. Aspen Tech.*,
   544 F.Supp. 2d 199 (S.D.N.Y. 2008)....................................................................8, 24

*In re Allied Cap. Corp. Sec. Litig.*,
   2003 WL 1964184 (S.D.N.Y. Apr. 25, 2003)............................................... *passim*

*In re Am. Mut. Funds Fee Litig.*,
   2009 WL 5215755 (C.D. Cal. Dec. 28, 2009) ........................................................15

*Amron v. Morgan Stanley Inv. Advisors*,
   464 F.3d 338 (2d Cir. 2006)..................................................................11, 12, 14, 16

*Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb*,
   28 F.4th 343 (2d Cir. 2022) .....................................................................................8

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009).................................................................................................8

*Binn v. Bernstein*,
   2020 WL 4550312 (S.D.N.Y. July 13, 2020), *adopted by* 2020 WL 4547167
   (S.D.N.Y. Aug. 6, 2020) ...................................................................................19, 29

*Bondali v. Yum! Brands*,
   620 F.App'x 483 (6th Cir. 2015) ............................................................................22

*Borg v. Int'l Silver Co.*,
   11 F.2d 147 (2d Cir. 1925)......................................................................................25

*Broder v. Cablevision Sys.*,
   418 F.3d 187 (2d Cir. 2005)....................................................................................10

*Chambers v. Time Warner*,
   282 F.3d 147 (2d Cir. 2002).....................................................................................8

*Chill v. Calamos Advisors*,
   2018 WL 4778912 (S.D.N.Y. Oct. 3, 2018) ...........................................................16

*City of Omaha v. CBS Corp.*,
   2010 WL 1029290 (S.D.N.Y. Mar. 16, 2010) ........................................................24

*Cohen v. Rosicki, Rosicki & Assocs.*,
   897 F.3d 75 (2d Cir. 2018).......................................................................................8

*Concord v. Bos. Edison Co.*,
915 F.2d 17 (1st Cir. 1990)..........................................................................................10

*In re Davis N.Y. Venture Fund Fee Litig.*,
2019 WL 2896415 (S.D.N.Y. May 30, 2019) (81%), *aff'd*, 805 F.App'x 79
(2d Cir. 2020)................................................................................................................16

*Denny v. Barber*,
576 F.2d 465 (2d Cir. 1978)................................................................................. *passim*

*Dfinity Found. v. N.Y. Times*,
702 F.Supp.3d 167 (S.D.N.Y. 2023), *aff'd*, 2024 WL 3565762
(2d Cir. July 29, 2024) ....................................................................................................3

*Diabat v. Credit Suisse Grp.*,
2024 WL 4252502 (S.D.N.Y. Sept. 19, 2024)...............................................................24

*Eaton Vance Sr. Income Tr. v. Saba Cap. Master Fund*,
2024 WL 4579652 (Mass. Sup. Ct. Oct. 21, 2024) .......................................................28

*Fernandez v. UBS AG*,
222 F.Supp.3d 358 (S.D.N.Y. 2016)..............................................................................18

*First Fed. Sav. & Loan Ass'n of Temple v. United States*,
694 F.Supp. 230 (W.D. Tex. 1988), *aff'd*, 887 F.2d 593 (5th Cir. 1989)...............27, 28

*In re Franklin Mut. Funds Fee Litig.*,
478 F.Supp.2d 677 (D.N.J. 2007) ..................................................................................20

*FS Credit Opportunities Corp. v. Saba Cap. Master Fund*,
146 S.Ct. 1546 (2026)...................................................................................................1, 9

*Ganino v. Citizens Utils.*,
228 F.3d 154 (2d Cir. 2000)..........................................................................................3, 8

*Gartenberg v. Merrill Lynch Asset Mgmt.*,
573 F.Supp. 1293 (S.D.N.Y. 1983), *aff'd*, 740 F.2d 190 (2d Cir. 1984)..................15

*Gartenberg v. Merrill Lynch Asset Mgmt.*,
694 F.2d 923 (2d Cir. 1982)......................................................................................11, 12

*Gen. Motors Corp. v. Tracy*,
519 U.S. 278 (1997)........................................................................................................10

*Global Beauty Grp. v. Visual Beauty*,
2018 WL 840102 (S.D.N.Y. Feb. 12, 2018)...................................................................29

iv

*In re Goldman Sachs Mut. Funds*,
  2006 WL 126772 (S.D.N.Y. Jan. 17, 2006) ...............................................................17

*Green v. Nuveen Advisory Corp.*,
  295 F.3d 738 (7th Cir. 2002) ....................................................................................20

*Harris v. AmTrust Fin. Servs.*,
  135 F.Supp.3d 155 (S.D.N.Y. 2015), *aff'd*, 649 F.App'x 7 (2d Cir. 2016)............................27

*Hoffman v. UBS-AG*,
  591 F.Supp.2d 522 (S.D.N.Y. 2008)................................................................14, 18

*In re Hutchinson Tech. Sec. Litig.*,
  536 F.3d 952 (8th Cir. 2008) ....................................................................................21

*I. Meyer Pincus & Assocs. v. Oppenheimer*,
  1990 WL 161016 (S.D.N.Y. Oct. 15, 1990), *aff'd*, 936 F.2d 759
  (2d Cir. 1991)...........................................................................................................28

*Jones v. Harris Assocs.*,
  559 U.S. 335 (2010)............................................................................... *passim*

*Jones v. Harris Assocs.*,
  611 F.App'x 359 (7th Cir. 2015) ..............................................................................12

*In re JP Morgan Chase Sec. Litig.*,
  2007 WL 950132 (S.D.N.Y. 2007), *aff'd*, 553 F.3d 187 (2d Cir. 2009) ................................27

*Kalish v. Franklin Advisers*,
  742 F.Supp. 1222 (S.D.N.Y. 1990)...........................................................................16

*Kasilag v. Hartford Inv. Fin. Servs.*,
  2017 WL 773880 (D.N.J. Feb. 28, 2017), *aff'd*, 745 F.App'x 452 (3d Cir.
  2018) ........................................................................................................................15

*Kennis v. Metro. W. Asset Mgmt.*,
  2019 WL 4010747 (C.D. Cal. July 9, 2019)..............................................................17

*Krantz v. Prudential Invs. Fund Mgmt.*,
  77 F.Supp.2d 559 (D.N.J. 1999), *aff'd*, 305 F.3d 140 (3d Cir. 2002)......................................11

*Krinsk v. Fund Asset Mgmt.*,
  715 F.Supp. 472 (S.D.N.Y. 1988), *aff'd*, 875 F.2d 404 (2d Cir. 1989).................................17

*Kuriakose v. Fed. Home Loan Mortg. Corp.*,
  897 F.Supp.2d 168 (S.D.N.Y. 2012*), aff'd*, 543 F.App'x 72 (2d Cir. 2013)...........................23

v

*Kushner v. Beverly Enters.*,
    317 F.3d 820 (8th Cir. 2003) ....................................................................23

*Lipow v. Net1 UEPS Techs.*,
    131 F.Supp.3d 144 (S.D.N.Y. 2015)............................................................8

*In re Marsh & Mclennan Cos. Sec. Litig.*,
    501 F.Supp.2d 452 (S.D.N.Y. 2006).....................................................23, 27

*Migdal v. Rowe Price-Fleming Int'l*,
    248 F.3d 321 (4th Cir. 2001) ...............................................................10, 14

*Mintz v. Baron*,
    2009 WL 735140 (S.D.N.Y. Mar. 20, 2009) ..............................................17

*N.J. Carpenters Health Fund v. Royal Bank of Scot.*,
    709 F.3d 109 (2d Cir. 2013).........................................................................8

*In re Overstock Sec. Litig.*,
    2020 WL 5775845 (D. Utah Sept. 28, 2020)..............................................21

*Paskowitz v. Prospect Cap. Mgmt.*,
    232 F.Supp.3d 498 (S.D.N.Y. 2017).................................................. *passim*

*Paypolitan OU v. Marchesoni*,
    2022 WL 17541091 (S.D.N.Y. Aug. 26, 2022)..............................................3

*Pirundini v. J.P. Morgan Inv. Mgmt.*,
    309 F.Supp.3d 156 (S.D.N.Y. 2018), *aff'd*, 765 F.App'x 538 (2d Cir. 2019)................. *passim*

*Pirundini v. J.P. Morgan Inv. Mgmt.*,
    765 F.App'x 538 (2d Cir. 2019) .............................................................9, 12

*Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank*,
    11 F.4th 90 (2d Cir. 2021) .........................................................................21

*Plumbers & Steamfitters Loc. 773 Pension Fund v. Can. Imperial Bank of Com.*,
    694 F.Supp.2d 287 (S.D.N.Y. 2010)...........................................................27

*Pub. Serv. Co. of N.M. v. FERC*,
    832 F.2d 1201 (10th Cir. 1987) .................................................................25

*Rahl v. Bande*,
    328 B.R. 387 (S.D.N.Y. 2005).....................................................................18

*Rios v. Max Mara USA*,
    2025 WL 66502 (S.D.N.Y. Jan. 10, 2025) ..................................................24

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004)..................................................................................21, 22

*Schuyt v. Rowe Price Prime Reserve Fund*,
    663 F.Supp. 962 (S.D.N.Y. 1987)...................................................................................16

*In re Scudder Mut. Funds Fee Litig.*,
    2007 WL 2325862 (S.D.N.Y. Aug. 14, 2007).................................................................16

*Star Equity Fund v. Firsthand Cap. Mgmt.*,
    2026 WL 933296 (D. Md. Apr. 7, 2026)........................................................................19

*Strougo v. BEA Assocs.*,
    1999 WL 147737 (S.D.N.Y. Mar. 18, 1999)...................................................................10

*In re Valuation of Common Stock of Libby, McNeill & Libby*,
    406 A.2d 54 (Me. 1979)..................................................................................................26

*Verkouteren v. BlackRock Fin. Mgmt.*,
    2000 WL 298255 (Table) (2d Cir. Mar. 21, 2000) ..........................................................9

*Verkouteren v. BlackRock Fin. Mgmt.*,
    37 F.Supp.2d 256 (S.D.N.Y. 1999), *aff'd*, 208 F.3d 204 (2d Cir. 2000) ................................14

*Woolgar v. Kingstone Cos.*,
    477 F.Supp.3d 193 (S.D.N.Y. 2020).............................................................................22

*Yampolsky v. Morgan Stanley Inv. Advisers*,
    2004 WL 1065533 (S.D.N.Y. May 12, 2004) ...............................................................11

**Statutes**

15 U.S.C. §80a-2(a)(9)....................................................................................................14

15 U.S.C. §80a-2(a)(41)...........................................................................................1, 9, 19

15 U.S.C. §80a-2(a)(48)....................................................................................................3

**Other Authorities**

17 C.F.R. §270.2a-5 ................................................................................................. *passim*

86 Fed. Reg. 748 ..............................................................................................................21

*In re Madison Cap. Mgmt.*,
    Investment Advisers Act Release No. 6948 (Feb. 25, 2026)..........................................10

R.Dennis, *ARCC: The Titan of Private Credit* ..............................................................23

vii

**TABLE OF ABBREVIATIONS**

| Term | Meaning |
|------|---------|
| $_B | Billion |
| $_M | Million |
| ¶_ | Paragraphs in the Complaint (ECF No. 1) |
| 2021 10-K | Form 10-K of Ares Capital Corporation ("ARCC") for Fiscal Year 2021, filed with the SEC on February 9, 2022 (Ex. 3 to Declaration of Alexander J. Rodney in Support of Defendant's Motion to Dismiss ("Rodney Decl.")) |
| 2025 10-K | Form 10-K of ARCC for Fiscal Year 2025, filed with the SEC on February 4, 2026 (Ex. 1 to Rodney Decl.) |
| 2026 Proxy | ARCC's Proxy Statement, filed with the SEC on March 5, 2026 (Ex. 4 to Rodney Decl.) |
| ACM | Ares Capital Management LLC |
| Advisory Agreement | Second Amended and Restated Investment Advisory and Management Agreement Between Ares Capital Corporation and Ares Capital Management LLC (Ex. 5 to Rodney Decl.) |
| ARCC | Ares Capital Corporation |
| Ares | Ares Management Corporation |
| Aventine | Aventine Intermediate LLC |
| Board | ARCC's Board of Directors |
| BDC | Business development company |
| CSI | Consolidated Schedules of Investments |
| DCF | Discounted cash flow |
| Essential Services | Essential Services Holding Corp. |
| ETF | Exchange-traded fund |
| FV/AC | Fair-value-to-cost ratio |

| Term | Meaning |
|---|---|
| GAAP | Generally accepted accounting principles |
| ICA | Investment Company Act of 1940 |
| IHAM | Ivy Hill Asset Management, L.P. |
| Independent VPs | Independent valuation providers |
| NAV | Net asset value |
| NII | Net investment income |
| Performance Chart | Bloomberg total return and annualized return data (listed as "Annual Eq") for ARCC and S&P BDC Index (Ex. 2 to Rodney Decl.) |
| PIK | Payment-in-kind |
| Pluralsight | Pluralsight, LLC |
| Q3'24 10-Q | Form 10-Q of ARCC for Q3 2024, filed with the SEC on October 30, 2024 (Ex. 7 to Rodney Decl.) |
| R.Dennis | R. Dennis, *Ares Capital Corporation: The Titan of Private Credit – And A 9% Dividend,* OPPORTUNITYCOSTS.SUBSTACK.COM (Nov. 30, 2025), *available at* https://opportunitycosts.substack.com/p/ares-capital-corporation-the-titan (Ex. 6 to Rodney Decl.) |
| Reported Valuations | ARCC's fair value determinations as set forth in the Consolidated Schedules of Investments reported within ARCC's annual and quarterly financial statements filed with the SEC |
| Rodney Decl. | Declaration of Alexander J. Rodney in Support of Defendant's Motion to Dismiss |
| SDLP | Senior Direct Lending Program, LLC |
| SEC | Securities and Exchange Commission |
| Symplr | Symplr Software Inc. |

**INTRODUCTION**

For the past 20 years, Defendant Ares Capital Management LLC ("ACM") has advised and managed Ares Capital Corporation ("ARCC"), a market-leading business development company ("BDC"). ACM has a strong track record of generating attractive risk-adjusted returns for ARCC shareholders—***more than doubling*** the S&P BDC Index while Plaintiff has held stock—despite being compensated only at "typical" rates (as Plaintiff admits).

Recently, however, the private credit industry has been subject to a wave of negative publicity. Plaintiff seeks to capitalize on that wave and convert it into a claim for excessive fees under Section 36(b) of the Investment Company Act (the "ICA"). He claims that ACM is "systematically inflat[ing] the value of ARCC assets," with some unquantified, trickle-down effect on ACM's fees that caused them to be higher than they would have been without the alleged inflation. ¶1.[1] His theory fails for three reasons, each of which independently supports dismissal with prejudice.

*First*, private parties cannot pursue valuation- or fraud-based claims under the ICA. Congress addressed valuation in Section 2(a)(41) of the ICA, and delegated exclusive enforcement and rulemaking authority over that provision to the SEC. 15 U.S.C. §80a-2(a)(41). By contrast, Section 36(b) is a narrow cause of action "sharply focused" on policing the outer bounds of permissible fee structures. *Jones v. Harris Assocs.*, 559 U.S. 335, 352 (2010). Just last month, the Supreme Court rejected efforts to read new private claims into the ICA where Congress did not expressly provide for them. *FS Credit Opportunities Corp. v. Saba Cap. Master Fund*, 146 S.Ct. 1546, 1552-55 (2026).

---

[1] Unless otherwise noted, all emphases are added, and all internal citations and quotations are omitted. Citations to "¶" are to Complaint paragraphs.

*Second*, Section 36(b) claims only survive dismissal if they allege that an investment adviser "charge[d] a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining." *Jones*, 559 U.S. at 346.  Plaintiff fails that standard twice-over.  Plaintiff alleges nothing about the quality of ACM's advisory services, and he concedes that ACM's fee structure is within the "typical" industry range.  Moreover, Plaintiff fails to adequately plead any of the other four factors the Second Circuit uses to evaluate the adequacy of Section 36(b) claims under *Jones*.

*Third*, Plaintiff fails to plead the existence of any valuation impropriety, let alone systematic portfolio-wide inflation translating into such grossly excessive fees that fall outside the range of arm's-length bargaining.  As the disclosures Plaintiff relies on show, ARCC's valuation process, and ACM's role in it, fully comply with the ICA and the applicable fair-value rule (SEC Rule 2a-5).  As part of that process, ACM's valuations are reviewed by three independent non-parties—independent valuation firms; ARCC's independent Board of Directors (the "Board"), including its Audit Committee; and ARCC's independent auditor.  Plaintiff points to no deficiency in that process.  Nor does Plaintiff plead the ***amount*** of overvaluation or any theory applicable to ARCC's portfolio overall.  And each of Plaintiff's scattershot theories fail on their own terms.

Each failure is fatal; the Complaint should be dismissed in full with prejudice.

## BACKGROUND

### A.    ACM's Advice Generates Outstanding Returns for ARCC Investors.

ARCC is a publicly traded BDC, a type of investment company regulated by the ICA.  ¶24; 15 U.S.C. §80a-2(a)(48).

ARCC was established in 2004 and is the largest publicly traded BDC by market capitalization, with $31.2B in total assets as of December 31, 2025.  2025 10-K at F-5; ¶41.[2] ARCC's diversified portfolio includes 600-plus investments across 34 industries.  *See* 2025 10-K at 10, F-7-F-71; ¶48.  Its strategy "focus[es] on self-originating most of" its loans.  2025 10-K at 5.

ACM's investment advice and management have generated exceptional returns for ARCC investors; since September 2021—when Plaintiff alleges he became a stockholder, ¶20—ARCC has generated an 8.5% annualized return, ***more than doubling*** the S&P BDC Index (4.0%). Performance Chart.[3]  And over the past three years, ARCC has paid an annual dividend of $1.92/share (a 9.5%-10.6% yield).  2025 10-K at F-199.

### B.    ACM Has Been ARCC's Investment Adviser Since ARCC's Inception.

Defendant ACM is an SEC-registered investment adviser.  ¶21.  Since ARCC's inception, ACM has served as ARCC's external investment adviser pursuant to an Investment Advisory and Management Agreement (the "Advisory Agreement").  2025 10-K at 3.  ACM manages ARCC's

---

[2]    The Complaint repeatedly cites and relies upon ARCC's 2021-2025 10-Ks, Q1'24-Q1'26 10-Qs, and 2026 proxy for their truth.  *See, e.g.*, Compl. at 1 (allegations "are based on…[SEC] filings"); ¶¶8, 81-82, 114, 162-63, 166-68, 182, 191, 237 (citing 2025 10-K); ¶144 (2026 Proxy); ¶220 (data from Q1'24-Q1'26 10-Q and 10-Ks); ¶¶82, 124 (data from 2021-25 10-Ks).  Those filings are therefore incorporated by reference or are integral to the Complaint and may be considered on a motion to dismiss.  *Infra* at 8.

[3]    Annualized return calculations assume dividends are reinvested.  Rodney Decl. ¶2.  The Court may take judicial notice of publicly available stock price and financial data.  *Ganino v. Citizens Utils.*, 228 F.3d 154, 166 n.8 (2d Cir. 2000); *Dfinity Found. v. N.Y. Times*, 702 F.Supp.3d 167, 171 & n.6 (S.D.N.Y. 2023), *aff'd*, 2024 WL 3565762 (2d Cir. July 29, 2024); *Paypolitan OU v. Marchesoni*, 2022 WL 17541091, at *2 n.3 (S.D.N.Y. Aug. 26, 2022).

day-to-day operations and investment activities.  ¶¶61-62.  ACM determines the composition of ARCC's portfolio.  2025 10-K at 16.  ACM originates ARCC's investments, so ACM must identify and evaluate investment opportunities, perform due diligence, structure and negotiate loan terms, and execute transactions.  *Id.*  And ACM actively monitors each of ARCC's 600-plus investments.  *Id.* at 14.

ACM's management of ARCC has driven substantial ARCC growth; since 2021, total assets have grown 55%, from $20.1B to $31.2B.  ¶124 (citing data from ARCC's 2021 and 2025 10-Ks).  Over that same timeframe, ACM has grown the number of ARCC's portfolio companies by 56%, from 387 to 603.  2021 10-K at 13; 2025 10-K at 14.  To service that rapidly growing portfolio, ACM has increased its investment team by 59%, from 145 to 230 professionals.  2021 10-K at 4; 2025 10-K at 4.

### C. ACM Is Compensated at Industry-Standard Rates.

As compensation for its investment and management services, ACM earns management fees and incentive fees.

*Management Fee.*  ARCC pays ACM a management fee of 1.5% of total assets, which is reduced to 1.0% to the extent that ARCC's assets are financed using leverage exceeding a 1.0x debt-to-equity ratio.  ¶74; 2025 10-K at 16.  In 2025, that reduction meant ACM's management fee was 1.36% of ARCC's total assets.  *See* ¶82 ($425M management fees against $31.2B total assets).  Plaintiff admits that ACM's management fee "falls within the range of advisory fees comparable to other BDCs," which "typically" range from 1% to 2%.  ¶¶133-34.  ACM's 1.36% management fee in 2025 was well below the midpoint of that range.

*Incentive Fee.*  ARCC pays ACM an incentive fee equal to 20% of net investment income above a 1.75% quarterly (7% annualized) hurdle rate.  ¶¶75-76.  ACM earns no incentive fee unless

ARCC first exceeds the hurdle rate.  *Id.*[4]  Plaintiff also admits that ACM's incentive fee is within the "typical[]" BDC range of 17.5% to 20%.  ¶133.[5]

### D.    ARCC's Independent Board Reviews and Approves ACM's Fee Rates.

ARCC has a ten-member Board, six of whom are independent or "disinterested" pursuant to ICA Section 2(a)(19) (*i.e.*, they have no material relationship with ARCC's investment adviser or principal underwriter) (the "Independent Directors").  2026 Proxy at 4-11; ¶141.  ARCC's Board and the Independent Directors are required to review and determine whether to renew the Advisory Agreement every year.  ¶¶140, 146-47; 2025 10-K at 19-21.

As relevant here, on May 13, 2025, ARCC's Board and the Independent Directors approved the Advisory Agreement "as being in the best interests of [ARCC] and its stockholders," following a comprehensive review.  2025 10-K at 19-21.  They considered:  (i) the nature, extent, and quality of ACM's services; (ii) the advisory fees paid versus fees paid by other ACM-managed funds and comparable third-party-managed BDCs; (iii) ARCC's long- and short-term investment performance; (iv) the costs of ACM's services and ACM's profitability; (v) the potential for and sharing of economies of scale; and (vi) additional benefits to ACM and the alignment of its interests with stockholders.  *Id.*  After completing that review, the Board and the Independent Directors concluded that ACM's fee rates are "fair and reasonable in relation to the services provided."  *Id.*

---

[4]    There is a separate 20% capital gains incentive fee, which ACM has not received since 2021.  ¶¶79-82.

[5]    ACM's incentive fee is also deferred under certain circumstances.  Advisory Agreement §2(b)(iii).

**E.      ARCC's Valuation Process Involves Multiple Layers of Independent Oversight.**

ARCC's asset-valuation process is governed by SEC Rule 2a-5, which prescribes a framework for determining fair value. ¶¶63, 231; 17 C.F.R. §270.2a-5. ARCC follows ASC 820, which codifies GAAP for fair value measurement. ¶232. A substantial majority of ARCC's investments are classified as "Level 3" assets under ASC 820, meaning they do not have "readily available" market values, so "the fair value of the investments must typically be determined using unobservable inputs." 2025 10-K at 100-101; ¶66.

**1.      Consistent with SEC Rules, ARCC's Board Has Appointed ACM as Its Valuation Designee.**

Under SEC Rule 2a-5, a BDC's board may choose to delegate performance of fair value determinations to its "valuation designee." 17 C.F.R. §270.2a-5. If the board delegates, then Rule 2a-5(e) *requires* that the "valuation designee" be the BDC's investment adviser (unless the BDC has no adviser). §270.2a-5(b), (e)(4) ("Valuation designee means the investment adviser") (emphasis omitted). Consistent with Rule 2a-5, ARCC's Board has appointed ACM as its "valuation designee." ¶63. ACM performs fair value determinations each quarter for ARCC's investments across 600-plus portfolio companies. 2025 10-K at 99; *id*. at F-191 (explaining methodologies).

**2.      Independent Valuation Providers Review and Confirm Valuations.**

ARCC also retains independent third-party valuation providers ("Independent VPs") to confirm valuations. *Id*. The Independent VPs are provided "[r]elevant information related to [each] portfolio investment" and combine it with "relevant market and economic data" to "independently determine[] a range of values for the portfolio investment." *Id.* at 100. They provide their findings to ACM's valuation committee, which considers those findings to determine fair value. *Id.* The Independent VPs then review that valuation and issue a report that "confirms

6

[that] the fair value determined by [ACM] for the portfolio investment is within the range of values independently calculated by such [Independent VPs]." *Id.*

This process is overseen by both the Board and its Audit Committee, which is comprised solely of Independent Directors. *Id.*; 2026 Proxy at 30-31.

### 3. ARCC's Independent Auditor Audits ARCC's Financial Statements, Including Its Reported Valuations.

ARCC's independent auditor (KPMG) audits the financial statements, "including the consolidated schedules of investments" ("CSI"), 2025 10-K at F-2-F-4, which sets forth the "fair value" of each investment (the "Reported Valuations"), *see id.* at F-7-F-71. KPMG considers "the evaluation of the fair value of investments as a critical audit matter." *Id.* at F-2. During its annual audit, KPMG conducts several independent tests of fair value. *First*, KPMG "evaluate[s] the design and test[s] the operating effectiveness of certain internal controls over [ARCC's] process to measure the fair value of its investments." *Id.* at F-3. *Second*, KPMG tests a selection of prior valuations by comparing them with subsequent transactions in the same assets. *Id.* *Third*, KPMG engages its own "valuation professionals" to "evaluat[e] [ARCC's] estimate of fair value by developing an independent estimate of fair value," for a selection of investments, which is "based upon independently developed ranges for market yields, market multiples, and discount rate assumptions." *Id.* KPMG also uses those independent assumptions as a further test of ARCC's assumptions for the same inputs. *Id.*

Following this testing, KPMG has issued an unqualified opinion stating that ARCC's financial statements, including the CSI setting forth ARCC's Reported Valuations, "present fairly, in all material respects" ARCC's finances. *E.g., id.* at F-2 (2024-2025 financials are "present[ed] fairly").

7

**LEGAL STANDARD**

Under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Although a court must accept the truth of factual allegations, it need not credit 'a legal conclusion couched as a factual allegation.'" *N.J. Carpenters Health Fund v. Royal Bank of Scot.*, 709 F.3d 109, 120 (2d Cir. 2013). Where well-pleaded facts "do not permit the court to infer more than the mere possibility of misconduct, the complaint has...not shown...that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679.

On motion to dismiss, courts may consider documents incorporated by reference or integral to the Complaint. *Cohen v. Rosicki, Rosicki & Assocs.*, 897 F.3d 75, 80 (2d Cir. 2018). Documents are incorporated by reference where the complaint makes "a clear, definite and substantial reference to the documents," *Lipow v. Net1 UEPS Techs.*, 131 F.Supp.3d 144, 157 (S.D.N.Y. 2015), or are integral if the complaint "relies heavily upon [their] terms and effect," *Chambers v. Time Warner*, 282 F.3d 147, 153 (2d Cir. 2002). Courts may "permissibly consider documents other than the complaint for the truth of their contents if they are attached to the complaint or incorporated in it by reference." *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb*, 28 F.4th 343, 352 n.3 (2d Cir. 2022). "Where the plaintiff's allegations are contradicted by a document that the complaint incorporates by reference, the document controls." *380544 Can., Inc. v. Aspen Tech.*, 544 F.Supp. 2d 199, 215 (S.D.N.Y. 2008). Courts may also take "judicial notice of well-publicized stock prices." *Ganino*, 228 F.3d at 166 n.8.

## ARGUMENT

### I.    THE ICA DOES NOT PROVIDE A PRIVATE RIGHT OF ACTION TO CHALLENGE ASSET VALUATIONS.

As the Supreme Court clarified last month, "[t]he [ICA] comprehensively regulates investment companies" and "private parties generally cannot enforce the ICA." *Saba*, 146 S.Ct. at 1551, 1554. Instead, Congress delegated "comprehensive" enforcement authority over the ICA to the SEC. *Id.* at 1554. Congress only "expressly authorize[d] two private rights of action"—one related to "short-term profits realized by a regulated individual" (not applicable here) and Section 36(b). *Id.* at 1555. "[N]othing in the text or structure of the ICA" authorizes private enforcement of any other provision, *id.*, and certainly not an action asking the Court to determine the valuation of ARCC's 600-plus investments, as Plaintiff does here.

Section 36(b) creates a narrow fiduciary duty that is "sharply focused" on fee rates. *Jones*, 559 U.S. at 352. As the Supreme Court has explained, and as Plaintiff admits, "the test is essentially whether the ***fee schedule*** represents a charge within the range of what would have been negotiated at arm's-length." *Id.* at 344; ¶35; *accord Pirundini v. J.P. Morgan Inv. Mgmt.*, 765 F.App'x 538, 540 (2d Cir. 2019). By contrast, Congress expressly addressed valuation in a different provision of the ICA, Section 2(a)(41), which is focused on the valuation process. Congress delegated enforcement authority over that provision exclusively to the SEC. 15 U.S.C. §80a-2(a)(41). That "express provision of one method of enforcement"—by the SEC—"suggests that Congress intended to preclude others." *Saba*, 146 S.Ct. at 1555. The SEC has since promulgated Rule 2a-5 to further regulate fair valuation. 17 C.F.R. §270.2a-5. Private plaintiffs cannot use the ICA to challenge valuations. *See Verkouteren v. BlackRock Fin. Mgmt.*, 2000 WL 298255 (Table), at *2 (2d Cir. Mar. 21, 2000) ("[T]he district court properly declined" to consider claims "grounded in" other ICA provisions "rather than on the explicit right of action in Section

36(b)"); *Migdal v. Rowe Price-Fleming Int'l*, 248 F.3d 321, 329 (4th Cir. 2001) (same).  Nor can plaintiffs use "artful pleading to circumvent a bar against private actions." *Broder v. Cablevision Sys.*, 418 F.3d 187, 201 (2d Cir. 2005).[6]

Despite this, Plaintiff's Section 36(b) claim is based on the theory that ACM "has systematically inflated the value of ARCC assets to extract windfall fees."  ¶1.  In other words, Plaintiff's theory is that valuation had a trickle-down impact on fees, not that the fees are excessive.  But allegations that have "merely an incidental or speculative effect on advisory fees are ***not*** properly within the scope of Section 36(b)." *Migdal*, 248 F.3d at 329; *Strougo v. BEA Assocs.*, 1999 WL 147737, at *4 (S.D.N.Y. Mar. 18, 1999) (similar).  Indeed, the Supreme Court has recognized that it is outside the province of "a judge or jury to determine a 'fair price,'" because courts are "institutionally unsuited to gather the facts upon which economic predictions can be made, and professionally untrained to make them." *Jones*, 559 U.S. at 352-53 (quoting *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 308 (1997) & *Concord v. Bos. Edison Co.*, 915 F.2d 17, 25 (1st Cir. 1990) (Breyer, C.J.)); *accord id.* (Section 36(b) "does not require courts to engage in a precise calculation" of a "reasonable[]" rate).  The action should therefore be dismissed with prejudice.

## II.    PLAINTIFF FAILS TO PLEAD A SECTION 36(B) CLAIM UNDER THE CONTROLLING *JONES* STANDARD.

Unsurprisingly, given Plaintiff's attempt to fit a square peg in a round hole, his valuation claim fails for a second, independent reason:  he cannot state a claim under the controlling standard for Section 36(b) claims.  As the Supreme Court established in *Jones*, a Section 36(b) claim

---

[6]    As Plaintiff admits, the SEC enforces valuation rules using provisions other than Section 36(b). ¶198 n.53 (citing *In re Madison Cap. Mgmt.*, Investment Advisers Act Release No. 6948 (Feb. 25, 2026) (enforcement action under Section 203 of the Investment Advisers Act)).

requires allegations that an investment adviser "charge[d] a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining."  559 U.S. at 346; *see Pirundini v. J.P. Morgan Inv. Mgmt.*, 309 F.Supp.3d 156, 163 (S.D.N.Y. 2018) (plaintiff must "allege[] sufficient facts to plausibly support an inference that…the adviser's fee is so disproportionately large relative to the services rendered that it falls outside the range of what could be negotiated at arm's length"), *aff'd*, 765 F.App'x 538 (2d Cir. 2019).

In assessing whether a fee is "so disproportionately large," the Second Circuit looks to "the six well-established factors" identified in *Gartenberg v. Merrill Lynch Asset Mgmt.*, 694 F.2d 923, 928 (2d Cir. 1982) and endorsed by *Jones*:  (1) "the nature and quality of services provided to fund shareholders"; (2) "comparative fee structures"; (3) "the independence and conscientiousness of the [Board]"; (4) "the profitability of the fund to the adviser-manager"; (5) "economies of scale"; and (6) "fall-out benefits."  *Amron v. Morgan Stanley Inv. Advisors*, 464 F.3d 338, 344 (2d Cir. 2006) (affirming dismissal after applying *Gartenberg* factors); *Jones*, 559 U.S. at 344 & n.5. A plaintiff's burden under that test is "heavy," *Paskowitz v. Prospect Cap. Mgmt.*, 232 F.Supp.3d 498, 501 (S.D.N.Y. 2017), and claims under Section 36(b) are "particularly appropriate for dismissal…under Rule 12(b)(6)." *Krantz v. Prudential Invs. Fund Mgmt.*, 77 F.Supp.2d 559, 562 (D.N.J. 1999), *aff'd*, 305 F.3d 140 (3d Cir. 2002).

Here, each factor supports dismissal.  Plaintiff's rote "track[ing] [of] the *Gartenberg* factors" is unavailing since he fails to "indicate how or why" any factor shows that ACM's "fees [we]re 'so disproportionately large'" as to fall outside the range of arm's-length bargaining. *Yampolsky v. Morgan Stanley Inv. Advisers*, 2004 WL 1065533, at *2 (S.D.N.Y. May 12, 2004).

11

### A.    Plaintiff Alleges No Deficiency in ACM's High-Quality Services.

As *Jones* establishes, a plaintiff must show that the adviser's fees "bear[] no reasonable relationship *to the services rendered*." 559 U.S. at 346.  The services inquiry looks to whether the adviser has used its "expertise" to deliver "quality" investment advice.  *Gartenberg*, 694 F.2d at 930.  "[B]etter-than-average return[s]" show it has done so. *Id.*  Here, Plaintiff pleads no facts about how ACM's advice has impacted ARCC's performance and instead simply rehashes his overvaluation theory.  ¶¶104-05.[7]  But this District has dismissed overvaluation theories where, as here, they "make[] no specific allegation of bad investment decisions by [the adviser]" and fail to show that the fund "performed substantially worse" than its peers.  *Prospect*, 232 F.Supp.3d at 506; *accord Amron*, 464 F.3d at 344 (pleading "little, if anything, about the nature or quality of the specific services offered" means a plaintiff cannot satisfy the comparative test required by *Jones*).

### B.    Plaintiff Admits That ACM's Fees Are Comparable to Its Peers.

Plaintiff admits that ACM's sub-1.5% management fee and 20% incentive fee "fall[] within the range of advisory fees comparable to other BDCs," which are "typically…1% to 2%" and "17.5% to 20%," respectively.  ¶¶133-34.  This, too, is fatal to his claim.  As *Jones* establishes, Plaintiff must plead that ACM's fees "could not have been the product of arm's length bargaining." 559 U.S. at 346.  And where "the fees as a whole" are within industry range, they are necessarily within "the range of what arm's-length bargaining could produce" and are not "so disproportionately large." *Prospect*, 232 F.Supp.3d at 505-06; *accord Jones*, 559 U.S. at 344 n.5 (assessment is whether fees are consistent with "those paid by similar funds").

---

[7]    Nor could he, given ARCC's well-above-average returns.  *Supra* Facts.A; *see Jones v. Harris Assocs.*, 611 F.App'x 359, 361 (7th Cir. 2015) (services were high-quality where "returns (net of fees) exceeded the norm for comparable investment vehicles"); *Pirundini*, 765 F.App'x at 541 (similar).

Plaintiff nevertheless alleges that ACM's fees are not comparable to its peers because the value of ARCC's portfolio was "inflated."  ¶137.  This District has already rejected that circular reasoning.  *Prospect*, 232 F.Supp.3d at 505-06 (rejecting argument that "assets were overvalued" where fees are within industry range).  Plaintiff also offers two arguments related to payment-in-kind ("PIK") income.  ARCC holds certain PIK investments, which pay interest by capitalizing the interest into the principal, rather than in cash.  2025 10-K at 13.  PIK interest is accounted for as income when it accrues but is "generally collected upon repayment of the outstanding principal" at maturity.  *Id.* at 13, 36.  Plaintiff claims that ACM's fees are not comparable to its peers because (i) ARCC has no "look-back feature, or clawback" requiring the return of PIK income "not ultimately realized," ¶¶134-35,[8] and (ii) PIK income is included in the incentive fee calculation, *id*.  Again, this District has held that these exact arguments are "of no avail," where, as here, fee rates are within the industry range.  *Prospect*, 232 F.Supp.3d at 505-06 (rejecting allegations that (i) the "investment advisory agreement lacked a 'Lookback/Cap mechanism,'" and (ii) "payment-in-kind" was included in "calculating [the] incentive fee").

**C.      ARCC's Independent Board Reviewed and Approved ACM's Fee Rates.**

Where "disinterested directors consider the [*Gartenberg*] factors, their decision to approve a particular fee agreement is entitled to ***considerable weight***."  *Jones*, 559 U.S. at 351.  The ICA "contains an express presumption that mutual fund trustees and natural persons who do not own

---

[8]  Plaintiff does not identify a single BDC with a clawback term requiring "the adviser to return incentive fees that are based on deferred income, such as PIK interest, to account for credit losses."  ¶135.  Instead, Plaintiff speculates that clawbacks exist based on an analysis suggesting that "half" of "43 publicly traded BDCs" have a "look-back feature," not a clawback. *Id.*  Regardless, Plaintiff's allegation *admits* that half of BDCs do *not* have a "look-back."  ¶135.  Thus, Plaintiff admits that not having such a term is within the competitive range, defeating this theory as a matter of law.  *Prospect*, 232 F.Supp.3d at 505-06 (rejecting theory).

13

25% of the voting securities [in the adviser or BDC] are disinterested." *Amron*, 464 F.3d at 344 (citing 15 U.S.C. §80a-2(a)(9)). A "plaintiff's burden to overcome this presumption is a heavy one." *Id.*; *accord Hoffman v. UBS-AG*, 591 F.Supp.2d 522, 540 (S.D.N.Y. 2008).

Plaintiff concedes that six of ARCC's ten directors are "independent" under the ICA definition. ¶49. His only challenges to the Board's independence are that (i) (he says) four of ARCC's Independent Directors served on the board of other funds managed by affiliates of Ares Management Corporation ("Ares"), and (ii) the Independent Directors received compensation increases. ¶¶141, 144. Both theories are foreclosed by controlling Second Circuit precedent. *Amron*, 464 F.3d at 341-42, 345 ("serv[ing] on the board of at least *123* different Morgan Stanley funds" and receiving substantial "compensation [and] retirement benefits" was "insufficient as a matter of law" to defeat presumption of independence); *accord Migdal*, 248 F.3d at 325 (service on 22-38 T-Rowe Price-managed funds insufficient); *Verkouteren v. BlackRock Fin. Mgmt.*, 37 F.Supp.2d 256, 260-61 (S.D.N.Y. 1999) (21 funds), *aff'd*, 208 F.3d 204 (2d Cir. 2000).

Moreover, "§ 36(b) does not call for judicial second-guessing of informed board decisions." *Jones*, 559 U.S. at 352. Thus, "[a]bsent some evidence of a deficient approval process," a court should defer to "the Board's considered findings." *Pirundini*, 309 F.Supp.3d at 170. Here, Plaintiff claims that ARCC's "financial disclosures show that" the Board must have "either not adequately considered or not given sufficient weight" to his contentions as to why ACM's fees are purportedly excessive, but pleads no facts at all in support. ¶155. Such conclusory allegations that approval was based on "inaccurate and/or incomplete information" fail to meet Plaintiff's burden. *Pirundini*, 309 F.Supp.3d at 170.[9] Regardless, ARCC's 2025 10-K shows that

---

[9]   Plaintiff attempts the same theory he alleged against a different adviser of a different BDC, which shows that ***other independent boards*** approve similar fee terms. *See Siegel v. Blue Owl Technology Credit Advisors LLC*, No. 1:26-cv-05183 (S.D.N.Y.).

the Board—and the Independent Directors—considered information relevant to each of the *Gartenberg* factors before unanimously approving the Advisory Agreement and ACM's fees. *Supra* Facts.D (detailing consideration of each factor); *Pirundini*, 309 F.Supp.3d at 170 (dismissal where plaintiff relied on document describing board evaluation and alleged no facts disputing the accuracy of that description).

### D.    ACM's Profits Are Not Properly Alleged, Let Alone Shown to Be Excessive.

Plaintiff fails to say anything about ACM's profits, let alone that they were improper. Section 36(b) "does not prohibit an investment adviser from making a profit, nor does it regulate the level of profit." *In re Am. Mut. Funds Fee Litig.*, 2009 WL 5215755, at *50 (C.D. Cal. Dec. 28, 2009); *accord Gartenberg v. Merrill Lynch Asset Mgmt.*, 573 F.Supp. 1293, 1316 (S.D.N.Y. 1983) (same), *aff'd*, 740 F.2d 190 (2d Cir. 1984).  Instead, Plaintiff must allege facts showing "profit margins [were] so great that they could not have been achieved at arm's-length." *Kasilag v. Hartford Inv. Fin. Servs.*, 2017 WL 773880, at *22 (D.N.J. Feb. 28, 2017), *aff'd*, 745 F.App'x 452 (3d Cir. 2018).

Plaintiff concedes that ACM's profitability "is not publicly available," so he stacks speculation upon speculation to conclude that ACM derived a profit margin of "more than 42%" managing ARCC.  ¶¶107-11.  But profitability cannot be pled based on "average[s]" or "speculation;" it must be based on "defendants' actual costs." *Prospect*, 232 F.Supp.3d at 506. Plaintiff's only alleged fact says nothing about ACM's costs or profits from advising ARCC: Plaintiff speculates that ACM has "similar economics and margins" as ACM's parent company, Ares.  ¶¶108-09.  But Plaintiff admits that Ares manages fee-paying assets under management of $399.6B, more than 12 times the $31.2B of total assets ACM manages for ARCC.  ¶¶109, 113. Ares also operates across five segments, while ACM only services funds in the credit segment. ¶¶21, 26.  Plaintiff alleges zero facts showing that ACM's profitability matches that of Ares.  *See*

15

*Amron*, 464 F.3d at 342, 344 ("speculat[ion] that fees are high" "allege[s] nothing" as to profitability).

Regardless, a 42% profit margin is ***far below*** margins that courts have held are not excessive. *See, e.g.*, *In re Davis N.Y. Venture Fund Fee Litig.*, 2019 WL 2896415, at *14 (S.D.N.Y. May 30, 2019) (81%), *aff'd*, 805 F.App'x 79 (2d Cir. 2020); *Schuyt v. Rowe Price Prime Reserve Fund*, 663 F.Supp. 962, 979 (S.D.N.Y. 1987) (77% margin); *Chill v. Calamos Advisors*, 2018 WL 4778912, at *20 (S.D.N.Y. Oct. 3, 2018) (71%).[10]

### E.      Plaintiff Fails to Allege That ACM Achieves Economies of Scale.

To plead economies of scale, Plaintiff must allege that "the per unit cost of performing [ARCC's] transactions decreased as the number of transactions increased." *Amron*, 464 F.3d at 345; *Pirundini*, 309 F.Supp.3d at 166 (without cost allegations, "there is no way to determine whether any economy of scale even existed"). Plaintiff must also allege that any economies of scale were "not sufficiently shared with the Fund and its shareholders." *Pirundini*, 309 F.Supp.3d at 166.

Plaintiff fails to do either. He makes "no allegations regarding the costs of performing fund transactions," so he has failed to allege economies of scale. *Amron*, 464 F.3d at 345. Plaintiff alleges only that ARCC's gross assets have increased by 55% since 2021, while fees have increased by 53%. ¶129. But "[m]ere assertions that fees increased with the size of the Funds are not enough to establish…economies of scale." *In re Scudder Mut. Funds Fee Litig.*, 2007

---

[10] Plaintiff's allegation that "advisory firm profitability" ranges from "25%…to 40%" is based on data about personal *financial* advisers. ¶110 & n.31. Those studies say nothing about the profitability of "adviser-managers of similar funds"—private credit BDCs—so they are not "probative at all." *Kalish v. Franklin Advisers*, 742 F.Supp. 1222, 1237 (S.D.N.Y. 1990).

WL 2325862, at *16 (S.D.N.Y. Aug. 14, 2007); *In re Goldman Sachs Mut. Funds*, 2006 WL 126772, at *9 (S.D.N.Y. Jan. 17, 2006).

Regardless, Plaintiff admits that ARCC's Level 3 assets "require active monitoring and valuation," ¶103, meaning that each additional investment requires incremental resources by ACM. ARCC's 10-Ks, from which Plaintiff pulls his asset and fee growth figures, also show that over the same timeframe, the number of ARCC investments and ACM's investment professionals have grown ***faster*** than assets (and fees). *Supra* Facts.B (56% growth in the number of ARCC portfolio companies and 59% increase in the number of ACM investment professionals). That data refutes Plaintiff's speculation that economies of scale exist here. *See Kennis v. Metro. W. Asset Mgmt.*, 2019 WL 4010747, at *32 (C.D. Cal. July 9, 2019) ("[I]nvesting over $70[B] is far more difficult, and requires far more resources, personnel, technology, and infrastructure, than investing sums less than $10[B] (even if the strategy remains substantially the same).").[11]

### F.    Plaintiff Alleges No Fall-Out Benefits Received by ACM.

Fall-out benefits are "collateral benefits that accrue to the adviser because of its relationship with the mutual fund." *Prospect*, 232 F.Supp.3d at 506-07. To plead "fall-out benefits," Plaintiff must allege that ACM earned a ***profit*** from ventures only made possible because of its relationship with ARCC. *Id.*; *Mintz v. Baron*, 2009 WL 735140, at *3 (S.D.N.Y. Mar. 20, 2009); *Krinsk v. Fund Asset Mgmt.*, 715 F.Supp. 472, 494 (S.D.N.Y. 1988) ("Fall-out benefits are *indirect profits* to [the adviser] attributable in some way to the existence of the Fund."), *aff'd*, 875

---

[11]    Moreover, as the Complaint acknowledges, there is a management fee discount for leverage above a 1.0x debt-to-equity ratio. ¶74. Plaintiff ignores that this feature is a breakpoint that shares any potential benefits of scale with stockholders by reducing fees when the fund's asset base grows through leverage.

F.2d 404 (2d Cir. 1989).  Plaintiff must also plead the "***amount***" of that profit.  *Hoffman*, 591 F.Supp.2d at 539.  Plaintiff fails to do either.

*First*, Plaintiff alleges that ACM receives unspecified "expense reimbursements" as a fall-out benefit.  ¶¶69-70, 116, 121.  That theory fails because "reimburs[ment] for expenses actually incurred...produce[s] no profit," *Prospect*, 232 F.Supp.3d at 506, and is therefore not a fall-out benefit.

*Second*, Plaintiff alleges that ACM obtained "access to investment opportunities" and "benefits from co-investment arrangements…across Ares[]-affiliated vehicles."  ¶¶116-20.  But Plaintiff fails to plead any amount of profit ACM gained via these opportunities, which fails.  *Prospect*, 232 F.Supp.3d at 506-07 ("profit" required); *Hoffman*, 591 F.Supp.2d at 539 ("amount" required).  And Plaintiff also fails to allege these benefits arose from ACM's relationship with ARCC and would not have existed but for ACM's advisory relationship with ARCC.  To the contrary, he says that ***Ares*** "originates deals centrally and allocates them across…affiliated vehicles," generating supposed benefits for ACM.  ¶117.  A benefit ACM derived from Ares—not ARCC—is not a fall-out benefit.  *See Prospect*, 232 F.Supp.3d at 506-07 (fall-out benefits must "accrue to the adviser because of its relationship with the…fund").

## III.    PLAINTIFF FAILS TO ALLEGE ANY UNDERLYING OVERVALUATION.

Setting aside that Plaintiff cannot pursue a claim for overvaluation under Section 36(b), Plaintiff's claim must independently be dismissed because he fails to allege that ACM "systematically inflated the value of ARCC's assets to extract windfall fees."  ¶1.  Fiduciary duty claims alleging "misrepresent[ations]" of aspects of a fund "to line [the defendant's] own pockets" sound in fraud and must satisfy Rule 9(b)'s particularity requirements.  *Fernandez v. UBS AG*, 222 F.Supp.3d 358, 386 (S.D.N.Y. 2016); *see Rahl v. Bande*, 328 B.R. 387, 412 (S.D.N.Y. 2005) ("[Rule 9(b)'s] heightened pleading standard is applicable to breach of fiduciary claims…when

18

the breach is premised on…fraudulent conduct.").  Overvaluation is a fraud theory, so in other contexts where—unlike here—a private right of action exists, a plaintiff must "specif[y]…what loans" were overvalued and "at what times, and in what amounts" to survive a motion to dismiss. *Denny v. Barber*, 576 F.2d 465, 469 (2d Cir. 1978); *accord Binn v. Bernstein*, 2020 WL 4550312, at *30 (S.D.N.Y. July 13, 2020) (dismissal where plaintiff failed to "allege what method of valuation [d]efendants misused or should have used," "disparity between the reported value and any objective standard of market value," or "irregularity or error in the calculation"), *adopted by* 2020 WL 4547167 (S.D.N.Y. Aug. 6, 2020).

Plaintiff's overvaluation claim fails for three independent reasons.

### A.      Plaintiff Fails to Allege Any Violation of the ICA's Fair Valuation Rules.

Plaintiff claims that ACM inflated the fair value of ARCC's assets, but as Plaintiff admits, the ICA already prescribes a comprehensive process for asset valuation.  ¶¶231-32.  ICA Section 2(a)(41) requires that the fair value of securities for which market quotations are not readily available be "determined in good faith."  15 U.S.C. §80a-2(a)(41).  The SEC's Fair Value Rule (Rule 2a-5) operationalizes this provision through a ***process-based framework***—it requires "assessing and managing material risks associated with fair value determinations; selecting, applying, and testing fair value methodologies; and overseeing and evaluating any pricing services used."  SEC, Release No. IC-34128 at 8 (Dec. 3, 2020); *see* 17 C.F.R. §270.2a-5 (codifying these requirements).  The ICA does not regulate outputs of that process—nor would such a regulatory focus make sense, as "valuing securities for which no current market exists involves the exercise of judgment."  *In re Allied Cap. Corp. Sec. Litig.*, 2003 WL 1964184, at *1, *4 (S.D.N.Y. Apr. 25, 2003); *accord Star Equity Fund v. Firsthand Cap. Mgmt.*, 2026 WL 933296 (D. Md. Apr. 7, 2026) (dismissing overvaluation claims because valuation decisions are "inherently subjective").

19

Consistent with Rule 2a-5's requirements, ARCC follows a multi-step valuation process, with several layers of independent oversight:  (1) Independent VPs independently calculate a valuation range for ARCC's Level 3 assets based on relevant asset information and economic data, and then review ACM's fair value determinations to ensure they are within range;[12] (2) ARCC's independent Board and Audit Committee oversee that process; and (3) ARCC's independent auditor KPMG audits ARCC's financial statements, including the CSI setting forth ARCC's Reported Valuations.  *Supra* Facts.E.  KPMG considers valuations a "critical audit matter" and performs several independent tests, including (i) evaluating the design and effectiveness of certain of ARCC's internal controls over fair value determinations, (ii) comparing a selection of prior valuations against subsequent transactions in the same assets, and (iii) engaging independent valuation professionals to "develop[] an independent estimate of fair value" of a selection of investments "based upon independently developed ranges for market yields, market multiples, and discount rate assumption."  *Supra* Facts.E.3; 2025 10-K at 99-100, F-2-F-3.

Plaintiff alleges no deficiencies in this valuation ***process***.  Instead, he alleges that the valuations must be overstated because ACM has an "inherent conflict" of interest since it both values ARCC's assets and earns fees derived, in part, from those values.  *E.g.*, ¶4.  But courts have long considered "the mere showing of a conflict of interest" to be "insufficient" to plead a Section 36(b) claim.  *In re Franklin Mut. Funds Fee Litig.*, 478 F.Supp.2d 677, 683 (D.N.J. 2007); *accord Green v. Nuveen Advisory Corp.*, 295 F.3d 738, 743 (7th Cir. 2002) ("[T]he existence of a potential conflict like the one plaintiffs assert…does not violate ICA § 36(b).").  An alleged conflict is especially insufficient here, because it arises from Rule 2a-5.  The SEC—after carefully

---

[12] Plaintiff claims that Independent VPs "do[] not independently verify the information…receive[d]" from ACM, but alleges no deficiency in that information.  ¶230.

considering investment adviser-conflict risk, 86 Fed. Reg. 748, 782-83—authorized the Board to appoint a "valuation designee," and *requires* that if it chooses to do so, the designee must be the investment adviser (unless there is no adviser). 17 C.F.R. §270.2a-5(b), (e)(4). Plaintiff's "inherent conflict" theory is contrary to the SEC's considered judgment. *See In re Overstock Sec. Litig.*, 2020 WL 5775845, at *10 (D. Utah Sept. 28, 2020) ("Complying with SEC rules does not demonstrate deception or manipulation.").

### B. Plaintiff's Disconnected Theories Do Not Plausibly Plead "Systematic[]" Overvaluation.

Rather than plead a violation of the ICA's fair value rules, Plaintiff adopts a kitchen-sink approach, asserting various "overvaluation" theories, unrelated to the ICA (or each other). These theories do not support "systematic[] inflat[ion]" or "grossly excessive" fees for three reasons. ¶¶1, 4.

#### 1. Plaintiff Fails to Plead the Amount of the Purported Overvaluation.

A plaintiff must "specif[y]" the "amount[]" of overvaluation. *Denny*, 576 F.2d at 469. Plaintiff pleads no amount of overvaluation or any purported alternative "correct" measure of ARCC's assets. That alone requires dismissal. *Allied*, 2003 WL 1964184, at *4-5 (dismissing where plaintiff failed to allege the "extent of any such overvaluation").

#### 2. Plaintiff Fails to Plead Fund-Wide Overvaluation.

Plaintiff's theory is one of "systematic[] inflat[ion]," ¶1, so he must allege how his asset-specific claims show the existence of fund-wide overvaluation. *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004) (affirming dismissal because it was "wholly unclear why data relating to four facilities can be deemed representative of…115 other facilities, or material to the company[] overall"); *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank,* 11 F.4th 90, 105 (2d Cir. 2021) ("a single branch…cannot alone establish" an alleged "scheme"); *In re Hutchinson*

21

*Tech. Sec. Litig.*, 536 F.3d 952, 959-60 (8th Cir. 2008) (anecdotes "about specific plants" insufficient to allege companywide scheme); *Bondali v. Yum! Brands*, 620 F.App'x 483, 489 (6th Cir. 2015) (scattered incidents "hardly [reflect] a companywide" issue).

Here, Plaintiff identifies, at most, five assets (Symplr, Pluralsight, two PIK investments, and Ivy Hill Asset Management ("IHAM")) that he says were overvalued. ¶¶191, 200-02, 212-18. Plaintiff does not even try to connect those allegations to the valuations for the rest of ARCC's 600-plus investments.

- Plaintiff challenges the valuations of Symplr and Pluralsight, claiming that those assets should have been placed on "non-accrual" status. ¶¶201-02. Plaintiff does not allege that ARCC's 600-plus other assets should have been placed on non-accrual.

- Plaintiff's allegations about PIK investments extend only to PIK-bearing assets, which generate just "15.2% of [ARCC's] investment income." ¶96. Plaintiff does not allege that his PIK theories apply to the remaining 85% of ARCC's portfolio.

- IHAM represents just 8.3% of ARCC's portfolio value. 2025 10-K at 10. Plaintiff offers no explanation as to how his IHAM theories apply to the remaining 91.7% of ARCC's portfolio.

In each case, Plaintiff does not allege **why** or **how** his isolated examples could plausibly be "representative" of ARCC's portfolio as a whole. *Rombach*, 355 F.3d at 174; *Allied*, 2003 WL 1964184, at *5 (dismissing overvaluation claim where plaintiff disputed valuations of only "a small proportion of [defendant's] holdings").

### 3. Independent Review Makes Overvaluation Implausible.

In addition to the review of valuations by Independent VPs, ARCC's financial statements, including the CSI setting forth ARCC's Reported Valuations, were independently audited by KPMG. 2025 10-K at F-2-3; *supra* Facts.E.3. As relevant here, in 2024 and 2025, KPMG concluded that ARCC's financial statements, including the CSI, "present fairly, in all material respects, the financial position of [ARCC]." 2025 10-K at F-2. Signoff by an independent auditor "undermine[s]" any inference of inflated valuations. *Woolgar v. Kingstone Cos.*, 477 F.Supp.3d

22

193, 228 (S.D.N.Y. 2020) (collecting authority); *see Kushner v. Beverly Enters.*, 317 F.3d 820, 829 (8th Cir. 2003) (that "outside auditors did not question" defendant's accounting was "telling"). Nor is there any allegation that ARCC restated its audited financials, which "further negat[es] any [such] inference." *Kuriakose v. Fed. Home Loan Mortg. Corp.*, 897 F.Supp.2d 168, 181 (S.D.N.Y. 2012*), aff'd*, 543 F.App'x 72 (2d Cir. 2013); *accord In re Marsh & Mclennan Cos. Sec. Litig.*, 501 F.Supp.2d 452, 477 (S.D.N.Y. 2006).

### C.     Plaintiff's Disconnected Theories Also Fail on Their Own Terms.

Plaintiff's claim further fails because his theories individually lack merit.

**PIK.**  ARCC holds certain investments that pay PIK interest, which is accounted for as income when it accrues and is generally collected at maturity.  *Supra* §II.B.  Plaintiff's theories about ARCC's PIK investments are entirely speculative.

*First*, Plaintiff claims that collecting fees on PIK income is improper, as some PIK investments were marked down and he speculates that accrued PIK interest might not be collected at maturity.  ¶¶212-20.  This District has rejected that exact theory, holding that it is "of no avail to" plaintiffs whether the "parties included payment-in-kind income in net investment income for purposes of calculating [the] incentive fee."  *Prospect*, 232 F.Supp.3d at 505-06.  Regardless, Plaintiff admits that ARCC's supposed inability to collect PIK interest at maturity "has not yet been proven"—*i.e.*, that his theory is speculative.  ¶158.  And while Plaintiff alleges that ARCC's PIK income is higher than its peers, ¶96, the very next sentence of the source he incorporates notes that "a significant portion of this is 'structured PIK'…not 'distress[ed] PIK' from borrowers who cannot pay cash," R.Dennis, *ARCC: The Titan of Private Credit* at 10 (emphasis omitted) ("R.Dennis") (incorporated by ¶96, n.26).  "Distinguishing between these two [types of PIK] is vital" because "structured PIK" is not indicative of distressed debt, R.Dennis at 10; "a majority of

23

its PIK income was structured at the time of origination for performing credits with good growth prospects," ¶158.

*Second*, Plaintiff claims that mark-downs of some PIK investments mean they were historically overvalued and should have been marked down earlier.  ¶214 (alleging June 2025 valuation of Aventine was too high because ARCC marked down the loan "***the following quarter[]***").  But Plaintiff needs to plead "why the impairment…should have been recognized" at the time of the challenged valuation.  *City of Omaha v. CBS Corp.*, 2010 WL 1029290, at *9 (S.D.N.Y. Mar. 16, 2010).  He fails to do so, and instead "simply seize[s] upon disclosures made in later annual reports and allege[s] that they should have been made in earlier ones," which is impermissible "fraud by hindsight."  *Denny*, 576 F.2d at 470; *Diabat v. Credit Suisse Grp.*, 2024 WL 4252502, at *32 (S.D.N.Y. Sept. 19, 2024) ("Plaintiff's argument collapses to merely a quarrel with [defendant's] inability to accurately predict the future.").[13]

*Third*, Plaintiff alleges that ARCC's "increased reliance on PIK" has caused ARCC to experience a "cash shortfall."  ¶165.  But Plaintiff alleges no connection between ARCC's cash position and the fees it pays ACM.  Regardless, that allegation is contradicted by the documents incorporated into Plaintiff's complaint, so it must be rejected.  *See Rios v. Max Mara USA*, 2025 WL 66502, at *10 (S.D.N.Y. Jan. 10, 2025); *380544 Can.*, 544 F.Supp.2d at 215.  ARCC's cash balance ***increased 7.5%*** in 2025 to $924M, up from $860M at the end of 2024.  2025 10-K at

---

[13]   Likewise, Plaintiff disputes Essential Services's valuation because its mark "declined only modestly" when the investment converted to a PIK structure, but pleads no facts showing that the revised mark was wrong.  ¶216.

F-159.  And its 2025 cash balance was ***64% higher*** than the $564M it held at the end of 2023. *Id.*[14]

Plaintiff tries to manufacture the appearance of a cash shortfall through misleading comparisons of PIK income to net investment income ("NII").[15]  *See* ¶¶10, 11, 97, 157, 162 (alleging PIK income was "34% of ARCC's NII" in 2025); ¶¶165, 168 ("[e]xcluding IHAM and SDLP, 51% of ARCC's NII is PIK").  That comparison is misleading because it compares ***gross*** revenue from PIK investments to ***net*** profit from all investments; it "compares apples to oranges."  *Pub. Serv. Co. of N.M. v. FERC*, 832 F.2d 1201, 1218-19 (10th Cir. 1987) (rejecting argument conflating net and gross figures).  Instead, when comparing apples to apples (gross PIK income to gross investment income), PIK income comprises "15.2% of [ARCC's] investment income" (as Plaintiff admits elsewhere), ¶96, not 34% or 51%.

**IHAM Valuation.**  One of ARCC's investments is IHAM, an SEC-registered investment adviser that manages $14.6B across 23 vehicles.  ¶54.  IHAM earns fee income from managing those vehicles ($52M in 2025) and has $3.1B in assets invested in certain of those vehicles, which earn investment income ($282M in 2025).  2025 10-K at 76.  ARCC wholly owns IHAM and receives dividends as its sole equity holder.  *Id.* at 77.

Plaintiff alleges that ARCC overvalued IHAM by marking the fair value of "its equity investment in IHAM at approximately 14% above IHAM's book value" (*i.e.*, IHAM's assets minus liabilities).  ¶191.  But "[t]he suggestion that the book value of the shares is any measure of their actual value is clearly fallacious," *Borg v. Int'l Silver Co.*, 11 F.2d 147, 152 (2d Cir. 1925) (Learned

---

[14]  Plaintiff ignores many cash sources, including the cash ARCC collects when PIK investments mature.  For example, in 2025, ARCC collected $280M in PIK interest ($131M) and dividends ($149M).  2025 10-K at F-159.

[15]  NII measures ARCC's *profit* on its investments after accounting for costs associated with ***all*** its investments.  2025 10-K at F-6.

Hand, J.); "[t]here is nearly complete agreement that book value does not accurately represent the fair value of corporate assets," *In re Valuation of Common Stock of Libby, McNeill & Libby*, 406 A.2d 54, 67 (Me. 1979).  ARCC does not value IHAM using book value; it uses a discounted cash flow ("DCF") analysis, 2025 10-K at F-192, an approach Plaintiff does not allege was improper.

**Sales to IHAM/SDLP.**  Plaintiff alleges that ARCC "transfer[s] riskier or underperforming assets to IHAM and SDLP,[16] which has the effect of making ARCC's reported metrics appear stronger."  ¶12.  For starters, Plaintiff does not plead that ARCC ever transferred assets to SDLP.  And Plaintiff alleges only that ARCC "sold $3.7 billion of loans to IHAM."  ¶185.  Plaintiff fails to specify "what loans, at what times, and in what amounts were 'risky'" or underperforming, which requires dismissal of this theory.  *Denny*, 576 F.2d at 469.  Nor could Plaintiff plausibly plead that ARCC is transferring "lower-quality assets to IHAM" or SDLP.  ¶185.  If that were true, you would expect IHAM and SDLP to perform poorly after being saddled with those assets.  But the incorporated financials show the opposite.  In 2025, IHAM paid a $292M cash dividend to ARCC, a *17.2% yield* against the amortized cost of ARCC's equity investment in IHAM.  2025 10-K at 77.[17]  And SDLP generated $145M in interest income in 2025, a *13.2% yield*.  *Id.* at 81-82.  Both investments significantly outperformed the 10.0% yield of ARCC's broader portfolio.  *See id.* at 84.

**Non-Accrual.**  To show overvaluation of a given asset, Plaintiff must do more than plead some factor indicating distress; he must "allege that [defendant] did not take that factor into account."  *Allied*, 2003 WL 1964184, at *4.  Plaintiff alleges that Symplr was "distressed," but admits that ARCC "marked down" Symplr, ¶202, conceding the "distress" was accounted for.

---

[16]  SDLP is a joint venture investment partially owned by ARCC.  2025 10-K at 9.

[17]  ARCC also lends to IHAM at a 10.3% interest rate ($8M in 2025).  *Id.*

26

Moreover, "incremental" write-downs weigh against any inference of intentional overvaluation. *Plumbers & Steamfitters Loc. 773 Pension Fund v. Can. Imperial Bank of Com.*, 694 F.Supp.2d 287, 302 (S.D.N.Y. 2010).

Plaintiff tries to plead around this by alleging that Symplr should have been placed on "non-accrual" status, ¶202, an ***accounting*** treatment that applies to loans for which payments are "past due 30 days" or "there is reasonable doubt that principal or interest will be collected in full," 2025 10-K at F-162. But accounting practices are open to "a range of 'reasonable' treatments," *Harris v. AmTrust Fin. Servs.*, 135 F.Supp.3d 155, 171 (S.D.N.Y. 2015), *aff'd*, 649 F.App'x 7 (2d Cir. 2016), so Plaintiff must plead "specific examples of fraudulent accounting practices," *Marsh*, 501 F.Supp.2d at 477. Here, Plaintiff pleads no facts demonstrating that non-accrual treatment was appropriate, let alone required. Nor does Plaintiff challenge KPMG's clean independent audit, *supra* §III.B.3, which defeats Plaintiff's speculation that ARCC's accounting approach was improper. *In re JP Morgan Chase Sec. Litig.*, 2007 WL 950132, at *13 (S.D.N.Y. 2007) (failure to allege restatement of audited financials shows that "reasonable accountants could differ as to" accounting judgment—"an inference that defeats plaintiffs' claim[s]"), *aff'd*, 553 F.3d 187 (2d Cir. 2009).

Plaintiff also alleges that two Pluralsight loans had a "striking valuation disparity" in Q1 2026, ¶200, but fails to allege that the two loans "were comparable." *Allied*, 2003 WL 1964184, at *4. Loans with different interest rates are not comparable. *See First Fed. Sav. & Loan Ass'n of Temple v. United States*, 694 F.Supp. 230, 244-45 (W.D. Tex. 1988) ("economic distinction between two loans" is based on "a variety of factors including interest rate, term, seasoning, principal amount…etc."), *aff'd*, 887 F.2d 593 (5th Cir. 1989). Here, Plaintiff focuses on the first lien status and similar origination and maturity dates of the Pluralsight loans, ¶200, but ignores

27

that the loans had different interest rates when initially acquired—12% on the lower value loan and 9% on the near-par loan.  Q3'24 10-Q at 13.  That significant interest rate difference shows the loans are not plausibly comparable.  *See Temple*, 694 F.Supp. at 244-45.

**Share Price.**  Plaintiff alleges that "[f]or the last several months, ARCC's common stock has traded at a near 10% discount" to its reported net asset value ("NAV"), so ARCC's NAV must be overstated.  ¶¶93, 95.  But "[NAV] does not control the price of shares in closed-end funds. Instead, market forces determine share price."  *I. Meyer Pincus & Assocs. v. Oppenheimer*, 1990 WL 161016, at *1 (S.D.N.Y. Oct. 15, 1990), *aff'd*, 936 F.2d 759 (2d Cir. 1991).  Indeed, "shares of closed-end funds ***generally*** trade at a 'discount' from or a 'premium' to [NAV/]share."  *Id.*; *accord Eaton Vance Sr. Income Tr. v. Saba Cap. Master Fund*, 2024 WL 4579652, at *1 (Mass. Sup. Ct. Oct. 21, 2024).  Nevertheless, ARCC has, in fact, regularly traded at a ***premium*** to NAV. *See* 2025 10-K at 58 (premium throughout 2024).  Under Plaintiff's theory, that would imply the assets were ***undervalued***, rendering his speculation about overvaluation implausible.

**Risk.**  Plaintiff asserts that various investments or aspects of ARCC's strategy—such as ARCC's exposure to equity, software, or leverage—are "risk[y]."  *See* ¶¶182-83 (equity "riskier" than debt);  ¶59  (software  concentration  increases  overvaluation  risk);  ¶237 ("understated…exposure  to  software");  ¶187  ("higher  levels  of  leverage"  increase  "risk profile").[18]   But Plaintiff does not plead ***how*** his "risk" allegations show overvaluation. Regardless, alleging that investments are "risky," without more, fails as a matter of law.  *Denny*, 576 F.2d at 469 ("the simple use of the epithet 'risky' is no better than a mere conclusory allegation").

---

[18]   ARCC disclosed the assets SDLP held.  2025 10-K at Ex. 99.2.

**Price Smoothing.** Plaintiff argues that two statistics about ARCC's portfolio did not vary enough over time, suggesting that ARCC "smooths" its valuations. ¶¶203-07 (referring to weighted average credit grade and ARCC's fair-value-to-cost ratio ("FV/AC")). But Plaintiff does not explain *how* alleged "smoothing" causes (or reveals) overvaluation, let alone in *what amount*. *See Binn*, 2020 WL 4550312, at *30 ("Plaintiffs do not allege what method of valuation [d]efendants misused or should have used, any disparity between the reported value and any objective standard of market value…or any other facts to support their conclusion [of overvaluation]."); *Global Beauty Grp. v. Visual Beauty*, 2018 WL 840102, at *2 & n.4 (S.D.N.Y. Feb. 12, 2018) (similar).

Moreover, Plaintiff does not plausibly say how much those statistics *should* have varied. Plaintiff offers a benchmark comparison for only one of the statistics (FV/AC), but that comparison is to two exchange-traded funds ("ETFs") he calls "public market proxies." ¶204. Plaintiff never explains why these ETFs that track indices of *market traded* loans/preferred equity are comparable to ARCC's *private* investments. Since Plaintiff offers no support for his comparison, it must be rejected. *See Pirundini*, 309 F.Supp.3d at 164 ("no facts [were] even alleged as to why those 291 mutual funds were selected to be compared with the Fund in the first instance").

## CONCLUSION

Thus, the Court should dismiss the action with prejudice.

Date:  July 27, 2026                          Respectfully submitted,

                                              /s/ *Sandra C. Goldstein*
                                              Sandra C. Goldstein, P.C.
                                              Alexander J. Rodney, P.C.
                                              Jacob M. Rae
                                              KIRKLAND & ELLIS LLP
                                              601 Lexington Avenue
                                              New York, NY 10022
                                              Telephone: (212) 446-4779
                                              sandra.goldstein@kirkland.com
                                              alexander.rodney@kirkland.com
                                              jacob.rae@kirkland.com


                                              *Counsel for Ares Capital Management LLC*

30

## CERTIFICATION OF COMPLIANCE

Pursuant to Local Civil Rule 7.1(c), I hereby certify that the foregoing memorandum complies with the word count limitation as it contains 8,720 words, excluding parts of the memorandum otherwise exempt.


Dated: July 27, 2026
       New York, New York          */s/ Sandra C. Goldstein*
                                   Sandra C. Goldstein, P.C.