UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARTIN SIEGEL,<br><br>Plaintiff,<br><br>v.<br><br>ARES CAPITAL MANAGEMENT LLC,<br><br>Defendant. | No. 1:26-cv-04371<br><br>**VERIFIED AMENDED COMPLAINT** |

Plaintiff Martin Siegel ("Plaintiff"), by his undersigned counsel, brings this action for the benefit of Ares Capital Corporation ("ARCC" or the "Fund") against Ares Capital Management LLC ("Defendant") pursuant to Section 36(b) of the Investment Company Act of 1940 (the "ICA"), 15 U.S.C. § 80a-35(b). The following allegations are based on knowledge as to Plaintiff and Plaintiff's own actions, and on information and belief as to all other matters, based on the investigation of Plaintiff's counsel, which included, among other things, a review and analysis of public information provided by ARCC, public financial information and media reports, and other publicly available materials. Plaintiff believes that a reasonable opportunity for discovery will yield additional substantial evidentiary support for the allegations herein.

## NATURE OF THE ACTION

1. Defendant is the investment adviser of ARCC. In that role, Defendant selects ARCC's investments and asset allocation, decides when to buy and sell, and manages portfolio risk and cash flow. Defendant also serves as ARCC's valuation designee who determines the fair value of ARCC's portfolio investments. In its dual role as adviser and valuation designee, Defendant has determined fair values for ARCC's assets that did not reflect the prices independent

market participants would have paid, and received fees calculated on those values in breach of its fiduciary duties under Section 36(b) of the ICA. ARCC's stockholders suffer as a result.

2. ARCC is a management investment company treated as a business development company ("BDC") under the ICA. Unlike investment funds that buy and sell publicly traded stocks with readily available market prices, ARCC holds loans to private companies whose value must be estimated. Under ARCC's investment advisory and management agreement ("Investment Advisory Agreement"), Defendant manages ARCC in exchange for advisory fees calculated on ARCC's gross assets and pre-incentive fee net investment income. Those metrics depend in significant part on Defendant's own valuation judgments and accrual-based income recognition practices. As a result, when Defendant assigns higher values to ARCC's assets, delays markdowns or recognizes additional non-cash income, ARCC—and its stockholders—pay Defendant higher fees.

3. Section 36(b) of the ICA imposes a fiduciary duty on investment advisers to ensure that the compensation they receive from an investment company is not excessive. Defendant breached that fiduciary duty here by receiving investment advisory fees from ARCC that are so disproportionately large that they bear no relationship to the value of the services provided by Defendant and could not have been the product of arm's-length bargaining.

4. Defendant's fees were grossly excessive because Defendant (i) assigned inflated values to ARCC's assets and investment income and then collected inflated fees based on those inflated valuations; and (ii) over multiple years, consistently received management fees calculated on ARCC's gross assets—at a contractual rate of 1.50% up to 1.0x debt-to-equity and 1.00% above that threshold, resulting in an effective 2025 base management fee rate of approximately 1.48% of the contractual fee base—as well as incentive fees of 20% of ARCC's pre-incentive fee net

investment income despite the fact that ARCC's assets have increased by more than 55% in the past five years, alone, and by about 228% in the last ten years. This type of static percentage-based fee structure against the backdrop of a fund's substantial asset growth results in the exact type of excessive fees that Congress intended to prevent in enacting Section 36(b).[1]

5. The Investment Advisory Agreement's fee structure fosters excessive fees because (i) there is no sliding scale for advisory fees as assets increase; and (ii) an inherent conflict of interest exists having Defendant serve as the entity that both values ARCC's assets and chooses its portfolio assets (including assets that ultimately result in fees to Defendant even when those assets are ultimately not realized by the Fund).

6. The inflated values assigned to ARCC's portfolio of assets are underscored by public reports that Defendant and its parent, Ares Management Corporation ("Ares Management"), may be overvalued by about 10%. Additionally, investment management company Vulcan Value Partners released its first-quarter 2026 investor letter on April 22, 2026, which identified Ares Management as a material detractor from performance, noting that publicly traded stock of Ares Management declined 6.2% in 2025 and 31.6% during the first quarter of 2026 as a result of Ares Management's exposure to software and related artificial intelligence ("AI") fears.

7. ARCC's overconcentration in software and technology investments further contributes to the overvaluation of the Company's portfolio. On April 2, 2026, Morgan Stanley analysts reported that they expect loans to companies in the software sector to result in above-average defaults of 8% in private credit loans and 5.5% annual defaults in broadly syndicated loans from the second half of 2026 through the first half of 2027 that will result in subpar returns and

[1] *See* 1970 U.S.C.C.A.N. 4897, 4902 (noting problems that arise due to the economies of scale attributable to dramatic growth of a fund, that there is "a desirable tendency on the part of fund managers to reduce their effective charges as the fund grows in size").

sluggish assets under management ("AUM") growth. ARCC's portfolio companies have a higher exposure to software than any other industry, reporting a 24% exposure as of December 31, 2025 based on the Global Industry Classification Standard ("GICS"), an industry analysis framework developed by MSCI (Morgan Stanley Capital International) and S&P Dow Jones Indices. But Ares Management is wrongly downplaying its *actual* exposure to software investments in ARCC and Ares Management's other BDCs as fears spread that AI could decimate the software industry.

8. *The Wall Street Journal* recently conducted an independent analysis of the software exposure of four of the largest private credit fund managers, including Ares Management, using sector tags from data provider PitchBook and its own analysis, and determined that each of the fund managers understated their funds' exposure to software.[2] *The Wall Street Journal* concluded that while ARCC reported a 23.8% software exposure as of December 31, 2025, the Fund's actual exposure was nearly 30%. This means that ARCC's software exposure is materially higher than reported and Defendant is understating the risk of those investments.

9. ARCC's software exposure does not stop at 30% once its affiliated vehicles are considered. Those vehicles include ARCC's wholly owned portfolio company and registered investment adviser, Ivy Hill Asset Management, L.P. ("IHAM"), which acts as a strategic aggregator, and its joint venture vehicle, Senior Direct Lending Program ("SDLP"), through which ARCC co-invests with other investors to make larger loans without heavy syndication. Although ARCC's public filings do not separately report IHAM's and SDLP's software exposure, software

---

[2] *See* Jack Pitcher and Matt Wirz, *Private Credit's Exposure to Ailing Software Industry is Bigger than Advertised*, WALL STREET JOURNAL (Mar. 29, 2026), *available at* https://www.wsj.com/finance/investing/private-credits-exposure-to-ailing-software-industry-is-bigger-than-advertised-d80da378.).

and technology investments make up a significant 63% of ARCC's net asset value ("NAV") on a consolidated basis when IHAM and SDLP are included.

10. ARCC's software exposure is an important consideration when evaluating whether Defendant's fair value determinations on those investments are overstated. According to SS&G Global Intelligence, median software loan bid prices declined to 86% of par in mid-March 2026 from 92% of par in February 2026. With ARCC's Software & Services investments marked at roughly par,[3] simply marking these investments to market—as required—would reduce ARCC's NAV by approximately 9%. This likely even understates downside to NAV given that about 29% of ARCC's software exposure is second lien, subordinated debt, or equity, and 30% or more of investments were originated during the prior zero interest rate policy era that has long ended.

11. In addition, a significant portion of ARCC's net investment income ("NII") consists of non-cash payment-in-kind ("PIK") income. In a PIK financing, a borrower pays interest by adding the interest to the loan's principal balance rather than paying cash. PIK therefore allows borrowers—often companies facing distress or cash constraints—to defer cash interest until loan maturity, causing the debt balance to grow. When ARCC holds debt instruments that accrue PIK interest, it records income without receiving cash.

12. As a BDC, ARCC must distribute 90% of its taxable income to stockholders, and PIK interest is taxable even though it does not generate cash. ARCC therefore must fund cash dividends on income it has not received in cash. In 2025, gross PIK interest and dividends accrued by ARCC totaled approximately $490 million, equal to approximately 34% of ARCC's reported

---

[3] *See* Ares Capital Corporation Form 10-K for the year ended December 31, 2025, at F-20 (filed on Feb. 4, 2026), *available at* https://www.sec.gov/Archives/edgar/data/1287750/000128775026000006/arcc-20251231.htm (the "2025 10-K"). Any and all of ARCC's SEC filings are cited solely for the fact that the statements were made therein and not for the truth of the statements.

NII and approximately 27% of ARCC's pre-incentive fee net investment income, the income metric on which Defendant's income-based incentive fee is calculated, and cash net investment income did not cover the dividend. The fact that PIK income "net of collections" represented a lower percentage of total interest and dividend income, or that most PIK was structured at origination, does not negate the fee conflict. Defendant's income-based incentive fees are calculated and paid quarterly on accrued PIK income when booked, regardless of whether that income is later collected in cash. A later "collection" also does not necessarily eliminate the conflict because PIK may be treated as collected through refinancing, restructuring, repayment or replacement debt, even where the borrower has not generated cash sufficient to service the original obligation. And the Investment Advisory Agreement contains no true clawback requiring Defendant to return incentive fees already paid on accrued PIK income that ultimately proves uncollectible.

13. With PIK now making up approximately 27% of pre-incentive fee net investment income, cash net investment income not covering the dividend, and ARCC stock trading below NAV, ARCC can no longer use equity issuances to bridge the cash-earnings coverage gap. This level of PIK increases ARCC's risk profile and further supports that Defendant's incentive fees—which are calculated using net investment income that includes accrued PIK income—are being earned on income ARCC may never collect and that may not reflect true economic returns.

14. ARCC is also increasingly transferring riskier or underperforming assets to IHAM and SDLP, which has the effect of making ARCC's reported metrics appear stronger. Although ARCC does not consolidate IHAM and SDLP, the financial statements of those investment vehicles indicate that ARCC's leverage is materially understated and that equity risk represents a significant portion of ARCC's NAV. As a result, a meaningful portion of ARCC's reported

income, asset values, and overall stability appears to derive from structural features within the Ares Management platform—not from core investment management functions such as credit selection, underwriting, and monitoring, which ARCC pays Defendant to provide as its adviser. Those facts further support the conclusion that Defendant's fees are grossly excessive and disproportionate to the services it provides to ARCC.

15. Defendant is nevertheless collecting full advisory fees based on its overvaluation and the benefits ARCC realizes from structural features, as opposed to management and advisory services. While the aggregate amount of fees paid to Defendant by ARCC has increased by over 53% over the last five years—from $504 million in 2021 to $773 million in 2025—there has not been any corresponding scale-based reduction designed to ensure that the benefits of ARCC's growth were shared with stockholders.

16. The increase in fees paid by ARCC resulted in increased profits for Defendant at the expense of ARCC and its stockholders.

17. For fiscal year 2025, Plaintiff estimates that readily identifiable components of the excessive advisory fees totaled approximately $309 million to $326 million, representing approximately 40% to 42% of the $773 million in total advisory fees Defendant received from ARCC that year. Those components include, among other things, fees attributable to ARCC's expanded gross asset base without a proportionate increase in services or costs, incentive fees calculated on non-cash PIK income that ARCC may never collect in cash, and incentive fees paid on fee income generated by portfolio-company amendment, consulting, agency and guarantee services. These are the components of the excess that can be computed from ARCC's public filings. Plaintiff does not contend that they are the full measure of the excessive compensation Defendant received.

18. Plaintiff brings this action to recover for ARCC the excessive and unlawful investment advisory fees extracted by Defendant in violation of its fiduciary duty under Section 36(b) of the ICA.

## JURISDICTION AND VENUE

19. This action is brought by Plaintiff for the benefit of ARCC pursuant to Section 36(b) of the ICA, 15 U.S.C. § 80a-35(b).

20. The Court has subject matter jurisdiction over these claims pursuant to Sections 36(b)(5) and 44 of the ICA, 15 U.S.C. §§ 80a-35(b)(5), 80a-43, and 28 U.S.C. § 1331.

21. Personal jurisdiction and venue are proper in this judicial district pursuant to Section 44 of the ICA, 15 U.S.C. § 80a-43, and 28 U.S.C. § 1391(b). ARCC is headquartered in this district, Defendant transacts business in this district, Defendant's agent for service of process is located in this district, Defendant's managers work out of offices located in this district, and many of the acts and transactions giving rise to Plaintiff's claims occurred in this district.

22. No pre-suit demand on ARCC's board of directors (the "Board") is required, as the requirements of Fed. R. Civ. P. 23.1 do not apply to actions brought under Section 36(b) of the ICA. *See Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 542 (1984).

## THE PARTIES

### A. Plaintiff

23. Plaintiff is a stockholder of ARCC and has continuously owned shares of ARCC since at least September 2021.

### B. Defendant

24. Defendant is a Delaware limited liability company registered with the SEC as an investment adviser under the Investment Advisers Act and registered as a limited liability company authorized in the State of New York and has offices located at 245 Park Avenue, New York NY

10167. Defendant is a wholly owned subsidiary of Ares Management and part of the Ares Credit Group. Defendant focuses on credit strategies across the non-investment grade credit universe utilizing a range of credit assets, including liquid credit, alternative credit, direct lending, and opportunistic credit products.

25. Defendant provides investment management services to 37 public and private pooled investment vehicles, including ARCC and a non-traded Ares Management-affiliated BDC, Ares Strategic Income Fund, along with other separately managed accounts and other institutional clients.[4] As of December 31, 2025, Defendant had regulatory assets under management of $97.6 billion. Defendant provides most of the services necessary for the origination of ARCC's investment portfolio.

**C. Non-Party Ares Management**

26. Ares Management is a publicly traded alternative investment management company whose common stock is listed on the New York Stock Exchange under the ticker "ARES." As of December 31, 2025, Ares Management had $623 billion AUM.

27. Ares Management sponsors and controls ARCC as a publicly traded BDC and Ares Strategic Income Fund as a non-public BDC. Each BDC holds predominantly illiquid private credit assets and pays advisory fees to one of Ares's affiliated advisers, including Defendant. Each BDC maintains its own board of directors and audit committee, which are responsible for overseeing the adviser's fees, valuation process, fair value determination and related governance function.

---

[4] *See* Ares Capital Management LLC, Form ADV (filed with the SEC on Mar. 27, 2026), *available at* https://files.adviserinfo.sec.gov/IAPD/content/viewform/adv/Sections/iapd_AdvAdvisoryBusinessSection.aspx?ORG_PK=131619&FLNG_PK=00EFF9AC000801F101301B92006F0295056C8CC0.

28. Ares Management originates deals centrally and allocates them across its multiple affiliated vehicles, including private funds and collateralized loan obligations ("CLOs"), among others, all of which pay fees to Ares Management, directly or indirectly.

29. Ares Management's investment groups include: (i) Credit (which includes investments in non-investment grade capital credit markets across direct lending, alternative credit, liquid credit, opportunistic credit and APAC credit strategies), (ii) Real Assets (which includes investment equity and debt strategies across real estate and infrastructure investments), (iii) Secondaries (which includes investments in secondary markets across private equity, real estate, infrastructure and credit asset class strategies); (iv) Private equity (provide control and significant influence capital solutions to drive shared long-term success), and (v) Other Businesses, which includes investments in insurance and a venture capital business.

30. Defendant is part of the Ares Credit Group, and ARCC is one of Ares Management's direct lending vehicles.

**D. Non-Party ARCC**

31. ARCC is a Maryland corporation headquartered at 245 Park Avenue, New York, NY 10167. ARCC closed its initial public offering on October 8, 2004, and its common stock trades on the NASDAQ under the symbol "ARCC." ARCC has elected to be regulated as a BDC under the ICA.

## BACKGROUND OF ARCC'S OPERATIONS AND EXCESSIVE FEES

**A. ARCC's Organization and Operations**

32. BDCs were established by Congress in 1980 as part of the Small Business Development Act, which primarily sought to encourage the flow of capital to small and middle market companies at a time when bank balance sheets were strained. BDCs generally serve as a

vehicle for investors to participate in direct lending to middle market companies. The vast majority of BDCs were created in the last 15 years as the direct lending market scaled and matured.

33. BDCs earn money primarily through the interest payments they receive for the capital they lend. They also collect income from origination and prepayment fees and other lending-related charges. In some instances, BDCs take equity stakes in their portfolio companies and can realize capital gains. As of March 2025, BDC assets under management exceeded $475 billion.

34. ARCC is an externally managed, closed-end BDC that, as of March 31, 2026, was the largest publicly traded BDC by market capitalization and had approximately $31 billion of total assets.

35. ARCC has elected to be treated as a regulated investment company ("RIC") for U.S. federal income tax purposes. RICs can pass income through to investors, avoiding double taxation where both the RIC and the investors pay tax on the same income. The pass-through income allowable by RICs means the fund avoids paying corporate income taxes on profits passed on to its stockholders. The only imposed income tax is on individual stockholders.

36. Investment companies must meet certain obligations and criteria in order to qualify as a RIC. A RIC must earn at least 90% of its income from capital gains, interest, or dividends from investments. It must also distribute a minimum of 90% of its net investment income in the form of interest, dividends, or capital gains to its stockholders. Additionally, at least 50% of the Fund's assets must be in cash, cash equivalents, or securities.

37. ARCC's investment strategy primarily focuses on originating and making loans to, and making debt and equity investments in, U.S. middle-market companies, with a focus on

originated transactions sourced through the networks of Defendant and the broader Ares Management platform. ARCC's investment strategy has not changed during the relevant period.

38. ARCC's portfolio investments consist primarily of first lien debt instruments, but also include investments in second lien debt, subordinated debt, and common and preferred equity investments. ARCC invests in companies in various industries, with its largest investments in software (22%), financial services (13%), and healthcare equipment and services (11%), as of March 31, 2026.

39. As of March 31, 2026, ARCC had investments in 607 portfolio companies, with investment sizes ranging between $30 million and $500 million in each.

40. ARCC is overseen by a Board consisting of ten directors, six of whom are labelled in ARCC's public filings as "independent" directors. The Board has established three standing committees: an Audit Committee, a Nominating and Governance Committee, and a Co-Investment Committee. ARCC does not maintain a separate compensation committee; instead, the role of the compensation committee is performed by the Audit Committee. Seven of the directors on the ARCC Board oversee at least one other fund managed by Defendant and/or its affiliates.

41. Like many other externally managed investment funds, ARCC does not have employees or facilities of its own. Services necessary for ARCC's business are provided by individuals who are employees of Defendant or its affiliates, or by individuals contracted by Defendant, ARCC, or their respective affiliates to work on ARCC's behalf pursuant to service contracts, including the Investment Advisory Agreement.

42. The Board is responsible for selecting, monitoring, and overseeing ARCC's service providers, including its investment adviser, and approving all agreements with service providers, among other things.

### B. ARCC Invests in its Wholly Owned Portfolio Company IHAM and Joint Venture Vehicle SDLP

43. ARCC utilizes financing and securitization structures (including bank facilities and CLOs) and interacts with affiliated entities IHAM and SDLP.

44. IHAM is an asset manager and SEC-registered investment adviser that is a wholly owned portfolio company of ARCC. IHAM manages a substantial portfolio of CLOs and private investment funds in middle market credit. ARCC uses IHAM as a strategic aggregator to manage credit assets and boost returns. As of December 31, 2025, IHAM managed 23 vehicles and had assets under management of approximately $14.6 billion, and the amortized cost and fair value of IHAM was approximately $2.2 billion and $2.4 billion, respectively. In 2025, IHAM purchased $3.7 billion of loans from ARCC.

45. SDLP is a joint venture established by ARCC and Varagon Capital Partners to invest in first lien, senior secured and unitranche loans to middle market companies. ARCC and other BDCs managed by Defendant and its affiliates directly co-invest with SDLP. As of December 31, 2025, SDLP held loans to 39 borrowers, providing a portfolio that represents approximately 3.8% of ARCC's total investment portfolio.

46. Utilizing IHAM and SDLP as affiliated vehicles causes ARCC's reported company-level leverage to exclude substantial look-through leverage because ARCC does not consolidate certain affiliated vehicles that are themselves highly levered. Further, the scale of asset transfers to IHAM and the treatment of those assets post-transfer have the effect of improving ARCC's reported portfolio metrics without improving underlying economic performance.

### C. Defendant is ARCC's Investment Adviser and Valuation Designee

47. Defendant serves as the investment adviser to, and manages the day-to-day operations of, ARCC pursuant to the terms of the Investment Advisory Agreement. Defendant's

services under the Investment Advisory Agreement are not exclusive, and Defendant is free to provide similar advisory services to other entities. Defendant serves as the investment adviser of both ARCC and Ares Strategic Income Fund, and both funds share significant investment overlap and often co-invest in similar private, senior-secured, middle-market company loans.

48. Defendant is responsible for managing the Fund's portfolio of securities, including determining the composition of ARCC's portfolio and the nature and timing of any changes to the portfolio, structuring investments, determining the investments that ARCC makes, retains or sells, and determining the fair value of debt and equity securities that are not publicly traded and whose market prices are not readily available.

49. Defendant is also the valuation designee (the "Valuation Designee") of ARCC's portfolio investments pursuant to SEC Rule 2a-5 under the ICA, 17 C.F.R. § 270.2a-5. SEC Rule 2a-5 establishes a minimum framework for how BDCs determine the fair value of their investments in good faith. It requires investment companies to assess valuation risks and set fair value methodologies, and it allows fund boards to designate the investment adviser for valuation, subject to board oversight.

50. Defendant's valuation role is not collateral or incidental to the advisory services for which it is paid. Fair value determination is a *service* Defendant provides to ARCC. Under the Investment Advisory Agreement, Defendant is responsible for executing, monitoring, and servicing ARCC's investments, and for providing investment advisory, research, and related services reasonably required for the investment of ARCC's funds. For a portfolio composed largely of illiquid Level 3 private credit assets—debt and equity securities that are not publicly traded or whose market prices are not readily available—those advisory services necessarily include determining, monitoring, and updating the fair value of investments whose market prices

are not readily available and determining when valuation adjustments or reassessments may be appropriate.

51. ARCC values its investments quarterly at fair value as determined by Defendant, as well as any third-party valuation provider ("IVP") that may be engaged by Defendant.

52. The fair value determination of ARCC's portfolio investments is subjective and part of a conflict-ridden process. Specifically, the value of illiquid private credit instruments—assets lacking observable market quotations—is determined by Defendant using an analysis controlled by Defendant, while Defendant is paid higher fees based on higher valuations. Those fees are paid out of ARCC's assets, and economically, ARCC's stockholders bear the cost dollar-for-dollar through reduced equity.

53. In other words, Defendant is the same affiliated entity that controls the marks and gets paid on the marks: its fair value determinations drive ARCC's reported asset values and NAV, while those same reported asset values and related income recognition affect the gross asset and NII-based fees ARCC pays Defendant. This alignment creates an inherent incentive for Defendant to inflate, stabilize, or delay markdowns of portfolio valuations, particularly during periods of market volatility, credit spread widening or liquidity stress.

54. Defendant specifically acknowledges in its Firm Brochure submitted along with its Form ADV filed with the SEC that it has a conflict of interest in determining fair value of ARCC's investments because "an investment's loss in value will result in a decrease in management fees paid to [Defendant]."[5] Defendant suffers from an additional conflict of interest with respect to valuations because "valuations (including a determination of when an investment should be written

[5] *See* Ares Capital Management LLC Firm Brochure (Mar. 27, 2026) at 36 ("Firm Brochure"), *available at* https://files.adviserinfo.sec.gov/IAPD/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRSN_ID=1030224.

down or written off) could impact [Defendant's] track record." Said differently, Defendant is incentivized to inflate or delay markdowns of portfolio valuations, *i.e.*, conceal losses, inflate metrics, or mask deteriorating investments, to "maintain appearances."

55. Under the fair value rule, valuation processes are expected to include ongoing assessment of valuation inputs, assumptions and methodologies, as well as procedures to identify and evaluate circumstances that may require valuation adjustments between periodic valuation events. The rule also requires funds to test the appropriateness and accuracy of their fair value methodologies. For private credit investments (which make up the majority of ARCC's portfolio), this places particular emphasis on monitoring market conditions and investment-specific developments that could materially affect fair value.

56. ARCC's Board is charged with overseeing Defendant's valuation process. While ARCC's public filings state that the valuation designee's valuation process and fair value determination are subject to the oversight of the Board, the Board's role in that process is not detailed. Nonetheless, under Rule 2a-5, the Board retains ultimate responsibility for fair valuation determinations.

**D. The Advisory Compensation Structure**

57. All investment professionals are provided by and paid for by Defendant, and ARCC reimburses both Defendant and its administrator for its allocable portion of the compensation paid by Defendant to ARCC's Chief Compliance Officer and Chief Financial Officer and their respective staffs.

58. ARCC bears all other costs and expenses of its operations, administration and transactions, including (i) investment advisory fees, including management fees and incentive fees, to Defendant pursuant to the Investment Advisory Agreement; (ii) administrative fees for its

allocable portion of overhead and other expenses incurred by ARCC's administrator, Ares Operations, LLC, a subsidiary of Ares Management; and (iii) all other costs and expenses of its operations and transactions.

59. The fees ARCC pays Defendant for its advisory services are governed by the Investment Advisory Agreement, which is to be approved annually by a majority of the ARCC Board, as well as a majority of the independent directors. On May 13, 2025, the Board approved the current Investment Advisory Agreement.

60. Pursuant to the Investment Advisory Agreement, ARCC pays Defendant fees for its investment advisory services consisting of two components: a management fee and an incentive fee.

**1. Management Fee**

61. Defendant is paid a base management fee of 1.5% of ARCC's gross assets financed using leverage up to 1.0x debt to equity; and a base management fee of 1% on gross assets using leverage over 1.0x debt to equity. The base management fee is based on the average value of ARCC's total assets, including assets purchased with leverage, as opposed to net assets.

**2. Incentive Fee**

62. ARCC pays Defendant an incentive fee with two separate components: an income-based incentive fee and a capital gains incentive fee.

63. The income-based incentive fee is calculated quarterly. Defendant receives 20% of ARCC's pre-incentive fee net investment income after ARCC clears a 1.75% quarterly hurdle, subject to a catch-up between 1.75% and 2.1875%. Within that catch-up range, Defendant receives 100% of pre-incentive fee net investment income until its incentive fee equals 20% of all pre-

incentive fee net investment income for the quarter; above 2.1875%, Defendant receives 20% of the excess.

64. While the income-based incentive fee appears to include a stockholder-friendly hurdle rate, the catch-up provision substantially limits the protection that hurdle provides once ARCC's quarterly pre-incentive fee net investment income exceeds 2.1875%. ARCC claims that the catch-up is intended to provide Defendant "with 20% of the pre-incentive fee net investment income as if a hurdle rate did not apply if this net investment income exceeded 2.1875% in any calendar quarter."[6]

65. Pre-incentive fee net investment income consists of dividends, interest, and fee income accrued by ARCC, less operating expenses. Because the calculation uses accrued income, it includes amounts ARCC has not received in cash, including income from deferred-interest investments such as original issue discount, debt instruments with PIK interest, and zero-coupon securities.

66. That feature creates a risk of future nonpayment, even as ARCC issues quarterly payments to Defendant as if it had been paid in cash. When a borrower pays interest in kind, ARCC records income even though cash collection depends on future repayment or refinancing. If the borrower defaults or cannot refinance at maturity, ARCC may never collect the cash corresponding to that accrued income. Defendant nevertheless receives quarterly cash incentive fees on accrued PIK income when earned, and the Investment Advisory Agreement does not require Defendant to return those fees if the accrued income later proves uncollectible. Thus, PIK income allows Defendant to collect cash fees on non-cash, contingent income while ARCC and its stockholders retain the collection risk.

[6] 2025 10-K at 17.

67. The second component—the capital-gains incentive fee—is payable annually in arrears and equals 20% of cumulative realized capital gains from October 8, 2004, the date ARCC completed its IPO, net of cumulative realized capital losses and unrealized capital depreciation.

### 3. The Incentive Fee Structure Allows Defendant to Benefit from Investment Banking Services Provided to ARCC's Portfolio Companies

68. As ARCC's adviser, Defendant provides investment banking services to ARCC's portfolio companies, including reviewing existing credit facilities, arranging bank financing, arranging equity financing, structuring financing from middle lenders, restructuring existing loans, raising equity and debt capital, and providing general financial advice.

69. The fees generated by those services are recorded as ARCC's investment income, and the fees since 2023 are as follows:

| **Income Line Item** | **FY2023** | **FY2024** | **FY2025** |
|---|---|---|---|
| Capital Structuring Fees | $83 | $172 | $185 |
| Other Income | $53 | $62 | $93 |
| **Combined** | **$136** | **$234** | **$278** |

70. The capital structuring fees and other income referenced in the above table are included in ARCC's pre-incentive fee net investment income, which ARCC defines to include "interest income, dividend income and any other income (including any other fees such as commitment, origination, structuring, diligence and consulting fees or other fees that [ARCC] receives from portfolio companies)."[7] As a result, these portfolio-company fees increase the base on which Defendant's income-based incentive fee is calculated. In 2025, ARCC reported $278

[7] 2025 10-K at 16.

million of combined capital structuring fees and other income, which, if subject to the 20% income-based incentive fee, would support approximately $56 million of additional incentive compensation to Defendant.

71. The "other income" component alone totaled $93 million in 2025 and included "amendment fees," as well as fees for "management and consulting services, agency services, loan guarantees, commitments, and other services rendered by the Company to portfolio companies."[8] Those categories overlap substantially with the investment advisory, monitoring, servicing, restructuring and related services for which ARCC already pays Defendant a base management fee. Yet because this income is included in pre-incentive fee net investment income, Defendant receives an additional incentive fee on those amounts.

72. This creates another fee asymmetry. Services connected to portfolio monitoring, amendments, restructurings, agency functions and related activities may generate income to ARCC, but that income also increases Defendant's incentive fee. To the extent any such fees are paid or accrued in non-cash form, they further increase the same fee-timing problem described above: Defendant can receive current cash incentive compensation on income that ARCC has not received in cash.

73. Defendant acknowledges in its Firm Brochure submitted along with its Form ADV filed with the SEC that "where a Client's Governing Documents do not require management fees to be reduced in connection with investment reorganizations, restructurings, roll-over investments or similar transaction, [Defendant] is incentivized to pursue such transactions."[9]

---

[8] *Id.* at F-162.

[9] *See* Firm Brochure at 12.

74. IHAM, a wholly owned portfolio company of ARCC and an SEC registered investment adviser, managed $14.6 billion in assets across 23 vehicles as of December 31, 2025. IHAM earned $52 million in management and incentive fee income, plus $282 million in investment-related income, in FY2025. IHAM's fee income represents adviser-level economics embedded inside a portfolio company that ARCC carries at fair value, meaning Defendant collects management fees on the fair value of ARCC's equity in IHAM while IHAM simultaneously collects its own management fees from 23 vehicles. This is a notable example of adviser self-dealing across the Ares Management platform—one Ares-related manager (Defendant) collects a layer of management from IHAM, and IHAM, another Ares-related manager, extracts separate management fees.

**E. The Magnitude of Advisory Fees Paid by ARCC**

75. To the extent Section 36(b) provides a damages limitation "start date" (but no corresponding end date), damages are limited to only those excessive fees charged during the period beginning one year prior to the complaint filing (but extending through the pendency of the action). Under the relation-back doctrine, the "start date" for this Action is May 26, 2026, the date on which Plaintiff filed the original complaint.

76. On February 4, 2026, ARCC reported its advisory fees for the year ended December 31, 2025 in its 10-K filing. The aggregate amount of fees ARCC paid to Defendant has increased by 53% over the last five years, from $504 million in 2021 to $773 million in 2025.

77. The table below sets forth the investment management fees and incentive fees that ARCC paid to Defendant over the past five years:

| | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|
| Management Fees | $253 million | $305 million | $323 million | $374 million | $425 million |
| Income-Based Incentive Fees | $225 million | $252 million | $328 million | $364 million | $348 million |
| Capital Gains Incentive Fees | $26 million | -- | -- | -- | -- |
| Total Fees | $504 million | $557 million | $651 million | $738 million | $773 million |

78. Over the last five years, ARCC's gross assets have increased by roughly 55%, and in the last ten years, ARCC's gross assets have increased by more than 228%, from $9.5 billion to $31 billion. Defendant's management fee and income base fee percentages of 1.50% and 20%, respectively, have remained constant over the last ten years despite the fact that the gross asset base on which the fee is calculated has grown by 228%. This is precisely the type of excessive fee construct that Congress intended to prevent by enacting Section 36(b), as explained in the legislative history (1970 U.S.C.C.A.N. 4897, 4902):

> Problems arise due to the economies of scale attributable to the dramatic growth of the mutual fund industry. In some instances these economies of scale have not been shared with investors. Recently there has been a desirable tendency on the part of some fund managers to reduce their effective charges as the fund grows in size.

79. A common advisory fee structure that addresses excessive fees as assets under management increase is a percentage-tiered fee structure, which includes a declining fee percentage rate as a fund's assets under management increases. Yet, Defendant's advisory fees are, and always have been, a flat fee percentage despite ARCC's exponential growth over the last ten years.

80. The magnitude of Defendant's fees is even more striking when compared to the total economic return actually delivered to ARCC stockholders. In 2025, ARCC stockholders

received cash dividends of approximately $1.81 per share, calculated as $1.264 billion of total dividends paid divided by 699 million weighted average shares outstanding. ARCC's NAV also increased by $0.05 per share, from $19.89 as of December 31, 2024 to $19.94 as of December 31, 2025. Together, ARCC delivered total economic return to stockholders of approximately $1.86 per share.

81. During the same period, Defendant collected approximately $773 million in advisory fees, or approximately $1.11 per share on the same weighted average share base. Thus, for every $1.00 of total economic return delivered to ARCC stockholders in fiscal year 2025, Defendant collected approximately $0.60 in advisory fees. Stated another way, of the approximately $2.97 per share in combined advisory fees and stockholder economic return generated in fiscal year 2025, Defendant retained approximately 37% and stockholders received approximately 63%.

82. That comparison understates the asymmetry between Defendant's compensation and the economic return delivered to ARCC stockholders. Defendant's approximately $1.11 per share in advisory fees was paid in cash and received currently, with no obligation to return any portion if the income on which the fees were calculated later proves uncollectible. By contrast, not all of the stockholders' $1.81 per share in dividends represented contemporaneous cash income generated by ARCC's portfolio. As alleged herein, approximately 27% of ARCC's fiscal year 2025 distributions were not covered by cash net investment income because ARCC's reported NII included approximately $487 million of non-cash PIK income. If the comparison is limited to distributions covered by cash earnings—approximately $1.32 per share, or 73% of total dividends per share—Defendant collected approximately $0.84 in advisory fees for every $1.00 of cash-earnings-funded distributions to stockholders.

83. Moreover, Defendant's base management fee of 1.50% is based on ARCC's gross assets, which includes assets financed with leverage (which increases the fee base). A 1.5% management fee on gross assets equates to 3.00% on NAV at 1.0x leverage. If the fee base stripped out borrowed money, Defendant's adviser fees (which equaled 5.4% of NAV total return in 2025), exceeded the unlevered portfolio return (which was 1.8% at FYE 2025).




84. Had the base management fee been calculated on ARCC's net assets of approximately $14.3 billion rather than gross assets of approximately $31.2 billion, the 2025 base management fee would have been approximately $215 million instead of $425 million, a difference of approximately $210 million. The $16.9 billion of borrowed assets on which the fee

is calculated does not represent equity capital entrusted to Defendant's management by ARCC's stockholders; it represents third-party debt that inflates the fee base.

85. Defendant collected hundreds of millions of dollars in advisory fees in a year when ARCC's realized investment performance was burdened by realized losses and stockholder distributions were increasingly dependent on income streams that included substantial non-cash PIK income. Put differently, Defendant's fee structure allowed it to capture a disproportionate share of the Fund's cash and economic returns while ARCC and its stockholders bore the risk that accrued, non-cash income and marked asset values would not ultimately be realized, without any corresponding or appropriate clawback mechanism requiring Defendant to return fees previously earned on unrealized income.

86. A review of the allocation of ARCC's gross investment income demonstrates that less than half of ARCC's income goes to stockholders and more than half goes to pay high management fees and the cost of leverage.




### F. Defendant's Compensation Structure Generates Excessive Fees

87. The Investment Advisory Agreement includes an advisory fee structure based on ARCC's gross assets, which serves to artificially boost fees in several ways.

88. First, ARCC's assets are Level 3 assets, meaning debt and equity securities that are not publicly traded or whose market prices are not readily available. This means that the value of those assets is determined by Defendant and comes from models controlled by Defendant. Defendant's fee is based on those self-interested fair value determinations.

89. Second, PIK interest is capitalized into the principal balance and amortized cost basis of the underlying investment. As a result, ARCC records additional investment income and

a higher contractual amount owed, even though it has not received corresponding cash and ultimate collection may depend on the borrower's future ability to refinance or repay. To the extent those accrued amounts are reflected in the asset's fair value, they also increase the total asset base on which Defendant's management fee is calculated.

90. Third, Defendant's incentive fee is based on a percentage of pre-incentive fee net investment income, which includes, in the case of investments with a deferred interest feature (such as a PIK interest), accrued income that ARCC may not have received in cash. Thus, the same non-cash PIK accrual can benefit Defendant by increasing the gross asset base used to calculate the management fee and by increasing fee-bearing NII used to calculate the income incentive fee. Furthermore, in instances where Defendant has received an incentive fee based on deferred income that is ultimately uncollected by ARCC, the Investment Advisory Agreement fee structure does not provide for a clawback requiring Defendant to return the incentive fees previously received on that unrealized interest income. Although future NII may be lower if the investment later stops accruing income, is placed on non-accrual, or is written down, that future effect does not compensate ARCC for cash incentive fees already paid to Defendant on income that was never actually realized.

91. Defendant discloses in its Firm Brochure that it has the discretion to make a "fee base adjustment" due to declines in value of ARCC's portfolio investments. The Investment Advisory Agreement does not require any fee base adjustment for declines in valuations. Because a fee base adjustment is left to Defendant's sole discretion, Defendant acknowledges that "a conflict of interest exists because a determination of a Fee Base Adjustment will have a negative impact on [Defendant] where there is a decrease in management fees."[10] The Firm Brochure further

---

[10] *See* Firm Brochure at 6.

discloses that Defendant's standards for adjustment are "intended to be high" and that it may determine that "even extremely distressed investments should not be subject to a Fee Base Adjustment."[11]

92. These three features of Defendant's compensation framework not only result in excessive advisory fees, but also fail to address inherent conflicts of interest associated with Defendant's management services and compensation.

**G. PIK Income and Fee Conflict**

**1. What PIK Is and How It Works**

93. A significant feature of ARCC's NII is non-cash (or PIK income). In a typical loan, the borrower pays interest in cash each quarter. In a PIK arrangement, instead of paying cash, the borrower adds the owed interest to the loan's principal balance, effectively paying with an IOU rather than cash. PIK therefore allows borrowers—often companies facing distress or cash constraints—to defer cash interest payments until loan maturity, causing the debt balance to grow over time.

94. ASC Topic 946 provides GAAP accounting and reporting guidelines for entities that qualify as investment companies. Under ASC Topic 946, when a borrower elects to pay interest in kind rather than in cash, the accrued PIK amount is capitalized into the loan's principal balance and amortized cost basis. Each quarter, ARCC records investment income equal to the PIK coupon multiplied by the outstanding balance. That income increases the asset's cost basis but generates no cash inflow to the fund.

95. PIK arrangements eliminate a critical market signal that exists in conventional cash-pay loans. With a cash-pay loan, the periodic coupon functions as an independent indicator of

[11] *Id*. at 36.

credit performance: if the borrower fails to deliver a scheduled cash interest payment, the absence of that payment is observable, binary, often constituted an event of default, and forces the investment manager to confront whether the position should be reclassified as nonperforming. The cash coupon is, in effect, an honest broker—it either arrives or it does not, and its non-arrival can trigger evaluation of non-accrual, valuation and disclosure consequences.

96. PIK securities eliminate this mechanism. Because the contractual terms permit (or require) the borrower to satisfy its interest obligation by adding to the outstanding principal balance rather than delivering cash, there is never a moment at which the absence of a cash payment forces Defendant (the Valuation Designee) to acknowledge deterioration. Rather, the borrower's obligation is "met" on paper regardless of whether the underlying enterprise could service a cash coupon of equivalent magnitude. The position remains technically "performing" under its contractual terms even as the credit quality of the borrower may be declining.

97. This creates a defensive marking dynamic. Because PIK allows a borrower to remain contractually current without making cash interest payments, the Valuation Designee can maintain the position as income-producing and delay the moment when credit deterioration must be reflected through a formal non-accrual designation or distressed mark. Rather than forcing a gradual, cash-pay-based reassessment of fair value as the borrower's ability to service debt deteriorates, PIK preserves the appearance of performance until impairment becomes too significant to defer. The result is a cliff-marking dynamic: the position remains marked at or near par and continues generating fee-bearing income for as long as possible, then moves sharply lower when a restructuring, non-accrual designation or other credit event makes the deterioration unavoidable. The result is that PIK positions occupy a valuation limbo that services Defendant's interests: the position is never formally classified as nonperforming (preserving the income accrual

and the incentive fees earned on that accrual), yet the fair value marks move further below cost (acknowledging, implicitly, that full recovery is uncertain). Defendant avoids the headline risk of a non-accrual reclassification and continues to earn fees on the compounding PIK income through the descent.

**2. PIK Inflates Defendant's Fees**

98. PIK income affects Defendant's compensation across both components of its fee structure.

99. First, PIK interest is included in net investment income and therefore contributes directly to the income-based incentive fee calculation. When a borrower pays interest in kind, ARCC records income even though cash collection depends on future repayment or refinancing. Defendant nevertheless receives quarterly cash incentive fees on that accrued PIK income.

100. Second, because PIK interest is capitalized into the principal balance and amortized cost basis of the underlying investment, it increases ARCC's gross assets. The base management fee is calculated on ARCC's gross assets, so PIK income expands the asset base on which Defendant's management fee is calculated.

101. In addition, by increasing reported asset values and delaying the recognition of unrealized depreciation and realized losses, PIK income increases the magnitude of capital gains incentive fees, which are calculated net of such losses and depreciation. Accordingly, a single PIK dollar benefits Defendant across all three components of its compensation.

102. The $487 million in PIK income included in ARCC's NII generated an estimated $80 million to $97 million in income-based incentive fees payable to Defendant in 2025. Those fees were paid in cash on income ARCC had not received in cash.

103. Critically, the Investment Advisory Agreement does not include a clawback mechanism requiring Defendant to return incentive fees received on accrued income that ARCC

never actually collects in cash. Although future NII may be lower if the investment later stops accruing income, is placed on non-accrual, or is written down, that future effect does not compensate ARCC for cash incentive fees already paid to Defendant on income that was never realized. Defendant's incentive fees are calculated quarterly and payable in arrears shortly after each quarter-end, meaning incentive fees are paid on income that remains contingent on the borrower's future ability to refinance or repay the underlying obligation. The risk of non-collection is borne entirely by ARCC and its stockholders, while Defendant retains the fees.

### 3. ARCC Has Higher Than Average PIK Interest

104. For at least the past three years, ARCC's PIK interest has well exceeded that of the broader peer average of roughly 6.5 to 9%. In 2025, noncash PIK interest and dividends were nearly $490 million, or 34%, of ARCC's reported net investment income and approximately 27% of the pre-incentive fee net investment income on which Defendant's income-based incentive fee is calculated. When excluding contributions from ARCC's affiliated vehicles IHAM and SDLP, PIK represents roughly half of remaining earnings. As of March 31, 2026, PIK income represented 15.2% of ARCC's investment income, which is nearly double that of the BDC peer average. A decade ago, PIK was 8% of ARCC's net investment income.

105. As recognized by financial news sources, ARCC's higher-than-average PIK interest differs from other highly rated BDCs in a riskier way in that more of the investment income booked by ARCC is in the form of IOUs (PIK), not cash in hand. In recent years, Ares Management has allowed many borrowers to defer paying cash interest with PIK, and in 2025, noncash PIK interest and dividends were nearly $490 million, or 34% of ARCC's reported NII and

approximately 27% of ARCC's pre-incentive fee net investment income.[12] A decade ago, PIK was 8% of ARCC's NII.

106. BDCs have seen a meaningful increase in PIK income since 2021 and based on a late-2025 analysis by *Pitchbook*, among the top 15 BDCs, PIK loans accounted for an average of 16% of total investments, with five of the top 15 BDCs holding a majority of that exposure. ARCC reportedly held the second largest amount of PIK loans across the 15-BDC cohort.[13] While ARCC claims that a majority of its PIK income was structured at the time of origination for performing credits with good growth prospects, and thus collections of PIK income will be higher than PIK income resulting from amendment activity, that claim is unsubstantiated given the rise of underwritten PIK in recent years and limited exits of those investments to date. ARCC has attempted to minimize this issue by pointing to PIK income "net of collections" (meaning the amount of accrued PIK income minus the PIK income later received in cash or paid off) and by claiming that most PIK income was structured at origination rather than added later when borrowers ran into trouble. But those metrics do not answer the fee-conflict problem. The relevant question is not merely whether some PIK was eventually "collected," but whether Defendant was entitled to receive quarterly cash incentive fees at the moment the PIK income was first recorded on the books, before ARCC knew whether that income would ever actually be collected in cash. Moreover, a "collection" does not necessarily mean that the borrower paid cash. PIK can be treated as "collected" when a loan is refinanced, restructured, or replaced with new debt—none of which prove that the borrower ever generated the cash needed to pay the accrued interest. A net-of-

---

[12] *Id.*

[13] *See* Kenny Tang, *PIK interest income at BDCs falls for 3rd straight quarter as schism appears*, PITCHBOOK (Nov. 2025), *available at* https://pitchbook.com/news/articles/pik-interest-income-at-bdcs-falls-for-3rd-straight-quarter-as-schism-appears.

collections figure can therefore mask the fundamental timing problem: Defendant receives real cash fees today based on paper income, while ARCC's stockholders bear the risk that the paper income never turns into actual cash.

**4. PIK Creates a Cash-Earnings Coverage Gap for ARCC and Its Stockholders**

107. As a RIC, ARCC is required to distribute at least 90% of its investment company taxable income, including PIK income, and therefore must make cash distributions to stockholders. PIK interest is taxable when accrued, regardless of whether it has been received in cash. ARCC therefore must fund cash distributions to stockholders on income that it has not actually received in cash.

108. The result is an asymmetrical structure that benefits Defendant while burdening ARCC and its stockholder: accrued PIK income increases pre-incentive fee NII and therefore supports Defendant's quarterly cash incentive fees, but ARCC must distribute cash on income that may not be collected until maturity, if ever. As PIK income has grown, so too has the mismatch between ARCC's cash income and the cash distributions it must fund. This cash income dividend coverage is the direct result of the management decisions and services Defendant provides to ARCC—*i.e.*, its increased use of PIK instruments, which inflates its management fee base.

109. That asymmetry has produced a measurable cash-earnings coverage gap. Over the three fiscal years ended December 31, 2025, ARCC recognized approximately $1.314 billion in non-cash PIK income. After deducting PIK, ARCC's cash net investment income was approximately $2.795 billion. During the same period, ARCC paid approximately $3.434 billion in dividends, resulting in a cumulative gap between cash net investment income and dividends paid of approximately $639 million. Because ARCC's cash distributions exceeded its cash net

investment income, the excess necessarily required other sources of liquidity, including some combination of borrowings, portfolio repayment proceeds, equity issuances, existing cash, or shares issued through ARCC's dividend reinvestment plan. Regardless of the precise source—which is within Defendant's possession—the coverage gap demonstrates that reported non-cash income supported distributions that were not supported by contemporaneous cash earnings.

110. This structure further magnifies the fee conflict. Defendant exercises substantial influence over the selection, structuring and continued holding of investments carrying PIK terms, the timing of income recognition and non-accrual determinations, and the fair-value determinations for the positions that generate that income. Those decisions affect the amount of taxable income subject to ARCC's distribution requirement. At the same time, Defendant collects current cash incentive fees on non-cash PIK income and current base management fees on gross assets, including assets financed with leverage. In fiscal year 2025, approximately 27% of ARCC's cash distributions were not covered by cash earnings. Although ARCC's precise investment company taxable income is not fully disclosed, GAAP net investment income provides a publicly available approximation illustrating the magnitude of the cash mismatch. The precise calculation and composition of ARCC's taxable income are within Defendant's possession.




111. In most of the past 10 years, ARCC's dividend payouts have not been covered by the cash components of its NII and dividend income, and ARCC has had to rely on money from loan repayments, investment gains, and capital inflows to satisfy its dividend obligations. This shows the disconnect between fee-bearing income and likelihood of realized economic returns.

112. High levels of PIK can hurt the cash earnings coverage of BDCs' dividends because PIK is collected in cash only upon final repayment. BDCs can exhibit cash earnings coverage below 100% despite strong growth in NII from higher rates due to elevated PIK income.

113. In 2025, 34% of ARCC's net investment income was PIK interest and dividends, and cash net investment income did not cover the dividend.[14] Without including noncash PIK, ARCC netted $930 million in cash interest and dividends in 2025, after expenses. ARCC paid $1.26 billion in dividends. Dividend payouts have exceeded cash net investment income for most of the last decade.

---

[14] *See* 2025 10-K at 29, F-6, F-159, F-162-63.

114. ARCC's cash earnings coverage was 73% in 2025, and in Q1 2026, its cash earnings coverage was 66%—weaker than many of its BDC peers. This is part of a trend of increased PIK interest and dividends and lower dividend coverage:

| ARCC Cash Net Investment Income & Dividend Coverage | | | | |
|---|---|---|---|---|
| | **2022** | **2023** | **2024** | **2025** |
| Net Investment Income | $ 1,092 | $ 1,266 | $ 1,436 | $ 1,415 |
| (-) PIK Interest | (138) | (166) | (206) | (219) |
| (-) PIK Dividends | (175) | (198) | (257) | (268) |
| **Cash Net Investment Income** | **$ 779** | **$ 902** | **$ 973** | **$ 928** |
| (-) Dividends | (912) | (1,031) | (1,139) | (1,264) |
| **Cash NII - Dividend** | **$ (133)** | **$ (129)** | **$ (166)** | **$ (336)** |
| **PIK % of Net Investment Income** | **29%** | **29%** | **32%** | **34%** |
| **Dividend Coverage (%)** | **85%** | **87%** | **85%** | **73%** |
| *Ending Diluted Shares* | *534* | *593* | *655* | *716* |

115. Historically, ARCC has bridged this cash-earnings coverage gap through equity issuance with diluted shares increasing 34% from 534 million shares in 2022 to 716 million shares in 2025. With ARCC's stock now trading below NAV, this funding avenue is closed, as recognized in ARCC's public filings:

> We are not generally able to issue and sell our common stock at a price below net asset value per share. We may, however, sell our common stock, or warrants, options or rights to acquire our common stock, at a price below the current net asset value per share of our common stock if our board of directors determines that such sale is in our best interests and the best interests of our stockholders, and our stockholders approve such sale. Any such sale would be dilutive to the net asset value per share of our common stock. In any such case, the price at which our securities are to be issued and sold may not be less than a price that, in the determination of our board of directors, closely approximates the market value of such securities (less any commission or discount). If our common stock trades at a discount to net asset value, this restriction could adversely affect our ability to raise capital.[15]

[15] *Id*. at 29.

116. Sustained cash earnings coverage below 100% for BDCs is viewed negatively, according to Fitch Ratings. As shown above, ARCC's cash earnings coverage has been below 100% since at least 2022.

117. Yet, the cash-earnings coverage gap has increased with the increased reliance on PIK interest. Excluding IHAM and SDLP, 51% of ARCC's NII is PIK.

118. IHAM and SDLP accounted for approximately 32% of ARCC's NII in 2025, despite representing only about 12% of investments at fair value:

| IHAM/SDLP % of NII | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | 2023 | | 2024 | | 2025 | Source |
| Dividend Income | $ | 243 | $ | 285 | $ | 292 | |
| Interest Income | | 29 | | 2 | | 8 | |
| **IHAM Investment Income** | **$** | **272** | **$** | **287** | **$** | **300** | **Pg. 77 of FY-25 10-K** |
| | | | | | | | |
| Interest Income | $ | 174 | $ | 173 | $ | 145 | |
| Capital Structure Servicing Fees & Other | | 13 | | 17 | | 9 | |
| **SDLP Investment Income** | **$** | **187** | **$** | **190** | **$** | **154** | **Pg. 82 of FY-25 10-K** |
| | | | | | | | |
| IHAM | $ | 272 | $ | 287 | $ | 300 | |
| SDLP | | 187 | | 190 | | 154 | |
| **IHAM/SDLP Investment Income** | **$** | **459** | **$** | **477** | **$** | **454** | |
| (/) Net Investment Income | | 1,258 | | 1,436 | | 1,415 | Pg. F-6 of FY-25 10-K |
| **IHAM/SDLP % of NII** | | **36%** | | **33%** | | **32%** | |
| | | | | | | | |
| IHAM - Equity | $ | 1,925 | $ | 1,915 | $ | 1,904 | Pg. 77 of FY-25 10-K |
| IHAM - Subordinated Loan | | 62 | | - | | 530 | Pg. 77 of FY-25 10-K |
| SDLP | | 1,288 | | 1,192 | | 1,117 | Pg. 74 of FY-25 10-K |
| **IHAM/SDLP Fair Value** | **$** | **3,275** | **$** | **3,107** | **$** | **3,551** | |
| (/) Fair Value of ARCC Investments | | 22,874 | | 26,720 | | 29,485 | Pg. 74 of FY-25 10-K |
| **IHAM/SDLP % of Investments** | | **14%** | | **12%** | | **12%** | |

119. ARCC's auditor, KPMG, required ARCC to include audited standalone financials for IHAM, ARCC's unconsolidated, wholly owned portfolio company, in an amended 10-K for the year ended December 31, 2025. IHAM's consolidated financial statements confirm that the

dividends paid to IHAM were in cash.[16] Similarly, the interest on SDLP certificates was paid in cash.

120. Given that approximately 32% of NII from IHAM and SDLP is cash, the implication is that about 51% of the remaining ARCC NII is PIK:

| PIK % of NII ex. IHAM/SDLP | | | | |
|---|---|---|---|---|
| | 2023 | 2024 | 2025 | Source |
| Net Investment Income | $ 1,258 | $ 1,436 | $ 1,415 | |
| IHAM Investment Income | (272) | (287) | (300) | |
| SDLP Investment Income | (187) | (190) | (154) | |
| **NII ex. IHAM/SDLP** | **$ 799** | **$ 959** | **$ 961** | |
| | | | | |
| PIK Interest | $ 166 | $ 206 | $ 219 | Pg. F-159 of FY-25 10-K |
| PIK Dividends | 198 | 257 | 268 | Pg. F-159 of FY-25 10-K |
| **PIK Investment Income** | **$ 364** | **$ 463** | **$ 487** | |
| (/) NII ex. IHAM/SDLP | 799 | 959 | 961 | |
| **PIK % of NII ex. IHAM/SDLP** | **46%** | **48%** | **51%** | |

121. This demonstrates that a significant portion of ARCC's NII is non-cash (PIK), and when excluding contributions from affiliated vehicles, PIK represents roughly half of ARCC's remaining earnings. This shows that incentive fees are being earned on income that is not realized and may not reflect true economic returns.

122. This framework creates an asymmetry between the timing of adviser compensation and the realization of credit outcomes within the portfolio. Adviser compensation tied to accrued income may be earned and paid quarterly, while the economic performance of the underlying investments—including the collectability of PIK interest and the ultimate recovery value of the loans—may only become apparent over a longer time horizon. In point of fact, for the first quarter

[16] *See* Ares Capital Corporation, 2025 Amended 10-K, at 6 (filed on Mar. 23, 2026) (the "Amended 10-K"), *available at* https://www.sec.gov/Archives/edgar/data/1287750/000162828026020560/arcc-20251231.htm.

2026, ARCC reported that its unrealized net losses jumped to $412 million, up from $83 million a year earlier.

123. Defendant's decision to include high levels of PIK in ARCC's portfolio undermines the quality of the advisory services it provides to ARCC. PIK is considered a lower quality asset because it: (i) is "paper" income, not actual income; (ii) masks underlying borrower distress; (iii) compounds risk (as total debt grows larger from interest added to principal, default risks increase); and (iv) delays losses (creates a false sense of safe performance because deferred provisions allow for delayed write-downs). Thus, ARCC's reliance on PIK interest (as a result of Defendant's investment choices) increases the Fund's credit risk and uncertainty in cash flow realization.

**DEFENDANT'S CONFLICTS OF INTEREST**

124. Defendant's dual role as the investment adviser and the Valuation Designee creates a conflict architecture in which Defendant simultaneously controls the marks of ARCC's assets and benefits financially from higher marks. The conflict operates on multiple levels.

125. First, Defendant's management fee is 1.50% of ARCC's gross assets. Every 1% increase in ARCC's reported asset values adds approximately $4.2 to $4.3 million in annual base management fees alone, before accounting for any additional incentive fees, PIK-related income fees, capital gains fee effects, or broader platform benefits tied to maintaining elevated NAV and reported asset values.

126. Second, Defendant's income-based incentive fee is 20% of NII above a 1.75% quarterly hurdle. PIK income flows into NII despite generating no current cash, allowing Defendant to earn quarterly cash incentive fees on income ARCC may not ultimately collect. At the same time, accrued PIK increases the contractual principal balance and amortized cost basis of

the underlying investment and, to the extent those accrued amounts are reflected in fair value, also increase the asset base used to calculate Defendant's base management fee.

127. Third, many of ARCC's portfolio positions are co-invested alongside the Ares Management-affiliated funds. Defendant therefore marks positions in which the parent entity has direct economic exposure. A markdown on an ARCC portfolio asset would signal impairment across multiple Ares Management vehicles, place tremendous downward pressure on Ares Management equity, impair fundraising narratives, and potentially trigger write-downs in private funds not subject to the ICA fair value reporting, giving Defendant massive economic incentives to hold marks stable that extend far beyond ARCC's own fee structure.

128. Fourth, Ares Management operates ARCC, ACRE, and ARDC, along with numerous private investment vehicles with a substantial portfolio overlap. Adjusting a mark in one vehicle logically affects all affiliated vehicles holding the same position. The systemic incentive is to maintain mark consistency across the platform. Any markdowns could result in reducing fees, impairing reported performance, and undermining capital-raising efforts across multiple affiliated vehicles simultaneously.

129. The determination of fair value of ARCC's portfolio investments is subjective. Because ARCC's portfolio comprises Level 3 assets (significant unobservable inputs), the fair value of those assets comes from models controlled by Defendant. Those fees are paid out of ARCC's assets, and economically, ARCC's stockholders bear the cost dollar-for-dollar through reduced equity. This alignment creates an inherent incentive for Defendant to inflate, stabilize, or delay markdowns of portfolio valuations, particularly during periods of credit spread widening or liquidity stress. Defendant recognizes this conflict in its Firm Brochure, which states that it "has

an incentive to make determinations that result in the continued payment of, or an increase in, management fees."[17]

**EVIDENCE OF DEFENDANT'S OVERVALUATION AND FEE-GENERATING STRATEGIES THAT INCREASE RISK AND MASK PERFORMANCE METRICS**

130. An analysis of Defendant's valuation practices shows that Defendant maintains value marks of ARCC's portfolio assets at levels that are inconsistent with observable market evidence, economic conditions, and the evolving risk profile of the Fund's portfolio. Over the relevant period, credit conditions materially deteriorated across the private credit market, including rising interest burdens, increased use of PIK structures, growing non-accruals, and increasing realized losses that were not reflected in ARCC's asset values.

**A. Defendant's Valuation Judgment Directly Affects ARCC's NAV**

131. When an asset's amortized cost exceeds its fair value, the security is considered impaired or carrying an unrealized loss.

132. For the first quarter of 2026, ARCC reported that the fair value of its assets was $29.499 billion for the first quarter 2026, versus an amortized cost of $29.648 billion, reflecting net unrealized depreciation in the portfolio. The existence of some depreciation, however, does not establish that Defendant's marks fully reflected the portfolio's economic risk or that further write-downs were unwarranted. Instead, the gap confirms that Defendant's valuation judgments directly affect ARCC's reported NAV and, because Defendant's advisory fees are calculated on ARCC's asset base, the amount of fees Defendant collects.

133. For the first quarter of 2026, ARCC reported NAV per share of $19.59, down from $19.94 in the prior quarter. For the last several months, ARCC's common stock has traded at a

---

[17] Firm Brochure at 12.

near 10% discount to NAV. Yet, Defendant has collected management fees on assets that the market has priced at lower levels, thereby resulting in excessive management fees to Defendant.

134. ARCC's stock trading at a discount to NAV further indicates that the market does not fully credit ARCC's reported asset values. Taken together with the fact that amortized cost exceeds fair value, this supports the conclusion that Defendant is overvaluing ARCC's portfolio assets with marks that do not fully reflect the economic risk in the portfolio.

**B. Fair Value Below Amortized Cost on PIK Securities**

135. As of March 31, 2026, ARCC held several positions in PIK securities with fair value marks materially below amortized costs, with FV/Cost ratios ranging from approximately 70% to 98%. Because PIK income is capitalized into cost each period rather than collected in cash, the gap between fair value and cost represents a judgment by Defendant, acting in its capacity as Valuation Designee, and corroborated by an IVP, that the full accrued balance may not be recovered in cash at maturity. When the Valuation Designee marks a PIK position at 70 to 75 cents on the dollar of amortized cost, it expresses its own assessment that the borrower's ability to repay the PIK accretions is uncertain.

136. The table below details the quarterly progression of amortized cost, fair value, and FV/Cost ratios for each of the selected PIK positions in ARCC's portfolio from first quarter 2024 through first quarter 2026. As demonstrated, cost has risen steadily through PIK capitalization while fair value has stagnated or declined, producing a widening gap that compounds each quarter:

**ARCC PIK Position Tracking - Summary**

| Position | Instrument | PIK Rate | Type | Periods | Latest Cost | Latest FV | Latest FV/Cost | Cumul. Loss (UnR) |
|---|---|---|---|---|---|---|---|---|
| Amerivet | Subordinated Loan | 8.25% PIK (was 16.50%) | Full PIK | 8 | 77.0 | 65.8 | 85.5% | (11.2) |
| Aventine | Second Lien / Senior Sub Loan | 5.13% PIK (was 10.25%) | Full PIK | 7 | 53.1 | 40.9 | 77.0% | (12.2) |
| BVI Medical | First Lien Senior Secured Loan | 9.92% (5.00% PIK) | Partial PIK | 5 | 143.5 | 132.0 | 92.0% | (11.5) |
| Cornerstone OnDemand | Series A Preferred Shares | 10.50% PIK | Full PIK | 9 | 179.2 | 125.4 | 70.0% | (53.8) |
| Digicert | Series A Preferred Shares | 10.50% PIK | Full PIK | 9 | 208.0 | 153.9 | 74.0% | (54.1) |
| Essential Services | First Lien Senior Secured Loan | 9.17% (2.75% PIK) | Partial PIK | 1 | 151.5 | 145.4 | 96.0% | (6.1) |
| Huskies Senior Sub | Senior Subordinated Loan | 10.00% PIK | Full PIK | 9 | 137.2 | 123.5 | 90.0% | (13.7) |
| Plaskolite | First Lien Senior Secured Loan | 11.64% (4.00% PIK) | Partial PIK | 3 | 266.1 | 252.8 | 95.0% | (13.3) |
| Symplr | Second Lien Senior Secured Loan | 13.77% (4.00% PIK) | Partial PIK | 7 | 55.7 | 41.8 | 75.0% | (13.9) |
| WebPT | Senior Subordinated Loan | 13.25% PIK | Full PIK | 8 | 76.8 | 66.8 | 87.0% | (10.0) |
| **TOTAL** | | | | | **1,348.1** | **1,148.3** | | **(199.8)** |

*Source: ARCC 10-Q filings (SEC EDGAR). Dollar amounts in millions.*

137. Two position-level examples illustrate how this dynamic operates in practice. First, ARCC's position in Aventine Intermediate LLC reflects a multi-stage credit workout that is visible only through a line-by-line comparison of ARCC's schedules of investments. ARCC held both a first lien senior secured loan with a partial PIK component and a junior loan that was originally labeled "senior subordinated" and later relabeled as a "second lien senior secured loan." Between 2024 and the first quarter of 2026, the facilities experienced multiple amendments: the junior loan was relabeled without any apparent change in economic terms, the first lien maturity was extended from June 2027 to June 2029, the first lien par balance fell from \$10.6 million to \$6.3 million between June 30, 2025 and September 30, 2025, and the PIK rate on the second lien was later reduced from 10.25% to 5.13%. These changes are consistent with a negotiated credit workout involving maturity relief, principal reduction and reduced non-cash interest accruals. Yet the position was not described as such in ARCC's narrative disclosures.

138. Aventine is particularly probative because the first lien was marked at 97.2% of cost as of June 30, 2025, immediately before the following quarter's restructuring in which maturity was extended and par value declined by approximately 40%. Either a borrower in the midst of a multi-stage workout somehow repaid a substantial portion of its first lien debt in cash while simultaneously requiring maturity relief, or ARCC's prior near-par mark failed to reflect credit information that was already known or knowable to Defendant as Valuation Designee. In

either case, the sequence shows that Defendant's fair value marks do not timely reflect credit deterioration. At the same time, the second lien continued to accrue PIK income while being marked at approximately 77% of amortized cost, reflecting ARCC's own doubt that the full PIK-accreted balance would be recovered.

139. Second, Essential Services Holding Corporation shows the same issue in a different form: the conversion of a previously all-cash-pay first lien loan into a partial PIK loan with only a modest valuation response. ARCC held a first lien senior secured loan to Essential Services that was refinanced in June 2024 into a single $151.5 million facility maturing in June 2031. From that refinancing through December 31, 2025, the loan was entirely cash-pay. By March 31, 2026, however, the spread had increased from SOFR + 5.00% to SOFR + 5.50%, and 2.75 percentage points of the coupon had been converted to PIK. That amendment is consistent with a borrower receiving cash flow relief because it could no longer service the full cash coupon, with the spread increase compensating ARCC for increased credit risk.

140. Despite that deterioration, the Essential Services mark declined only modestly, from 97.0% of cost at December 31, 2025 to 96.0% of cost at March 31, 2026. The near-par valuation creates the appearance that the newly accrued PIK income remains money-good, even though the very conversion from cash-pay to PIK indicates that the borrower required relief from its cash interest burden. As with Aventine, the amendment and its credit implications were not discussed in ARCC's narrative disclosures and are apparent only from a comparison of successive schedules of investments. This calls into question Defendant's investment choices and illustrates the core conflict: Defendant can continue to accrue fee-bearing PIK income and preserve near-par asset values while the underlying credit has already required material amendment relief. Once a

loan is restructured from cash-loan to PIK, that loan now reflects credit-stress and should promptly result in a mark down of the loan's valuation.[18]

141. These examples are not isolated and show that ARCC's schedules contain warning signs of credit stress—PIK conversions, maturity extensions, spread increases, principal reductions, relabeling and reduced PIK accrual rates—that are not meaningfully explained to stockholders, while Defendant continues to earn fees on the resulting accrued income and reported asset values. Defendant earned approximately $15 to $17 million per year in incentive fees attributable to PIK income from an analysis of just eleven PIK positions alone, while the reduction in base fees from marked-down fair values on these same positions is comparatively modest (roughly $1.8 million per year). Across the full portfolio, Plaintiff estimates that PIK income generated approximately $80 million to $97 million of income-based incentive fees for Defendant in fiscal year 2025. In effect, Defendant is collecting cash fees on income that its own marks indicate may not be realized, without a corresponding clawback mechanism requiring repayment if ARCC ultimately does not collect the accrued PIK in cash.

142. These markdowns are notable because they persist within a valuation framework that is systematically overstated. Even taking Defendant's own marks at face value, the fair value determinations on the PIK positions reflect material doubt about recoverability, and the true extent of impairment may be greater still.

### C. Leverage is Severely Understated

143. As of December 31, 2025, ARCC was approximately 53% loan-to-value (1.12x debt to equity). However, both SDLP and IHAM are highly levered vehicles, and ARCC's

---

[18] *See Report on Vulnerabilities in Private Credit*, FINANCIAL STABILITY BOARD (May 6, 2026), *available at* https://www.fsb.org/uploads/P060526.pdf.

financial statements do not consolidate those vehicles. Only ARCC's equity interests in these entities are reflected on its balance sheet.

144. As of December 31, 2025, SDLP was approximately 74% loan-to-value (2.8x debt to equity), and IHAM was approximately 85% loan-to-value (5.5x debt-to-equity). Adjusting for this by consolidating SDLP and IHAM with ARCC's reported balance sheet increases ARCC's debt-to-equity from an innocuous 1.12x to 2.06x, the highest of any public BDC.

**ARCC Consolidated Balance Sheet**

| | ARCC | IHAM | SDLP | Adjustments | Consolidated |
|---|---|---|---|---|---|
| 1L Senior Secured Loans | $ 17,858 | | $ 4,159 | $ - | |
| 2L Senior Secured Loans | 1,487 | | - | - | |
| Senior Subordinated Loans | 1,585 | | - | - | |
| Preferred Equity | 2,475 | | - | - | |
| Other Equity | 2,529 | | - | - | |
| SDLP Structured Equity | 1,117 | | - | (1,117) | |
| IHAM Intercompany Loan | 530 | | - | - | |
| IHAM Equity | 1,904 | | - | (1,904) | |
| **Investments at Fair Value** | **$ 29,485** | **$ 11,599** | **$ 4,159** | **$ (3,021)** | **$ 42,222** |
| Other Assets | 1,750 | 764 | 128 | - | 2,642 |
| **Total Assets** | **$ 31,235** | **$ 12,363** | **$ 4,287** | **$ (3,021)** | **$ 44,864** |
| | | | | | |
| Debt | $ 15,991 | $ 9,851 | $ 3,137 | $ - | $ 28,979 |
| Intercompany Note from ARCC | - | 531 | - | - | 531 |
| Other Liabilities | 926 | 313 | 94 | - | 1,333 |
| **Total Liabilities** | **$ 16,917** | **$ 10,695** | **$ 3,231** | **$ -** | **$ 30,843** |
| | | | | | |
| GAAP Equity | | $ 1,668 | $ 1,056 | | |
| (+) ARCC Markup | | 236 | 61 | | |
| **Equity** | **$ 14,318** | **$ 1,904** | **$ 1,117** | **$ (3,021)** | **$ 14,318** |
| **Debt / Equity** | **1.12x** | **5.45x** | **2.81x** | | **2.06x** |
| **LTV (%)** | **51%** | **80%** | **73%** | | **65%** |

145. Non-accrual investments represent loans where borrowers have ceased making contractual interest payments and therefore serve as a commonly referenced indicator of credit stress within a lending portfolio.

146. Non-accrual positions increased more than fivefold between 2023 and 2025, reaching approximately $181 million at fair value and $377 million at cost by year-end 2025.

147. These positions were carried at an average valuation of approximately 48 cents on the dollar, indicating substantial impairment once loans entered non-accrual status. The magnitude of these write-downs shows the degree to which credit deterioration materially impairs portfolio valuations when loans ultimately transition from performing to non-performing.

**D. ARCC's Asset Mix: Equity Risk is a Significant Portion of NAV**

148. Unlike the majority of public BDCs, ARCC's portfolio holdings include a substantial amount of equity or equity-like exposures, rather than just first lien senior secured loans prized by credit fund investors. In fact, a significant portion of ARCC's NAV is in equity investments, suggesting a higher risk profile than a traditional "senior secured lender" investment.

149. ARCC's equity stakes in the SDLP and IHAM account for approximately 21% of ARCC's net assets. Including reported "Preferred Equity" and "Other Equity," equity exposure accounts for about 56% of ARCC's net assets, making ARCC arguably the riskiest public BDC.

**ARCC Portfolio by Asset Class**

| | Fair Value | % of Investments | % of Net Assets |
|---|---|---|---|
| First Lien Senior Secured Loans | $ 17,858 | 60.6% | 124.7% |
| Second Lien Senior Secured Loans | 1,487 | 5.0% | 10.4% |
| Subordinated Certificates of the SDLP | 1,117 | 3.8% | 7.8% |
| Senior Subordinated Loans | 1,585 | 5.4% | 11.1% |
| Preferred Equity | 2,475 | 8.4% | 17.3% |
| Ivy Hill Asset Management - Equity | 1,904 | 6.5% | 13.3% |
| Ivy Hill Asset Management - Subordinated Loan | 530 | 1.8% | 3.7% |
| Other Equity | 2,529 | 8.6% | 17.7% |
| **Total Investments** | **$ 29,485** | **100.0%** | **205.9%** |
| *Memo: Net Assets* | | | *$ 14,318* |
| | | | |
| Other Equity | $ 2,529 | 8.6% | 17.7% |
| Preferred Equity | 2,475 | 8.4% | 17.3% |
| Ivy Hill Asset Management - Equity | 1,904 | 6.5% | 13.3% |
| Subordinated Certificates of the SDLP | 1,117 | 3.8% | 7.8% |
| **Equity Exposure** | **$ 8,025** | **27.2%** | **56.0%** |

150. Equity investments are generally considered riskier than debt investments because they offer no guaranteed return, lack collateral backing and place investors last in line for repayment during bankruptcy. Equity investments also face higher volatility and a greater potential for loss. Due to Defendant's choices to increase leverage and equity investments in ARCC's portfolio, ARCC has a higher risk profile than other BDCs or traditional senior secured lenders.

**E. ARCC's Reported Financial Stability Relies on Structural Features and Affiliated Vehicles Rather Than Core Investment Management Functions**

151. A substantial portion of ARCC's fee base is driven by structural dynamics rather than the quality of investment management services. As a result, the advisory fees ARCC paid to Defendant are disproportionally large relative to the services rendered.

152. For example, ARCC has increasingly transferred assets to IHAM and SDLP, which removes those assets from ARCC's reported metrics, including non-accruals, while remaining within the Ares Management platform. ARCC receives investment income from IHAM and SDLP while consolidating none of their expenses. In 2025, ARCC sold $3.7 billion of loans to IHAM, up nearly 5x year-over-year. Once transferred, these loans are no longer reflected on ARCC's balance sheet or included in its non-accrual metrics. This allows ARCC to move lower-quality assets to IHAM to mask ARCC's portfolio distress and risk profile and to portray stability.

153. IHAM and SDLP also contribute a disproportionate share of income relative to their size within the ARCC portfolio. There also appears to be a degree of circularity, where capital is allocated to affiliated vehicles that, in turn, generate income back to ARCC. To the extent this dynamic is sustaining fee-bearing income, it likely does not reflect independent third-party investment performance.

154. Moreover, as explained above, when considering ARCC's investments in IHAM and SDLP on a consolidated basis, ARCC's risk profile is considerably higher than reported, with higher levels of leverage, PIK and equity exposure.

155. Furthermore, as of December 31, 2025, SDLP and IHAM exhibited deteriorating fundamentals that did not support ARCC's valuations on its investments in those vehicles.

### 1. IHAM's Performance is Deteriorating and Cannot Cover Its Dividend, Yet ARCC's Equity Investment in IHAM is Valued Above IHAM's Book Value of Equity

156. IHAM's revenue has declined approximately 15% since 2023 despite investments increasing by about $2.2 billion over the same period. Profitability has also deteriorated, with return on assets declining from about 12% to 10% and return on equity from approximately 25% to 19%. PIK interest has been increasing, and IHAM is no longer able to cover its dividend with cash NII.

157. Notably, ARCC held a $530 million inter-company subordinated loan to IHAM at a 10.3% yield as of the fourth quarter 2025, broadly in line with the rest of ARCC's debt investments. ARCC is allocating capital to IHAM (as opposed to third-party middle market borrowers) because IHAM requires incremental capital to support its dividend to ARCC. As reported in IHAM's 2025 financial statement, "[i]n March 2026, the Partnership increased the total commitment under its subordinated note from Ares Capital Corporation from $750 to $1,000."[19]

158. Despite deteriorating fundamentals, ARCC continues to mark its equity investment in IHAM at approximately 14% *above* IHAM's book value of equity, notwithstanding declining revenue, lower returns and reduced cash dividend coverage:

[19] *See* Amended 10-K, Exhibit 99.3, at p. 32.

| IHAM Cash NII / Dividend Coverage | 2023 | 2024 | 2025 | Source / Notes |
|---|---|---|---|---|
| Investment Income | $ 1,100 | $ 1,021 | $ 936 | |
| Other Income | 10 | 15 | 13 | |
| **Revenue** | **$ 1,110** | **$ 1,036** | **$ 949** | |
| Interest Expense | (641) | (601) | (551) | |
| Distributions to Subordinated Notes | (43) | (55) | (42) | |
| Other Expenses | (34) | (26) | (25) | |
| **Net Investment Income** | **$ 392** | **$ 354** | **$ 331** | **Pg. 4 of Exhibit 99.3 of FY-25 10-K/A** |
| PIK Interest | (12) | (25) | (40) | Pg. 6 of Exhibit 99.3 of FY-25 10-K/A |
| Net Accretion | (1) | (2) | (1) | Pg. 6 of Exhibit 99.3 of FY-25 10-K/A |
| Amortization of Debt Costs / Investments | (15) | (4) | (13) | Pg. 6 of Exhibit 99.3 of FY-25 10-K/A |
| **Cash NII** | **$ 364** | **$ 323** | **$ 277** | |
| Distributions | (243) | (285) | (292) | Pg. 6 of Exhibit 99.3 of FY-25 10-K/A |
| **Cash NII - Distributions** | **$ 121** | **$ 38** | **$ (15)** | |
| **Cash NII % of NII** | **93%** | **91%** | **84%** | |
| **Cash NII Dividend Coverage** | **150%** | **113%** | **95%** | |

| IHAM Returns / LTV | 2022 | 2023 | 2024 | 2025 | Source / Notes |
|---|---|---|---|---|---|
| Investments at Fair Value | $ 8,998 | $ 9,401 | $ 8,172 | $ 11,599 | |
| Other Assets | 603 | 818 | 1,104 | 764 | |
| **Total Assets** | **$ 9,601** | **$ 10,219** | **$ 9,276** | **$ 12,363** | **Pg. 78 of FY-25 10-K** |
| | | | | | |
| Debt | $ 7,557 | $ 8,209 | $ 7,267 | $ 9,851 | |
| Subordinated Note from ARCC | 500 | 62 | - | 531 | |
| Other Liabilities | 132 | 190 | 269 | 313 | |
| **Total Liabilities** | **$ 8,189** | **$ 8,461** | **$ 7,536** | **$ 10,695** | **Pg. 78 of FY-25 10-K** |
| | | | | | |
| **Equity (IHAM Reported)** | **$ 1,412** | **$ 1,758** | **$ 1,740** | **$ 1,668** | **Pg. 78 of FY-25 10-K** |
| **Equity (ARCC Reported Fair Value)** | **$ 1,701** | **$ 1,925** | **$ 1,915** | **$ 1,904** | **Pg. 77 of FY-25 10-K** |
| | | | | | |
| **ROA** | | **12%** | **12%** | **10%** | **Revenue / Avg. Investments** |
| **ROE** | | **25%** | **20%** | **19%** | **NII / Avg. Equity (IHAM Reported)** |
| **Loan-to-Value** | **84%** | **81%** | **78%** | **84%** | **Debt + Sub. Note / Assets** |

### 2. SDLP is Highly Concentrated

159. Approximately 40% of SDLP's assets are concentrated in its five largest borrowers, and the top 15 investments account for about 88% of portfolio fair value.

| SDLP Portfolio Companies | | | | | | |
|---|---|---|---|---|---|---|
| # | ParentCo | | Cost | | FV | FV/Cost | % of Total |
| 1 | FS Squared Holding Corp. | $ 413 | $ 413 | 100.0% | 9.9% |
| 2 | Valcourt Holdings II, LLC | 343 | 343 | 100.0% | 8.2% |
| 3 | Walnut Parent, Inc. | 366 | 340 | 93.0% | 8.2% |
| 4 | ISQ Hawkeye HoldCo, Inc. | 309 | 309 | 100.0% | 7.4% |
| 5 | EIS Legacy Holdco, LLC | 286 | 286 | 100.0% | 6.9% |
| 6 | Triwizard Holdings, Inc. | 266 | 266 | 100.0% | 6.4% |
| 7 | Harvey Tool Company, LLC | 240 | 239 | 99.5% | 5.7% |
| 8 | Arrowhead Holdco Company | 279 | 228 | 81.5% | 5.5% |
| 9 | NMN Holdings III Corp | 227 | 227 | 100.0% | 5.4% |
| 10 | Pritchard Industries, LLC | 240 | 223 | 93.0% | 5.4% |
| 11 | Manna Pro Products, LLC | 262 | 212 | 81.0% | 5.1% |
| 12 | Ground Penetrating Radar Systems, LLC | 187 | 187 | 100.0% | 4.5% |
| 13 | Tiger Holdco LLC | 140 | 140 | 100.0% | 3.4% |
| 14 | THG Acquisition, LLC | 130 | 130 | 100.0% | 3.1% |
| 15 | Midco Holding, LLC | 115 | 118 | 103.2% | 2.8% |
| | Other | 502 | 498 | 99.1% | 12.0% |
| | **Total** | **$ 4,305** | **$ 4,159** | **96.6%** | **100.0%** |

160. SDLP's highly concentrated investments carry intensified credit risk that is more vulnerable to rising interest rates, volatility, and portfolio degradation.

161. While credit risk can increase stockholder losses, Defendant can benefit from utilizing strategies that increase credit risk. As Defendant acknowledges in its Firm Brochure, it is incentivized to select riskier investments as a result of its performance-based fee structure.

**F. Valuation Governance: The IVP's Limited Role**

162. To provide the appearance of independence in the valuation process, ARCC retains IVPs at the direction of Defendant. However, the scope of the IVP's role is limited, and Defendant may determine to use its internal valuation team to value certain investments, rather than an IVP.

163. The disclosed process confirms that Defendant as the Valuation Designee selects the data to provide to the IVP and that the IVP does not independently verify the information it

receives. The Valuation Designee then considers "the input of the IVPs that have been engaged to support the [Defendant's] valuation" of the investment.[20]

164. The process is circular: Defendant originates the investments, accrues the PIK income that inflates the cost basis, selects the information to provide to the IVP, and then uses the IVP's conclusions (valuation ranges derived from that unverified data) to support Defendant's fair value determinations on which Defendant's own fees are calculated. This circular information flow undermines the objectivity that the valuation governance framework is intended to provide.

165. ARCC's independent auditor KPMG does not contribute to the quarterly fair value determinations of the Fund's investments. KPMG only "obtains an understanding of, and performs select procedures relating to, [ARCC's] valuation process within the context of performing [ARCC's] integrated audit." There is no indication that KPMG's "select procedures" serve to test the accuracy of Defendant's fair value determinations. As for KPMG's "role" with respect to the fair value of investments in connection with the audit of ARCC's FY 2025 financials, KPMG's *Opinion on the Consolidated Financial Statements* included in ARCC's 2025 10-K discloses that KPMG identified the evaluation of the fair value of investments as a critical audit matter.[21] A critical audit matter is a matter arising from the audit of a company's financial statements that the auditor is required to communicate to the audit committee that (1) relates to disclosures that are material to the consolidated financial statements and (2) involved especially challenging, subjective, or complex judgment. KPMG determined that the evaluation of ARCC's fair value of investments was a critical audit matter due to "the inherent estimation uncertainty, assessment of the Company's judgments regarding the use of specific valuation assumptions involved in a high

---

[20] 2025 10-K at 36.

[21] *Id*. at F-2.

degree of subjective auditor judgment," and noted that "specialized skills and knowledge were required to evaluate these assumptions."[22] As recognized in the industry, auditors' implementation of critical audit matters have "failed to provide the information that many investors most wanted and that the standard explicitly permits: (1) an indication of the outcome of the audit procedures performed on the matter; and (2) key observations with respect to the matter." And an auditor's failure to disclose these types of details offers little value to investors in that it fails to provide specific insights that investors need to assess audit and business risks.[23] Thus, KPMG's audit of ARCC's fair values does not serve as a check on Defendant's marks because KPMG's audit report fails to provide details about (i) the outcome of the procedures performed and key observations relating to the fair value of investments, (ii) whether KPMG genuinely challenged management's valuations or merely confirmed them, (iii) the specific inputs, assumptions, or ranges that management used, or (iv) whether KPMG's testing produced results consistent with Defendant's valuations or whether adjustments were required. And, in any event, KPMG's "check" on fair value determinations is done ex post facto.

## THE MACRO AND CREDIT BACKDROP DEMANDED ASSET WRITE-DOWNS

### A. ARCC's Recent Performance

166. On April 28, 2026, ARCC issued its financial results for the first quarter of 2026. Those results reflected weakening performance: ARCC reported core earnings per share of $0.47, missing expectations and down from $0.50 in the prior year. On a GAAP basis, ARCC's net increase in stockholders' equity resulting from operations was $0.13 per share, representing a

---

[22] *Id*. at F-2.

[23] *See* Jeff Mahoney, *Audit transparency unlocked: The value of critical audit matters (CAMs) to investors*, THOMPSON REUTERS (June 2, 2025), *available at* https://tax.thomsonreuters.com/blog/audit-transparency-unlocked-the-value-of-critical-audit-matters-cams-to-investors/#what-are-critical-audit-matters-cams.

decline of 68.3%. The Fund also reported quarterly revenue of $763 million during the quarter, 4.5% below the consensus estimate of $776.4 million, but showed ample funding. ARCC further reported that its unrealized net losses jumped to $412 million in the first quarter of 2026, up from $83 million a year earlier. As of ARCC's April 28 earnings date, its share price was down 6.5% year-to-date, and NAV per share had decreased by $0.35.

167. At the same time, ARCC's first quarter marks showed little adjustment for software and other higher-risk loans, despite analyst expectations that valuations would reflect those risks. Software was a key area of market concern as investors focused on AI-related disruption, elevated leverage, and weakening secondary market prices for software borrowers. ARCC's exposure to that sector was significant: Software & Services remained its largest reported industry exposure, representing approximately 22% of ARCC's portfolio as of March 31, 2026. According to ARCC's first-quarter 2025 filing, only a handful of software loans were marked lower than their prior quarter valuations.

168. That limited valuation response is significant because ARCC's concentration in software and technology investments both heightens investor concerns and increases the risk that the Fund's portfolio is overvalued.

169. The private credit sector has come under increased scrutiny as AI-related disruption, fund outflows, and credit-stress concerns have pressured alternative asset managers' stocks. Much of that pressure has been tied to software-sector repricing, as AI-driven disruption has raised concerns about software borrowers' valuations and credit quality. Shortly before ARCC released its first-quarter 2026 results, investors in Ares Strategic Income Fund, a non-public BDC affiliated with Ares Management, submitted unprecedented redemption requests. Those requests were reportedly driven by concerns about private credit risk, market volatility, and potential AI-

driven disruption at portfolio companies. The redemption pressure also reflected valuation concerns, including investor concern that loans—particularly software-company loans—were not worth their recorded values.[24] Following a first quarter 2026 surge in investor withdrawal requests representing $1.2 billion, or 11.6% of shares outstanding, Ares Management capped redemptions at 5%. Ares Management itself has lost over 20% of its market value this year alone.

### B. AI Disruption and Software-Sector Repricing

170. The private credit sector has come under increased scrutiny as AI-related disruption, fund outflows and credit stress concerns have pressured alternative asset managers' portfolios. Much of that pressure has been tied to software sector repricing, as AI-driven disruption has raised concerns about software borrowers' valuations and credit quality.

171. AI disruption has fundamentally altered the valuation framework for software companies. According to Stanford Digital Economy Lab research, early career workers in AI-exposed jobs saw a 16% relative employment decline since late 2022, with software developers aged 22 to 25 experiencing a nearly 20% decline from peak employment levels. The shift reflects a structural change in how software companies are valued: companies that successfully integrate AI into their products and services may see increased revenue multiples, while those that fail to adapt face declining demand for their services and compressed valuations. S&P Global Ratings has noted that AI-driven pricing pressure and consolidation could weaken interest coverage and free cash flow for weaker credits in the software sector.

---

[24] *See* Maureen Farrell, *New Limits on Investors and a Debt Downgrade Add to Private Credit Woes*, NEW YORK TIMES (Mar. 24, 2026), *available at* https://www.nytimes.com/2026/03/24/business/moodys-private-credit-downgrade.html; Alex Nicoll, *Ares is the latest private credit player to limit withdrawals after investors ask to redeem their money*, BUSINESS INSIDER (Mar. 24, 2026), *available at* https://www.businessinsider.com/ares-limits-private-credit-fund-withdrawals-2026-3.

172. Asset pricing has reflected these developments. According to S&P Global Market Intelligence, median software loan bid prices declined to 86% of par (or face value) in mid-March from 92% of par in February 2026.

173. ARCC's exposure to software and technology investments is higher than any other industry, but Defendant appears to have understated ARCC's public reporting of exposure to software. ARCC reported a significant software exposure of 24% as of December 31, 2025, that number excluded exposure within IHAM and SDLP, which are classified as "Financial Services" and "Investment Funds and Vehicles," respectively. While software exposure is limited within SDLP, it is the largest industry exposure in IHAM, representing approximately 16% of investments. Given that IHAM is about 84% loan-to-value, roughly 97% of IHAM's equity value is exposed to software:

| ARCC Industry Exposure | | | | | |
|---|---|---|---|---|---|
| **ARCC[1]** | | **IHAM[2]** | | **SDLP[3]** | |
| Software and Services | 24% | High Tech Industries | 16% | Capital Goods | 24% |
| Financial Services | 12% | Banking, Finance, Insurance & Real Estate | 12% | Commercial & Professional Services | 22% |
| Health Care Equipment and Services | 11% | Healthcare & Pharmaceuticals | 12% | Household & Personal Products | 15% |
| Commercial and Professional Services | 9% | Services: Business | 11% | Consumer Distribution & Retail | 13% |
| Consumer Services | 6% | Services: Consumer | 6% | Health Care Equipment & Services | 8% |
| Insurance | 5% | Retail | 5% | Food & Beverage | 6% |
| Consumer Distribution and Retail | 5% | Beverage, Food & Tobacco | 5% | Financial Services | 4% |
| Capital Goods | 5% | Automotive | 4% | Insurance | 3% |
| Sports, Media and Entertainment | 4% | Consumer Goods: Non-Durable | 4% | Materials | 3% |
| Investment Funds and Vehicles | 4% | Chemicals, Plastics & Rubber | 3% | Software & Services | 2% |
| Pharma, Biotech and Life Sciences | 3% | Hotel Gaming & Leisure | 2% | Consumer Durables & Apparel | 0% |
| Materials | 2% | Transportation: Consumer | 2% | Sports, Media & Entertainment | 0% |
| Independent Power & Renewables | 2% | Wholesale | 2% | | |
| Consumer Durables and Apparel | 2% | Capital Equipment | 2% | | |
| Household and Personal Products | 1% | Aerospace & Defense | 2% | | |
| Other | 5% | Environmental Industries | 2% | | |
| | | Construction & Building | 2% | | |
| | | Containers, Packagining & Glass | 1% | | |
| | | Telecommunicatons | 1% | | |
| | | Media: Diversified & Production | 1% | | |
| | | Other | 5% | | |
| **Total** | **100%** | **Total** | **100%** | **Total** | **100%** |
| | | | | | |
| **Software / Tech % of NAV** | | **Software / Tech % of NAV** | | **Software / Tech % of NAV** | |
| ARCC Investments at Fair Value | $ 29,485 | IHAM Investments at Fair Value | $ 11,599 | SDLP Investments at Fair Value | $ 4,159 |
| (x) % Software & Services | 24% | (x) % High Tech Industries | 16% | (x) % Software & Services | 2% |
| **ARCC Software / Tech Exposure** | **$ 7,032** | **IHAM Software / Tech Exposure** | **$ 1,856** | **SDLP Software / Tech Exposure** | **$ 65** |
| (/) ARCC NAV | 14,318 | (/) IHAM NAV | 1,904 | (/) SDLP NAV | 1,117 |
| **Software / Tech % of ARCC NAV** | **49%** | **Software / Tech % of IHAM NAV** | **97%** | **Software / Tech % of SDLP NAV** | **6%** |

*(1) ARCC industry exposure per pg. 10 of FY-25 10-K*
*(2) IHAM industry exposure per Ivy Hill Asset Management Q4'25 investor presentation*
*(3) SDLP industry exposure per Exhibit 99.2 of FY-25 10-K*

174. Including IHAM and SDLP, software and technology investments account for about 63% of ARCC's NAV on a consolidated basis. This estimate is consistent with industry classifications, which likely understate true software exposure, as detailed by *The Wall Street Journal*.[25]

175. Such high exposure to software and technology companies means increased AI disruption risks and pressured valuations. The rapid adoption of AI has caused sector-wide reevaluation of software debt, increased market concern and caution and has resulted in high redemption requests in non-traded BDCs.

176. And when taking into account the investments in related-entities IHAM and SDLP, ARCC's exposure to software and technology investments make up a significant 63% of ARCC's NAV on a consolidated basis.

**C. Broader Market Stress**

177. The recent period of ARCC's fourth quarter 2024 to fourth quarter 2025 featured known credit headwinds that an independent market participant would have priced and that were not reflected in Defendant's marks.

178. ASC 820-10 requires fair value assessments for Level 3 assets to incorporate various qualitative factors, including market and economic climate, sector and company-specific performance and overall market volatility and liquidity.

179. First, the tariff escalation starting in April 2025 raised recession probability to 40% to 50% and cut gross domestic product growth to 0.5%. This forced private equity portfolio

---

[25] *See* Jack Pitcher and Matt Wirz, *Private Credit's Exposure to Ailing Software Industry is Bigger than Advertised*, WALL STREET JOURNAL (Mar. 29, 2026), *available at* https://www.wsj.com/finance/investing/private-credits-exposure-to-ailing-software-industry-is-bigger-than-advertised-d80da378.

companies—leveraged at 8x average—to face significant margin compression which an independent market participant would have priced into the leveraged loans that comprise the majority of ARCC's portfolio.

180. Second, credit market conditions have deteriorated sharply. UBS estimates default rates could hit 13% for U.S. private credit as AI disruption accelerates, totaling $75 to $120 billion in potential defaults. As of February 2026, $25 billion of speculative-rated software loans traded below 80 cents on the dollar, and PIK usage industry-wide surged from about 5% to 11%, reflecting increasing borrower cash-flow stress across the sector.

181. Third, rating agencies have responded to these conditions. Moody's downgraded its outlook for BDCs to negative. In June 2026, Wells Fargo downgraded its outlook for ARCC to equal-weight and lowered its price target by 5%. Financial services firm Rubicon Associates downgraded ARCC to hold due to valuation concerns on August 1, 2026, referencing that NII per share had declined to $0.50—narrowing dividend coverage cushions to roughly 104%, and non-accruals rose to 2.4% of cost in the second quarter of 2026 (up from 2.1% in the prior quarter), indicating credit drift and earnings compression.

182. Despite these converging headwinds, Defendant's reported values did not reflect the degree of repricing and credit deterioration occurring in observable markets.

## LEGAL FRAMEWORK

### A. The ICA'S Statutory Authority and Framework

183. An investment fund pools capital from investors in order to pursue a common investment strategy. Investment funds are managed by professional asset managers who are paid a fee, plus expenses, by investors. Before the ICA, this separation of the ownership of the investment funds from the control over the funds led to substantial conflicts of interest. In an effort

to mitigate conflicts of interest and protect the public from abuses in the investment fund industry, the ICA was enacted along with the Investment Advisers Act of 1940.

184. The ICA regulates the structure and operations of investment funds. The ICA seeks to protect the public primarily by requiring full disclosure of financial conditions and investment policies and restricts risky practices like excessive leverage. The ICA details rules and regulations that investment companies must follow when offering and maintaining investment product securities, and imposes registration requirements, mandatory disclosure requirements, balance sheet constraints and fund governance rules.

185. With respect to governance, the ICA requires that at least 40% of the investment company's directors be unaffiliated with its adviser, sponsor, or other key affiliates. The ICA also limits transactions between funds and affiliated parties, and imposes fiduciary duties on officers, directors, and investment advisers.

186. Section 36(b) was added to the ICA in 1970 after the SEC determined in the 1960s that investment advisers were still charging investment funds excessive fees that were "substantially higher" than rates they charged other clients.[26]

187. Section 36(b) imposes a fiduciary duty on mutual fund investment managers (and their affiliates) with respect to the receipt of compensation for services, specifically providing that:

> [T]he investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser. An action may be brought under this subsection by the Commission, or by a security holder of such registered investment company on behalf of such company, against such investment adviser, or any affiliated person of such investment adviser … who has a fiduciary duty concerning such compensation or payments, for breach of fiduciary duty in respect of such

[26] *See A Study of Mutual Funds Prepared for the Securities and Exchange Commission by the Wharton School of Finance and Commerce*, H.R. Rep. No. 2274, p. 296 (1962).

> compensation or payments paid by such registered investment company or by the security holders thereof to such investment adviser or person.

188. Section 36(b) is a specialized statutory claim focused strictly on whether an investment adviser charged a fee that is disproportionately large relative to the services rendered. As an enforcement mechanism, Section 36(b) specifically grants fund stockholders an express right of action against a fund's adviser that receives excessive advisory fees and does not limit such cause of action to any particular theory of excessive fees. In fact, legislative history makes clear that Congress contemplated that valuation of investments "determines … the basis for investment management compensation arrangements."[27]

189. The SEC has specifically acknowledged that "an adviser's receipt of advisory fees that are *based on inflated NAVs* may raise issues under, among other things, Sections 15(c) and 36(b) of the 1940 Act."[28]

190. Under the ICA, "scrutiny of investment adviser compensation by a fully informed mutual fund board … and shareholder suits under § 36(b) are mutually reinforcing but independent mechanisms for controlling adviser conflicts of interest."[29]

191. Section 36(b)(1) expressly provides that "[i]t shall not be necessary to allege or prove that any defendant engaged in personal misconduct."

---

[27] S. REP. 94-75, 83, 1975 U.S.C.C.A.N. 179, 261-62.

[28] *Division of Investment Management: December 1999 Letter to the ICI Regarding Valuation Issues*, S.E.C. Staff Guidance and Studies, 1999 WL 35020116, at *5 (S.E.C. Misc., Dec. 8, 1999) (emphasis added); *see also Good Faith Determinations of Fair Value*, 86 FR 748-01 (Jan. 6, 2021) ("Valuation of fund investments is also important because it can affect funds' fee and performance calculations," and "[i]mproper valuation can cause investors to pay fees that are too high or to base their investment decisions on inaccurate information").

[29] *Jones v. Harris Assocs. L.P.*, 559 U.S. 335, 336 (2010) (citations omitted).

192. The test for determining whether fee compensation paid to an investment adviser is excessive is "essentially whether the fee schedule represents a charge within the range of what would have been negotiated at arm's-length in light of all the surrounding circumstances."[30]

193. If an adviser charges a fee that is "so disproportionately large that it bore no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining," the adviser has violated Section 36(b).[31]

### B. The *Gartenberg* Factors

194. To make this determination, courts consider the following non-exclusive factors set forth in *Gartenberg v. Merrill Lynch Asset Management, Inc.*, 694 F.2d 923, 930 (2d Cir. 1981):

(1) the nature and quality of services being paid for by the fund and its investors;

(2) whether the trustees exercised a sufficient level of care and conscientiousness in approving the investment advisory or management agreements;

(3) what fees other mutual fund complexes or funds within the same fund family charge for similar services to similar mutual funds;

(4) whether savings from economies of scale were passed to the funds and their investors or kept by the investment adviser; and

(5) the costs of providing investment management services and the profitability of providing those services to the funds.

195. There is no requirement to make a conclusive showing as to each *Gartenberg* factor and the factors are non-exclusive. The court should consider "all relevant circumstances" where other factors merit consideration when considering whether the fees charged by an adviser violated Section 36(b).[32]

---

[30] *Gartenberg v. Merrill Lynch Asset Management, Inc*., 694 F.2d 923, 928 (2d Cir. 1981).

[31] *Id.*

[32] *Jones*, 559 U.S. at 347.

### C. Remedies Under the ICA

196. The amount of advisory fees that Defendant extracted and retained from ARCC is so disproportionately large that it bears no reasonable relationship to the services rendered in exchange for that fee and could not have been negotiated through arm's-length bargaining, as demonstrated by applying the *Gartenberg* factors.

197. Section 36(b) provides expansive remedies. It provides for "both 'damages or other relief' and nowhere states that rescission is unavailable," or any other equitable remedy.

198. Separately, as a safeguard for investors against fund agreements that violate the ICA, Section 47(b) of the ICA, 15 U.S.C.A. § 80a-46, makes contracts made in violation of the ICA unenforceable and allows rescission of a contract that violates a provision of the ICA as follows:

> (1) A contract that is made, or whose performance involves, a violation of this subchapter, or of any rule, regulation, or order thereunder, is unenforceable by either party … unless a court finds that under the circumstances enforcement would produce a more equitable result than nonenforcement and would not be inconsistent with the purposes of this subchapter.
>
> (2) To the extent that a contract described in paragraph (1) has been performed, a court may not deny rescission at the instance of any party unless such court finds that under the circumstances the denial of rescission would produce a more equitable result than its grant and would not be inconsistent with the purposes of this subchapter.

### D. SEC Rule 2a-5 and the Valuation Designee Framework

199. Rule 2a-5 under the ICA establishes a regulatory framework for the determination of fair value for registered investment companies. The rule permits—it does not require—a fund's board to designate the investment adviser as the Valuation Designee responsible for fair value determinations, subject to board oversight. The rule does not require the Valuation Designee to be independent of the adviser, nor does it mandate that an IVP independently verify the data that it

receives. Nor does Rule 2a-5 create a safe harbor insulating an adviser from liability under other provisions of the ICA. At most, Rule 2a-5 establishes a *minimum* procedural framework for fair-value determinations. It does not answer whether an adviser that controls valuation inputs and income-recognition judgments may receive excessive compensation based on those same values and income streams consistent with its fiduciary duty under Section 36(b). The structural conflict identified above, where the fee earning adviser controls the valuation inputs, is permissible under the rule's current framework but it heightens rather than reduces the need for rigorous board oversight and arm's-length bargaining.

200. ASC 820 10 (Fair Value Measurement) establishes hierarchy and methodology for fair value measurement. ARCC's PIK positions are classified as Level 3 assets (significant unobservable inputs), giving management wide discretion over the selection of valuation inputs and methodologies. The measurement is defined by reference to the assumptions market participants would use, and market participants are by definition independent of each other. Where the valuation process starts and ends with the adviser's own data, the resulting measurements do not reflect the assumptions an independent buyer would use.

201. ARCC's tax status as a RIC under Subchapter M of the Internal Revenue Code (§§ 851-855) requires ARCC to distribute at least 90% of its investment company taxable income. Because PIK interest and preferred dividends constitute taxable income when accrued (regardless of cash receipt), the Company must fund distributions from other cash sources, including cash on hand, borrowings, repayments, asset sales, or capital raises. The result is a structural cash-flow mismatch that benefits Defendant and burdens ARCC: PIK accruals increase reported income and support Defendant's quarterly incentive fees, while ARCC must distribute cash on income that may not be collected until maturity, if ever. The risk is not hypothetical; where Defendant marks

PIK positions below amortized cost, those marks reflect doubt that the accrued income will be fully recovered, even as Defendant has already collected fees on that income.

## DEFENDANT BREACHED ITS FIDUCIARY DUTY BY EXTRACTING GROSSLY EXCESSIVE FEES

### A. Defendant's Compensation is Excessive Under the *Gartenberg* Factors

202. The amount of advisory fees that Defendant extracted and retained from ARCC is so disproportionately large that it bears no reasonable relationship to the services rendered in exchange for that fee and could not have been negotiated through arm's-length bargaining, as demonstrated by applying the *Gartenberg* factors.

203. This case presents a compensation conflict that differs from the past Section 36(b) cases involving a fund that holds publicly traded securities with observable market prices. In those traditional cases, the adviser may select the securities, but the market generally determines the values on which advisory fees are calculated. Here, by contrast, ARCC holds illiquid Level 3 private credit assets whose values are determined through a process in which Defendant serves as the Valuation Designee. That distinction matters because the question becomes whether Defendant was paid on values and income streams that Defendant itself substantially controlled. Fair value accounting is not merely an accounting input in this structure; it is the mechanism through which advisory compensation is generated. If Defendant's marks are inflated, stabilized, or delayed in recognizing deterioration, then the fees calculated from those marks are correspondingly inflated, showing that those fees could not have resulted from arm's-length bargaining.

204. Valuation is critically important here because it is one of the services and core advisory functions Defendant performed for ARCC and because Defendant's own fair value determinations directly affected the compensation Defendant received. Unlike a fund holding publicly traded securities whose values are supplied by market prices, ARCC held illiquid Level

3 private credit assets whose values depended on Defendant's judgment. Those values determined reported gross assets, NAV and, together with income-recognition judgments, the asset and income base on which Defendant's management and incentive fees were calculated. Thus, the quality of Defendant's valuation, monitoring and income-recognition services is directly relevant to the *Gartenberg* inquiry into the nature and quality of services rendered and whether Defendant's fees bore a reasonable relationship to those services.

### 1. *Gartenberg* Factor 1: Nature and Quality of the Services Rendered

205. ARCC primarily invests in Level 3 private credit assets that require active monitoring and valuation. The nature of Defendant's services requires credit selection, monitoring, loan origination and restructuring, and fair value judgment over the illiquid Level 3 assets. Those functions were not incidental to Defendant's role; they were central to the advisory services for which ARCC paid Defendant. Under the Investment Advisory Agreement, Defendant is responsible for executing, monitoring and servicing ARCC's investments and for providing investment advisory, research and related services required for the investments of ARCC's funds. Defendant serves as ARCC's Valuation Designee with day-to-day responsibility for implementing the valuation process and determining the fair value of ARCC's investment portfolio each quarter.

206. With respect to investment advisory services, as a result of Defendant's investment choices, ARCC has a significant exposure to software and technology investments, increased leverage (through IHAM and SDLP), and above-peer average equity exposure and PIK securities. All of these investment choices not only increase ARCC's risk profile, but also increase Defendant's fees and negatively affect performance. ARCC's financial results for the first quarter of 2026 reflected weakening performance, including decreased earnings per share, a substantial

increase in unrealized net losses, NAV erosion and declining share price. According to ARCC's most recent quarterly report, loan defaults touched their highest level since at least 2021.

207. With respect to the services that Defendant provides relating to fair valuation of ARCC's investments, Defendant has systematically maintained fair value marks for ARCC's portfolio assets at levels inconsistent with observable market evidence, economic conditions, and the changing risk profile of its portfolio—particularly its PIK securities positions.

208. ARCC's own public filings confirm that the fair value standard Defendant should apply is based on the price that would be received for an investment in an orderly transaction between independent, knowledgeable and willing market participants on the measurement date. Defendant's valuation work was not collateral to the advisory relationship; it was one of the core services ARCC paid Defendant to perform. As alleged herein, ARCC paid compensation generated by a valuation service that produced values exceeding the prices independent market participants would have paid.

209. Defendant's improper valuation is incentivized by the inherent structural conflicts in which Defendant simultaneously controls the marks on the assets and benefits financially from higher marks through management fees and incentive fees (totaling $773 million in 2025 alone), which include fees that are based, in part, on non-cash PIK income or other deferred income that Defendant is not obligated to return even if the asset is later determined to be uncollectible by the Fund. Those conflicts made the quality of Defendant's valuation, monitoring, and income-recognition services directly relevant to the compensation Defendant received. As investment adviser, Defendant selected, monitored, restructured, and serviced ARCC's investments. As Valuation Designee, Defendant determined the fair value of those same investments. As fee recipient, Defendant was paid based on reported gross assets and NII.

210. Had Defendant assigned accurate (lower) marks to ARCC's portfolio assets, that would directly reduce its advisory fees. Similarly, had Defendant earlier placed deteriorating credits on non-accrual or otherwise stopped recognizing non-cash PIK income as fee-bearing NII, ARCC's reported NII and Defendant's income incentive fees would have been lower. The valuation failures therefore were not collateral accounting disputes—they concerned the quality of services Defendant was paid to perform and the inputs used to calculate the fees Defendant received.

211. With respect to Defendant's investment advisory services, generally, investment advisory services, funded by advisory fees, accounted for 48.49% of ARCC's total annual expenses in 2025—by far the largest category of Fund expenditures. As detailed herein, Defendant's valuation services provided to ARCC are deficient because Defendant maintained fair value marks that did not adequately reflect observable market evidence, credit deterioration, elevated PIK exposure and the changing risk profile of ARCC's portfolio, while receiving fees calculated on those same reported asset values and related accrued income.

212. Moreover, a meaningful portion of ARCC's reported financial stability derives from structural dynamics within the Ares Management platform—not from differentiated investment management services such as credit selection, underwriting, and monitoring, which ARCC pays Defendant to provide as its adviser. Therefore, the advisory fees ARCC paid to Defendant are disproportionate to the quality of investment management services actually provided. Moreover, in 2025 ARCC's common stock generated a meager 1.07% annualized total return (calculated with dividends reinvested) to stockholders in 2025, and in 2026 (YTD as of mid-September 2026), ARCC's total return was 2.8%.

### 2. *Gartenberg* Factor 2: Profitability to the Adviser

213. While Defendant fails to publicly disclose its profitability in providing services to ARCC, there are indications that Defendant's profits are substantially higher than average, and therefore that the advisory services Defendant provides to ARCC are highly profitable to Defendant.

214. Public filings of Ares Management include meaningful data on its fee-related earnings ("FRE") margins. Given that Defendant is Ares Management's subsidiary entity receiving fees from more than 40 pooled investment vehicles and operates within the same broad platform, similar economics and margins would apply to Defendant.

215. As of March 31, 2026, Ares Management reported $464.4 million in fee-related earnings, fee-paying AUM of $399.6 billion, and an FRE margin of 42.4%.

216. Furthermore, additional publicly available information shows that Defendant's advisory fees are excessive. According to Defendant's regulatory filings, it manages a total of 57 accounts, with a combined total of $97.6 billion AUM. ARCC's total AUM is more than $31 billion, thus, more than 30% of Defendant's investment advisory income is attributable to ARCC. As such, Defendant's historical and continued reliance on ARCC for income gives it added incentive to set rates at excessive levels or inflate asset value to garner excessive fees.

217. ARCC alone paid Defendant advisory fees totaling $773 million in 2025, based on ARCC's total reported assets of $31.2 billion. Considering that Defendant manages an additional $66.4 billion in assets for other Ares Management-affiliated and other entities, and assuming a similar fee structure that Defendant has with ARCC, it is estimated that Defendant received

additional advisory fees of approximately $1.65 billion, and together with fees paid by ARCC, a total of $2.4 billion in advisory fees in 2025.[33]

218. Defendant provides advisory services exclusively to Ares Management-affiliated entities and manages portfolios with overlapping investments, including through co-investment arrangements across affiliated funds.[34] This structure allows Defendant to originate, diligence, and monitor substantially similar investments across multiple vehicles simultaneously, reducing marginal costs while generating multiple streams of fee revenue tied to the same or similar underlying assets. Moreover, as discussed above, Defendant incurs limited marginal costs as assets scale.

219. In addition, Defendant discloses in its Firm Brochure that "Strategic Investors typically pay lower overall fees than other Underlying Investors in the same client," and receive "preferential economic or non-economic benefits, as well as co-investment rights or enhanced access to co-investment opportunities."[35] This two-tiered fee structure demonstrates that Defendant charges its preferred counterparties less advisory fees for the same advisory services for which ARCC stockholders pay higher advisory fees.

220. Defendant also discloses in its Firm Brochure that it and its employees acquire material non-public information and other confidential information while monitoring its clients' investments, which may restrict the ability of other clients to trade in the securities of such

---

[33] Defendant's $773 million fee from ARCC was 2.48% of ARCC's total assets. Defendant's reported AUM in 2025 ($97.6 billion) less ARCC's $31.2 billion, amounts to $66.4 billion. Applying that same 2.48% of AUM fee amount paid by ARCC to Defendant, to $66.4 AUM, results in $1.65 billion.

[34] *See* 2025 10-K at 72 ("there could be significant overlap in our investment portfolio and the investment portfolios of affiliated Ares entities that can rely on the Co-Investment Exemptive Order and have an investment objective similar to ours").

[35] *See* Firm Brochure at 5, 14.

company.[36] And, with "limited exceptions, [Defendant] and Ares Management do not establish information barriers between its internal investment teams."[37] ARCC's investment flexibility can therefore be curtailed by Defendant's activities on behalf of other Ares funds, a cost borne by ARCC's stockholders that generates no offsetting benefit.

221. Because neither ARCC nor Defendant publicly reports Defendants' financial information, Plaintiff expects that discovery will present additional detailed information relevant to the profitability factor.

222. Accordingly, Defendant's receipt of such substantial fee revenues, while managing overlapping Ares Management portfolios with shared infrastructure and limited incremental costs, is excessive in relation to the services Defendant provides.

### 3. *Gartenberg* Factor 3: Fall-Out Benefits to the Adviser

223. Fall-out benefits are indirect economic benefits an investment adviser receives from its relationship with a fund, separate from the advisory fee itself, including affiliated fee streams, soft-dollar benefits, access to investment opportunities, market information, reputational benefits, and platform efficiencies. ARCC's captive relationship with Defendant gives rise to these benefits because Defendant uses ARCC's scale, portfolio, and investor capital to support Ares Management's broader affiliated platform in ways that would not exist but for the captive relationship.

224. Defendant operates ARCC as part of a broader Ares Management platform managing multiple affiliated BDCs and private funds with overlapping investment strategies and portfolios. Ares Management originates deals centrally and allocates them across multiple

---

[36] *Id*. at 26, 27.

[37] *Id*. at 27.

affiliated vehicles (including ARCC, private funds and CLOs), all of which pay fees to Ares Management. As a result, Defendant can leverage shared personnel, infrastructure, and investment sourcing capabilities across multiple vehicles, reducing its marginal costs while generating additional revenue streams tied to each affiliated fund. Because of this shared pipeline, ARCC is likely not receiving differentiated investment management services commensurate with the management fees it pays to Defendant.

225. Defendant also benefits from co-investment arrangements and overlapping portfolio positions across Ares Management-affiliated vehicles, through which it earns fees on substantially similar or identical investments across multiple funds, further increasing the economic benefits derived from its relationship with ARCC.

226. Additionally, managing the world's largest BDC (ARCC) provides Defendant with a dominant market position and superior, proprietary information. The scale of ARCC allows Defendant to source, evaluate and invest in large loans that competitors cannot, bolstering Defendant's and Ares Management's reputation in the middle market.

227. Defendant further benefits from its relationship with ARCC, which has allowed Defendant to launch IHAM and SDLP and (i) utilize IHAM to purchase 3.7 billion in loans from ARCC, generating secondary transaction and management revenue for the broader Ares ecosystem, and (ii) direct co-investments through SDLP, which increases total AUM, optimizes transaction volume and credit deployment across multiple associated vehicles.

228. Furthermore, as Defendant discloses in its Firm Brochure, when investments are bridged or warehoused by Defendant or its affiliates before being funded by a client (such as ARCC), Defendant may retain any profit it makes from such transactions. This represents

additional adviser compensation extracted from the investment pipeline before ARCC participates, which is not offset against management fees.

229. Defendant receives additional soft-dollar fall-out benefits by performing brokerage services to ARCC's portfolio companies, such as capital restructuring services, management and consulting services, agency services, loan guarantees, commitments, and other services rendered by the Company to portfolio companies. Fees for these services flow into ARCC's pre-incentive fee net investment income and increase the incentive fee paid to Defendant.

230. These fall-out benefits, including soft-dollar benefits from brokerage services, shared platform efficiencies, and affiliated investment opportunities, materially increase the economic value of the advisory relationship to Defendant beyond the excessive advisory fees themselves.

### 4. *Gartenberg* Factor 4: Economies of Scale are Not Shared with Investors

231. Economies of scale in the provision of advisory services arise from the fact that as AUM increases, the marginal cost of providing advisory services for the assets decreases.

232. The legislative history of Section 36(b) recognizes that an investment adviser's failure to pass on economies of scale to the fund is a principal cause of excessive fees:

> It is noted . . . that problems arise due to the economies of scale attributable to the dramatic growth of the mutual fund industry. In some instances these economies of scale have not been shared with investors. Recently there has been a desirable tendency on the part of some fund managers to reduce their effective charges as the fund grows in size. Accordingly, the best industry practice will provide a guide.[38]

[38] *See* S. Rep. No. 91–184, 1970 U.S.C.C.A.N. 4897, 4901-02.

233. It is well understood that the level and cost of services required to operate a mutual fund or BDC does not increase proportionately with the assets under management.[39] In fact, Section 36(b) was enacted in large part because Congress recognized that as mutual funds grew larger, it became less expensive for investment advisers to provide the additional services, and Congress wanted to ensure that investment advisers passed on the fund investors the savings that they realized from those economies of scale. The economics of investment advisory services are widely understood to exhibit a downward-sloping average cost curve, in which the marginal cost of managing additional assets declines as assets increase, resulting in lower per-unit costs at scale. While initial and fixed operating costs for provision of investment advisory services are substantial (*e.g.,* salaries for research, trading, and portfolio management personnel sufficient to manage an entire portfolio; office space; procurement of systems and information necessary to conduct research and manage the portfolio), the variable costs associated with managing additional AUM are generally much smaller on a relative basis and do not increase proportionately with asset growth.

234. Moreover, ARCC's investment objectives, principal investment strategies, and investment process have all remained the same since ARCC became a public company. Thus, notwithstanding the growth in ARCC's portfolio assets and Defendant's advisory fees, the work facing Defendant has stayed fundamentally constant: it faces the same universe of possible investment securities, to which it applies the same techniques and strategies in pursuit of the same ends. Defendant also manages ARCC using personnel, systems, sourcing channels, valuation

[39] *See* U.S. Sec. & Exch. Comm'n Pubic Policy Implications of Investment Company Growth, H.R. Rep. No. 89-2337, at 10-11 (1966) ('"Public Policy Report") ("increases in an investment company's assets do not lead to commensurate increases in the cost of furnishing it with investment advice and other managerial services."); John C. Bogle, *ReMutualizing the Mutual Fund Industry—The Alpha and the Omega*, 45 B.C. L. REV. 391, 399- 404 (2004); *see also* 1970 U.S.C.C.A.N. 4897, 4902 (recognizing problems arising due to economies of scale attributable to dramatic fund growth).

processes and monitoring infrastructure shared across the broader Ares Management platforms. Those shared resources create scale efficiencies because the marginal cost of managing additional or overlapping assets is materially lower than the initial cost of building and maintaining the platform.

235. From 2021 to 2025, ARCC's portfolio assets have increased by 55%, from $20.1 billion to $31.2 billion.

236. The fee structure set forth in the Investment Advisory Agreement, including the applicable fee rates, has remained unchanged since at least 2019 (when ARCC's total assets were $14.9 billion—half its current size). The Investment Advisory Agreement does not include any meaningful scale-based breakpoints to reduce the Fund's fee rate as ARCC's portfolio asset base increases to ensure that the benefits of economies of scale would accrue to investors. Because advisory fees are based upon the Fund's gross assets, portfolio asset increases necessarily increase the advisory fees. As a result of the Fund's increase in portfolio assets, the investment advisory fees paid by ARCC to Defendant have also increased.

237. The aggregate amount of advisory fees that ARCC has paid to Defendant has increased 53% from 2021 ($504 million) through 2025 ($773 million), and in that same timeframe, ARCC's total assets have increased by 55%. In other words, Defendant's fee increase was essentially proportionate to ARCC's asset increase, even though the Investment Advisory Agreement contains no meaningful scale-based mechanism to ensure that any economies of scale generated by ARCC's growth were shared with stockholders.

238. Thus, because the variable costs associated with managing additional AUM are generally much smaller on a relative basis and do not increase proportionately with asset growth, Defendant has benefited from substantial economies of scale in connection with the investment

advisory services provided to ARCC—economies that have not been shared with ARCC's stockholders through reduced advisory fees, meaningful breakpoints, total-return protections, clawbacks for incentive fees earned on uncollected PIK income, or other reductions that would have aligned Defendant's compensation with realized shareholder value.

239. Moreover, because the fee structure includes no meaningful breakpoints to reduce Defendant's fees as ARCC's AUM increased, there are no economies of scale benefits shared with ARCC and its stockholders.

### 5. *Gartenberg* Factor 5: Comparable Fee Structures—the Adviser's Incentive Fee Structure Magnifies Asymmetry

240. The fee structure set forth in ARCC's Investment Advisory Agreement does not fall within any "typical" range of advisory fees comparable to other BDCs because ARCC is the largest publicly traded BDC in the country with approximately $31 billion in total assets—double the assets of even the second largest BDC. There is thus no "typical" comparison for Defendant's advisory fees. Because of the significant increase in ARCC's assets over the last five years and its current asset size, which more than doubles its closest BDC peer, the "typical" advisory fee percentages (for much smaller funds) result in excessive advisory fees. Unlike ARCC, peer BDCs with even significantly less AUM have imposed advisory fee reductions as fund assets increased.[40] Defendant's fee rates exceed the advisory fees paid by a number of public BDCs, including, those considered to be amongst the "top" largest BDCs that focus on private credit, and offer high

[40] For example, the adviser for Golub Capital BDC, Inc., a public BDC with approximately $8.9 billion AUM, permanently reduced its adviser's base management fee from 1.375% to 1% in July 2023 and reduced its income incentive fee to from 20% to 15% in January 2024 following a merger that increased its assets from $5.73 billion to roughly $8.5 billion. *See* Golub Capital BDC, Inc., Earnings Presentation for the quarter ended Mar. 31, 2024, at 4, *available at* https://golubcapitalbdc.com/wp-content/uploads/2024/05/GBDC-FY-2024-Q2_Earnings-Presentation.pdf.

dividend yields by lending primarily floating-rate, senior secured debt to U.S. middle-market companies) that, like ARCC, may not be able to bargain competitively.[41]

241. In addition to failing to include any meaningful breakpoints that reduce the base fee rate as ARCC's portfolio asset base grew, the Investment Advisory Agreement also fails to include a meaningful clawback feature for incentive fees that are paid on deferred income that is not ultimately realized by the Fund, further compounding excessive fees.

242. Based on an analysis of 43 publicly traded BDCs, half of those BDCs' advisory fee structures included a look-back feature, or clawback, that requires the adviser to return incentive fees that are based on deferred income, such as PIK interest, to account for credit losses.[42] This clawback feature is a mechanism designed to ensure that compensation reflects full-cycle investment performance rather than interim or unrealized results, and that advisers are not rewarded for short-term income that later turns into long-term capital losses. This type of clawback mechanism is particularly important where incentive fees are calculated and paid on a quarterly basis based on accrued or non-cash income, as it aligns compensation with realized performance over the life of the investment, consistent with practices commonly observed in institutional investment structures.

243. This is a meaningful component of the advisory fee structure, as approximately $80 to $97 million of Defendant's fees in 2025 were attributable to PIK income.

---

[41] For example, Blackstone Secured Lending Fund's (BXSL) ($13.8 billion AUM) adviser charges a base management fee of 1.00% of gross assets and an income incentive fee of 17.5% on net investment income (with a three-year total return lookback feature). BXSL's advisory fee structure consumes roughly 18.8% of the fund's total income, as opposed to ARCC's fee structure, which consumes roughly 24.5% of ARCC's total income.

[42] *See BDC Facts and Stats*, MAYER BROWN (June 15, 2025), *available at* https://www.mayerbrown.com/-/media/files/perspectives-events/publications/2025/06/bdc---factsstats-(2025).pdf%3Frev=644a03d6db80415e9da067a9aba85de6.

244. The asymmetry in Defendant's fee structure is further magnified because advisory fees are calculated based on ARCC's reported asset values and net investment income, both of which are determined using valuation inputs controlled by Defendant. To the extent those valuations incorporate inflated or overstated asset values or accrued income, Defendant's compensation is calculated on a base that exceeds the underlying economic value of the Fund's portfolio. Comparable fee structures that include clawback or look-back provisions mitigate this risk by aligning compensation with realized performance, whereas Defendant's structure permits the retention of fees based on unrealized or overstated values.

245. As a result, Defendant's fee structure is less favorable to ARCC than those employed by a substantial portion of comparable BDCs, particularly with respect to the treatment of deferred or non-cash income and the absence of mechanisms to reconcile compensation with realized investment performance. Defendant's fee structure permits it to retain compensation under circumstances where comparable structures would require adjustment or repayment.

**B. The Board Process Does Not Cure Excessiveness**

246. Courts consider "all facts in connection with the determination and receipt of [adviser] compensation," including "the independence of the unaffiliated directors and the care and conscientiousness with which they performed their duties" in approving the advisory agreement.[43]

247. Section 15(c) of the ICA provides that fund directors have a duty to request and evaluate, and the fund adviser has a corresponding and independent duty to provide, such information as may reasonably be necessary for the directors to evaluate the terms of any advisory

[43] *Gartenberg*, 694 F.2d at 929-30.

agreement. The Board's obligation is not merely procedural. It requires substantive engagement with the facts bearing on the adviser's compensation.

248. The Investment Advisory Agreement must be approved annually by ARCC's Board, a majority of ARCC's independent directors, as well as by the Audit Committee.

249. ARCC does not maintain a separate compensation committee. Instead, the role of the compensation committee is performed by the Audit Committee. This governance structure concentrates responsibility for financial reporting, valuation oversight, related-party matters, and compensation-related functions in the same committee, even though those issues are central to the excessive-fee analysis here. The same independent directors tasked with overseeing valuation and fee-related financial reporting also perform the compensation committee function, which shows that the Board process was not a sufficiently independent and rigorous check on Defendant's compensation.

250. The Second Amended Investment Advisory Agreement, effective as of June 6, 2019, is the operative agreement, which renews for successive annual periods if approved by the Board, including a majority of the independent directors. On May 13, 2025, the Board approved the continuation of the Investment Advisory Agreement and determined that doing so was in the best interest of ARCC's stockholders. The terms of the current Investment Advisory Agreement relating to advisory fees have not changed since it became effective in 2019, and the fee structure has not changed for at least ten years.

251. ICA Section 15(c) requires a fund's board—specifically a majority of the independent directors—to annually review and approve an investment advisory agreement and imposes a duty on the directors to request and evaluate, and a duty on the adviser to furnish, information that may be reasonably necessary to evaluate the terms of the advisory agreement.

ARCC's 2025 10-K discloses only that the Board "reviewed a significant amount of information" and considered, in essence, the *Gartenberg* factors. While it appears that the Board considered ARCC's and Defendant's "investment performance" and other investment services, there is no indication that the Board considered Defendant's fair valuation services provided to ARCC in approving the Investment Advisory Agreement. In considering the cost of services provided by Defendant (*i.e.*, advisory fees), the Board considered publicly available advisory fee data from comparable BDCs "of similar size and with a similar investment objective." However, there is no BDC of comparable size—ARCC's total assets of more than $31 billion dwarfs all other public BDCs, with more than double the assets of the second largest BDC. Thus, there is no indication that the Board took into account ARCC's size relative to all other public BDCs when considering the fairness and reasonableness of Defendant's advisory fees and in approving the Investment Advisory Agreement—nor did the Board consider the related economies of scale enjoyed by Defendant as a result. In fact, with respect to the economies of scale considered by the Board, ARCC disclosed only that the Board "considered information about the potential for our stockholders to experience economies of scale as we grow in size"—but does not mention that that the Board even considered economies of scale generated by the amount that ARCC has *already* grown in size. ARCC's public filings do not report that the Board considered the fall out benefits flowing to Defendant from its advisory relationship with ARCC described herein, and none of the public records indicate that the Board has ever rejected or negotiated down the advisory fees proposed by Defendants.

252. During the period surrounding the Board's approval of the Investment Advisory Agreement on May 13, 2025, ARCC's increasing reliance on PIK income, the absence of a clawback or meaningful breakpoint in the fee structure, the leverage and risk embedded in

affiliated vehicles IHAM and SDLP, and the extent to which reported income and asset stability depended on Defendant-controlled valuation judgments were observable in ARCC's own public filings. At the same time, broader conditions in the private credit market were evolving and several portfolio-level indicators had begun to shift. These trends show an increasing risk profile and increasing sensitivity to credit conditions and valuation assumptions—material facts bearing on Defendant's services and fees—that were either not adequately considered or not given sufficient weight.

253. In addition, the independence of ARCC's Board is compromised by overlapping Board service across the Ares Management-affiliated vehicles. ARCC claims to have six "independent" directors on its ten-member Board, including Anne Torre Bates, Steven B. McKeever, Eric B. Siegel, Daniel G Kelly, Jr., Mary Beth Henson and Michael K. Parks. However, four of those so-called "independent" directors serve, or have served, on the board(s) of at least one other Ares Management-affiliated fund, including affiliated BDCs that compete with ARCC and other Ares Management-related funds for investments. This overlapping service creates cross-fund fee dependencies and career incentives tied to the continuation of the advisory relationship.

254. Moreover, while six directors are considered independent, the four interested directors on the Board, which include Michael Arougheti, Mitchell Goldstein, Michael Smith and Kipp deVeer, are all in positions to influence the other Board members with respect to issues relating to Defendant, including voting to approve the Investment Advisory Agreement and approving/determining the fair value of ARCC's portfolio assets. For instance, according to public filings, Defendant is led by certain partners of the Ares Credit Group: Mitchell Goldstein and Michael Smith. In addition to leading and being members of Defendant's investment team, both Mitchell Goldstein and Michael Smith are Co-Chairs of the ARCC Board, partners in and Co-

Heads of Ares Credit Group (which comprises Defendant), and members of the investment committee of Ares Credit Group's U.S. Direct Lending ("USDL") strategy, which committee serves as ARCC's portfolio manager. Michael Arougheti is the co-founder, CEO and President of Ares Management, and is also a member of the USDL investment committee, which manages ARCC's portfolio. Anthony Ressler is another co-founder and executive chairman of Ares Management. Ressler is a limited partner of Defendant and has a 25-50% ownership interest in Defendant through intermediate holding companies. Kipp deVeer serves as the Executive Vice President of Ares Management, is a member of the USDL investment committee (and is thus ARCC's portfolio manager), and until February 2025, served as the head of the Ares Credit Group, which includes Defendant.

255. Moreover, three of ARCC's interested directors—deVeer, Goldstein and Smith—were ASIF's sole interested trustees in 2024 and 2025. At the same time, Bates, McKeever, and Siegel were all independent directors/trustees of both ARCC and ASIF. Thus, the Boards of both ASIF and ARCC shared nearly the same interested and independent directors/trustees.

256. Based on the four interested directors' roles at ARCC and their leadership and/or control over Defendant and ARCC's portfolio, which includes investment decision-making, the independent directors have little reason to (i) not approve the Investment Advisory Agreement for Defendant, which the interested directors lead and serve on its investment team; or (ii) second guess or challenge the complex financial decisions and valuations of the directors who run and/or control Defendant, Ares Management, or its affiliated entities.

257. In addition, the directors' fees that the independent directors receive from ARCC and Ares Management-affiliated entities present conflicts of interest and may serve as a basis to impair objectivity.

258. Anne Torre Bates occupies numerous compensated oversight positions across the Ares Management fund complex. Bates has served as an independent director of ARCC since 2010 and chairs ARCC's Audit Committee. She has also served as a trustee of ASIF since 2022, where she also chairs that fund's Audit Committee, and as a trustee of Ares Core Infrastructure Fund ("ACI") since October 2024, where she also serves as a member of the Audit Committee and the Nominating and Governance Committee.

259. Steven B. McKeever likewise occupies overlapping compensated Board positions across Ares-affiliated funds. McKeever has served as an independent director of ARCC since 2012 and currently chairs ARCC's Nominating & Governance Committee and serves as a member of the Co-Investment Committee. He also serves as a trustee of ASIF, where he likewise chairs its Nominating & Governance Committee. McKeever also serves on the co-investment committees of both ARCC and ASIF. The Co-Investment Committee is specifically charged with reviewing and making findings concerning co-investment transactions pursuant to the Fund's SEC exemptive order. ARCC likewise identifies McKeever as a member of its Co-Investment Committee. McKeever receives substantial compensation from both funds.

260. Eric B. Siegel serves as the lead independent director of ARCC and the lead independent trustee of ASIF, while also serving on the Audit, Nominating and Governance, and Co-Investment Committees of both funds. He has been a director at ARCC since 2004 and lead independent director since 2010. In those positions, Siegel is specifically charged with representing the interests of the independent directors, acting as a liaison with management and the investment adviser, *i.e.*, the Defendant, facilitating communications among the independent directors, and reviewing Board and committee agendas. Siegel receives meaningful compensation from his Board service on Ares Management funds in his over 20 years of service.

261. The independent directors received notable increases in compensation during the same period in which the Board approved the continuation of Defendant's advisory arrangement. According to ARCC's 2026 proxy filing, independent director compensation increased materially from 2024 to 2025, with several independent directors receiving increases of approximately 30% or more. These compensation increases are relevant to evaluating whether the Board exercised the level of care and conscientiousness required when approving Defendant's substantial advisory fees.

262. The following table shows the compensation received by the independent directors from ARCC and Ares Management-affiliated entities in 2025:

| Independent Director | ARCC | ASIF | ACI | TOTAL |
|---|---|---|---|---|
| Ann Torre Bates | $360,750 | $142,000 | $101,000 | $603,750 |
| Mary Beth Henson | $328,250 | | | $328,250 |
| Daniel G. Kelly | $320,250 | | | $320,250 |
| Steven B. McKeever | $329,750 | $133,000 | | $462,750 |
| Michael K. Parks | $321,250 | | | $321,250 |
| Eric B. Siegel | $374,000 | $158,000 | | $532,000 |

263. Each of the independent directors, particularly those with overlapping Board positions, receive substantial compensation from ARCC and Ares Management-affiliates such that they may have financial dependencies on their Board membership(s) and thus hesitant to take positions adverse to Defendant or the interested directors/management out of fear of losing their lucrative seats on the Board. These directors' highly compensated positions undermine their independence and ability to exercise fully independent judgment in matters affecting Defendant and/or the Ares Management-affiliated funds.

264. Moreover, Bates, McKeever and Siegel, have oversight responsibilities for multiple Ares Management funds, which may preclude them from spending the necessary time and attention to assess the investment advisory fees paid by ARCC.

265. As ARCC's independent directors, they are supposed to serve as a meaningful check on management and the investment adviser, *i.e.*, the Defendant. Yet their substantial compensation from ARCC and other Ares Management-affiliated funds present an economic incentive to maintain their board positions by not taking actions or positions adverse to the interested directors when evaluating matters involving Defendant or its affiliated investment vehicles.

266. The "independence" of a director cannot be viewed in isolation from the broader economic relationships that may affect their judgment. Where a director or trustee's continued compensation and leadership opportunities depend in part on appointments elsewhere within the same sponsor's fund complex, that director/trustee has a personal financial interest in preserving a favorable relationship with the sponsor. Thus, these directors' ability to act as a meaningful check on Defendant is compromised.

267. Moreover, under SEC Rule 2a-5, the Board has oversight obligations over Defendant's fair value determinations, which requires the Board to review quarterly reports relating to the fair value of designated investments and to assess the adequacy and effectiveness of the Valuation Designee's process of determining fair value. The Board must actively oversee the Valuation Designee and cannot treat its oversight as a passive job. However, most of the independent directors do not appear to have the relevant financial background to evaluate the accuracy Defendant's fair value marks or valuation process.

268. Specifically, with respect to Bates, ARCC's 2026 proxy cites her Board value as "financial services sector" and "accounting matters," not credit analysis. Her experience includes corporate treasury, airline finance, and professional fund directorship. While Bates has served on the board of another BDC, her board role at that BDC was governance, not credit.

269. Siegel has been ARCC's lead independent director for 16 years, but he does not appear to have any technical basis to challenge fair value inputs (such as discount rates, comparable selection and recovery assumptions) provided by Defendant. ARCC's proxy attributes Siegel's Board contribution to "regulatory and risk management issues," not credit or portfolio management experience. While Siegel is a retired limited partner of Apollo Advisers and Lion Advisers, his role at those companies included passive capital commitment, not a credit professional, underwriter, or portfolio manager.

270. McKeever's career background is in the entertainment industry and entertainment law. ARCC's proxy identifies McKeever's Board contribution as "small business and entrepreneurial experience."

271. Kelly is valued as a Board member for his corporate governance and securities law experience, but he also has no experience in determining fair value mark accuracy.

272. The remaining two independent directors, Mary Beth Henson and Michael Parks, each have backgrounds with minimal experience to evaluate assessments of fair value.

273. With respect to approving the Investment Advisory Agreement, the Board is ultimately faced with a "nuclear option." As recognized by SEC staff, "[a]s a practical matter, the primary threat that independent directors who do not approve of an adviser's contract have is what some call the "nuclear option," which is a vote not to approve the contract and instead obtain a replacement adviser for the fund. However, given the unique structure of the fund and its adviser,

combined with the expectation of investors, replacing the adviser would most likely lead to mutually assured destruction because investors will flee the fund (if they can), it will close, and the board will be out of business."[44] This practical reality further dissuades ARCC's independent directors from rejecting the Investment Advisory Agreement.

274. Even assuming ARCC's designated independent directors *are* disinterested or unaffiliated, the care and conscientiousness with which they performed their duty in approving the Investment Advisory Agreement and monitoring the adviser relationship indicate that the Board was not fully informed about facts bearing on Defendant's services and fees or failed to give multiple facts sufficient weight.

275. The Board approved an advisory agreement that provides for an advisory fee structure (including the fee base percentages) that has not changed in more than ten years, which links compensation to gross asset levels and accrued investment income, including non-cash income components, even though ARCC's gross assets have increased by roughly 228% in the past ten years. As of year-end 2025, ARCC reported total assets of approximately $31.2 billion, and net assets of approximately $14.3 billion. The management fee is therefore calculated on an asset base that is more than *twice* the equity capital of the fund. The static advisory fee construct is precisely what Congress intended to prevent with Section 36(b). Truly independent and conscientious directors would not have approved an advisory agreement that furthers the significant economies of scale enjoyed by Defendant. And the Board failed to negotiate with Defendant to even attempt to secure lower advisory fees or implement a tiered marginal fee structure tied to AUM, as opposed to a flat fee rate.

[44] Andrew J. Donahue, Director, Division of Investment Management, *Speech by SEC Staff: Address at the Mutual Fund Directors Forum Second Annual Directors' Institute* (Jan. 15, 2008), *available at* https://www.sec.gov/news/speech/2008/spch011508ajd.htm.

276. The concentration of valuation oversight responsibility in a director who sits on multiple affiliated boards, combined with the generous compensation levels ($320,250 - $603,750 per year) and reliance on the expertise of co-directors who are principals and partners of Ares Management demonstrates that the Board process was not disinterested and did not provide an independent check on Defendant's compensation.

277. The Investment Advisory Agreement fee structure results in excessive compensation to Defendant, and the Board either was not fully informed when it approved the agreement in May 2025 or the agreement was not the result of arm's-length bargaining.

### C. Macro and Market Conditions Demanded Write-Downs that Defendant Failed to Make

278. As set forth above, the macroeconomic and credit environment during the relevant period featured significant headwinds that warranted downward adjustments to ARCC's portfolio marks. The tariff escalation beginning in April 2025 raised recession probability to 40–50% and pressured leveraged portfolio companies. AI-driven disruption repriced software-sector debt—with median software loan bids declining to 86% of par by mid-March 2026 and the primary market for new software loans freezing entirely—while ARCC maintained a substantial exposure to Software & Services (as of March 31, 2026), particularly on a consolidated basis.

279. Despite these converging pressures, there are indications that certain assets, particularly CLO equity and multi-tranche positions, are being marked in a manner that does not track observable market movements or internal capital structure risk. This includes relatively stable or elevated marks, despite broader market softness and, in some cases, inconsistent relative valuation across tranches of the same issuer.

280. For example, ARCC's March 31, 2026 investment schedule reflects a striking valuation disparity within the same borrower, Pluralsight, LLC. Pluralsight illustrates the

interaction between restructuring, PIK accruals, valuation judgments and Defendant's fees. As of December 31, 2023, ARCC held a first lien senior secured term loan to Pluralsight with approximately $106.2 million of principal, a cash coupon of approximately SOFR plus 8.00%, and a maturity date of April 2027. ARCC carried that loan at approximately $94.5 million, or roughly 89 cents on the dollar.

281. In 2024, Pluralsight was restructured. ARCC recognized an approximately $60 million realized loss and replaced the original cash-pay loan with new positions in Pluralsight-related entities, including two first lien loans with different coupons and risk profiles and common equity. One of those loans carried an entirely PIK coupon of approximately 12% and therefore generated no current cash interest to ARCC. Nevertheless, the accrued PIK interest was included in ARCC's net investment income and increased the base on which Defendant's income-based incentive fee was calculated.

282. Over the next several quarters, Defendant continued to accrue PIK income on the Pluralsight tranche while the borrower's equity value deteriorated. ARCC marked the common units down from approximately $14.3 million at the time of the restructuring to approximately $13.7 million at December 31, 2024, $12.8 million at March 31, 2025, $9.6 million at June 30, 2025, $3.3 million at September 30, 2025, and zero at December 31, 2025. During that same period, both first-lien tranches were carried at exactly 100.0% of amortized cost at every reporting date through September 30, 2025.

283. That stability persisted despite adverse changes in the contractual economics of the PIK tranche. Between June 30 and September 30, 2025, the payment-in-kind rate on the second tranche was reduced from 11.83% to 5.85%, approximately halving the contractual return on the

position. Defendant recorded that reduction in the same schedule of investments, at the same reporting date, as the 100.0% mark assigned to the position.

284. The year-end 2025 mark is significant. By placing the PIK tranche on non-accrual, Defendant acknowledged that contractual interest was no longer expected to be collected. Yet Defendant simultaneously valued the same position at approximately 84% of amortized cost as of December 31, 2025—the date on which ARCC's year-end assets were measured and the base management fee was affected. One quarter later, as of March 31, 2026, Defendant marked the same position down to approximately $1.3 million, or roughly six cents on the dollar. By June 30, 2026, the position was marked at zero.

285. That later decline corroborates what the contemporaneous schedules already showed: the year-end 2025 mark did not reflect the price an independent market participant would have paid for the position at that date, at the same time Defendant's fees were calculated on ARCC's reported asset base and accrued income. The Pluralsight example thus illustrates the core conflict: Defendant was able to accrue fee-bearing PIK income and maintain a substantial fair value mark on a deteriorating credit until the deterioration became impossible to defer, while the Investment Advisory Agreement contained no true clawback requiring Defendant to return incentive fees earned on PIK income ARCC did not collect in cash.

286. ARCC's enterprise-value methodology reinforces the inference. ARCC's public filings state that enterprise value means the entire value of the portfolio company to a market participant, including the sum of the values of debt and equity securities used to capitalize the enterprise at a point in time, and that the EV analysis is used to determine the value of equity investments and whether there is credit impairment for debt investments. When Defendant assigned no value to the common units, it determined that the borrower's enterprise value did not

reach the bottom of the capital structure. Carrying both first-lien positions at 100.0% of amortized cost on the same reporting dates, while the common units were being written down to zero, supports the inference that Defendant's marks did not consistently reflect the borrower's deteriorating enterprise value and capital-structure risk.

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Pluralsight, LLC and Pluralsight Holdings, LLC and Paradigmatic Holdco LLC (4)(13) | Online education learning platform | First lien senior secured loan | 6.67% | SOFR (M) | 3.00% | 08/2024 | 08/2029 | | 21.8 | 21.7 | 21.8 | (2)(9) |
| | | First lien senior secured loan | | | | 08/2024 | 08/2029 | | 23.1 | 21.9 | 1.3 | (2)(8) |
| | | Common units | | | | 08/2024 | | 6,356,812 | | 14.3 | — | (2) |

287. The decision to mark one first lien loan near par while writing another down to approximately six cents on the dollar—after ARCC had already recognized approximately $17.2 million of net unrealized losses on Pluralsight during 2025 and while assigning no value to the common equity—reflects severe credit deterioration and shows that Defendant's valuation process does not consistently reflect the economic reality of the borrower.

288. The split-marking phenomenon was not limited to Pluralsight. ARCC's June 30, 2026 consolidated schedule of investments shows multiple borrower groups in which Defendant carried one accruing or PIK-generating tranche at or near par while carrying another tranche of the same borrower group on non-accrual at a deeply impaired value, or while assigning no value to the borrower's equity. For example, Defendant similarly carried a Kellermeyer Bergensons Services first-lien loan paying a 9% PIK coupon at 100.0% of amortized cost while carrying another first-lien loan of the same borrower group on non-accrual at approximately six cents on the dollar and preferred units at zero. Defendant carried three VPROP Operating, LLC first-lien loans paying 13.42% PIK coupons at 100.0% of amortized cost while carrying another first-lien loan of the same borrower group on non-accrual at approximately two cents on the dollar and the borrower's equity at zero. These contemporaneous marks support the inference that Defendant's valuation process preserved fee-bearing marks and accrued non-cash income on certain tranches

even where other positions in the same borrower group reflected severe credit impairment. Defendant's treatment of ADG, LLC further illustrates the same capital-structure issue: Defendant marked ADG's common equity at nearly zero while continuing to carry ADG's second-lien loan at 100.0% of amortized cost for two additional quarters and at 86.0% three quarters later, even though all claims depended on the same borrower enterprise value.

289. Symplr Software Inc. presents a similar example involving a still-accruing credit with substantial non-cash income. As of June 30, 2026, ARCC's investment in Symplr Software Inc. and Symplr Software Intermediate Holdings, Inc. stood at approximately $421.9 million of amortized cost and $276.8 million of fair value. More than two-thirds of that position—approximately $290.8 million—paid some or all of its return in kind rather than in cash, including three series of preferred stock totaling approximately $234.6 million carrying an "11.00% PIK" coupon and a second-lien tranche of approximately $56.2 million with a 4.00% PIK component. Over the eleven quarters ended June 30, 2026, amortized cost on the Symplr position increased by approximately $158.2 million, of which approximately $116.1 million was accretion on those PIK instruments.

290. Symplr illustrates the same fee asymmetry alleged throughout this Complaint. ARCC discloses that Defendant's income-based incentive fee is computed on income accrued but not yet received in cash, including preferred stock with PIK dividends, and that retained pre-incentive fee NII used to calculate the income-based fee is also included in the total assets used to calculate the base management fee. Thus, the same non-cash accretion on Symplr enlarged both the income base for Defendant's incentive fee and, to the extent retained and reflected in total assets, the asset base for Defendant's management fee. Yet Defendant is not obligated to reimburse

ARCC for income-based fees received on accrued income that ARCC never actually receives in cash.

291. Defendant's valuation of Symplr also reflects the lagging-mark dynamic alleged herein. For ten consecutive quarters, ARCC carried the Symplr position between approximately 83.1% and 89.9% of amortized cost. The position then fell by 13.6 percentage points in the quarter ended March 31, 2026 and another 5.1 percentage points in the quarter ended June 30, 2026, to 65.6% of amortized cost. Despite that decline, and despite more than two-thirds of the position consisting of PIK instruments at cost, Symplr had not been placed on non-accrual as of June 30, 2026.

292. Based on a compilation of 13 quarters of ARCC's reported data, ARCC's fair value-to-cost (FV/AC) marks exhibit very low variability, with a coefficient of variation of approximately 0.85%. Across that period, ARCC's reported FV/AC ratio remained clustered in a narrow range around par, despite changing credit conditions, increased PIK exposure and growing concerns regarding private credit and software-sector valuations.

293. In addition, when ARCC's portfolio is separated into its major sleeves and each sleeve is assigned an expected level of volatility based on public market proxies (*e.g.*, BKLN for senior loans, PFF for preferred securities) or conservative estimates for less liquid positions, the resulting expected volatility range is approximately 1.0% to 2.1%, even assuming zero correlation among the portfolio sleeves. That assumption is conservative because credit assets within the same or related sectors generally become more correlated during periods of market stress. By comparison, ARCC's actual reported FV/AC volatility is materially lower—approximately 18% below even the most conservative proxy-only floor and more than 50% below a moderate full-portfolio estimate—indicating that ARCC's reported marks are unusually smooth relative to the

risk and structure of the underlying portfolio. That degree of stability is difficult to reconcile with ARCC's actual portfolio composition. ARCC's portfolio is not composed solely of liquid, broadly syndicated first lien loans. It includes middle-market loans, second lien loans, subordinated debt, preferred equity, SDLP subordinated certificates, IHAM equity and other private equity-like exposures. In fact, ARCC has one of the lowest first-lien loan exposures: roughly 40% of its total book is linked to second lien and below instruments as of March 31, 2026, well above the sector average of ~23%. Many of these assets are illiquid, Level 3 instruments and sit lower in the capital structure than the assets reflected in public senior-loan indices. Accordingly, ARCC's marks should reasonably be expected to move at least as much as, and likely more than, comparable public proxies such as BKLN for senior loans and PFF for preferred securities.

294. ARCC's own internal credit grading system reinforces this inference and undercuts Defendant's fair value methodology. Under that system, new investments are initially assigned a grade of 3 on a scale of 1 to 4, with 4 involving the least risk and grade 3 meaning that the risk to ARCC's initial cost basis is generally similar to the risk at origination or acquisition. ARCC reported a weighted average portfolio grade of 3.1 at both December 31, 2024 and December 31, 2025.

295. Thus, despite a full year of portfolio turnover, credit events, increased PIK exposure, rising non-accruals, software-sector repricing and macroeconomic stress, Defendant's proprietary credit grading system showed no aggregate deterioration in portfolio credit quality. Because the grading system is expressly tied to risk relative to initial cost basis, its flatness is consistent with a process anchored to origination values rather than current market reality. The absence of any year-over-year deterioration in this metric indicates that Defendant's monitoring

and valuation framework operated as a smoothing mechanism, preserving reported stability rather than fully reflecting emerging credit deterioration.

296. While the marks have not remained static, they appear unusually smooth relative to the risk profile of the underlying portfolio, which includes a meaningful allocation to subordinated, equity-like, and structured exposures that should exhibit greater variability. The divergence between expected and reported volatility shows that the resulting asset values and income streams (used to calculate management and incentive fees) do not accurately reflect the portfolio's economic performance and demonstrates the lack of independence of the valuation process.

### D. Defendant Failed to Discharge its Fiduciary Duty to Determine Fair Value in Good Faith

297. Defendant's role as Valuation Designee under Rule 2a-5 supplies important context for Plaintiff's Section 36(b) claim. Plaintiff does not seek to enforce Rule 2a-5 directly or to obtain any relief for a freestanding valuation violation. Rather, Defendant's services included its control over valuation and income-recognition inputs and are the mechanism through which Defendant received disproportionate compensation from ARCC. Because Defendant's advisory fees were calculated using reported asset values and accrued income that Defendant substantially controlled, valuation is directly relevant to whether the fees Defendant received bore a reasonable relationship to the services rendered and could have resulted from arm's-length bargaining.

298. Defendant received $773 million in total fees in 2025 calculated on asset investment marks that it controls. Those fees were extracted during a period of observable market stress, increased PIK levels, declining NAV, software exposure of 63% on a consolidated basis, and increased leverage (on a consolidated basis)—conditions that should have resulted in lower marks and correspondingly lower fees. These portfolio and market conditions not only increased the risk profile of ARCC's portfolio, but also increased Defendant's fees. Defendant's Firm

Brochure specifically acknowledges that "the use of borrowing creates conflicts of interest because the general partner has incentives to utilize borrowing rather than calling capital directly from Underlying Investors. In certain circumstances, borrowing affects the calculation of management fees." Firm Brochure at 38. These indicators challenge the quality of the services provided by Defendant (*i.e.*, by making investment decisions that increase ARCC's risk profile) and demonstrate that the Board has not exercised required oversight of Defendant's valuation conclusions.

299. ARCC's Board oversight of the Valuation Designee and fair value determinations of the Fund's portfolio investments was limited. The independent directors relied on Defendant's models and independent valuation firms selected and paid for by Defendant.

300. The valuation process of ARCC's portfolio is the predictable outcome of a valuation process where the entity controlling the marks benefits financially from holding them high, faces existential regulatory consequences if they fall too far, and co-invests alongside the parent in the very positions being marked. The apparent stability of the PIK securities is not a reflection of genuine value stability or evidence of credit quality, but rather a warning that valuation movements may be suppressed rather than independently measured. Defendant failed to discharge its fiduciary duty by permitting this conflict-ridden process to produce valuations that inflated its own compensation at the expense of ARCC and its stockholders.

301. This is precisely the type of conflict Section 36(b) was designed to police. Plaintiff does not allege that private credit, BDCs, or Level 3 assets are improper. Nor does Plaintiff allege that a long-term, hold-to-maturity investment strategy is inconsistent with fair-value accounting. The point is the opposite: because ARCC holds illiquid Level 3 assets without readily available market quotations, the ICA, Rule 2a-5, and the Investment Advisory Agreement's fee structure

make timely, good-faith fair value determinations essential. A long-term investment strategy does not excuse stale marks. Fair-value accounting necessarily requires judgment, variability and, where market conditions or borrower performance warrant it, timely write-downs. Those write-downs do not defeat a private credit strategy; they are the mechanism by which stockholders receive a current measure of NAV, risk, leverage and performance.

302. Defendant's compensation structure was not aligned with that regime. In a fund holding publicly traded securities, market prices discipline the fee base. In ARCC, however, Defendant was paid based on reported gross assets and accrued income while also providing the service as the Valuation Designee responsible for determining the fair value of ARCC's illiquid investments. That structure made valuation a compensation issue. As macro uncertainty, software sector repricing, elevated PIK income, rising non-accruals, and widening market discounts tested ARCC's portfolio, Defendant continued to receive substantial cash compensation while stockholders bore the downside through NAV erosion, realized and unrealized losses, leverage, cash-distribution pressure, and delayed recognition of credit deterioration. Here, the Investment Advisory Agreement's architecture permitted Defendant to capture current economics from marks it controlled and non-cash income it accrued, while stockholders bore the later loss if those marks or accruals proved overstated or uncollectible.

303. The repeated continuation of that same Investment Advisory Agreement could not have been the product of arm's-length bargaining in light of all surrounding circumstances, particularly by April 2025. By then, the warning signs were already visible: ARCC's reliance on PIK income had grown, its stock traded at a discount to reported NAV, non-accrual risk was increasing, the portfolio's Level 3 marks remained unusually smooth, the advisory agreement lacked a meaningful total-return limitation or clawback for uncollected PIK income and Defendant

continued to receive substantial fees despite declining NAV and realized losses. A truly independent counterparty bargaining for ARCC's stockholders would not have agreed to preserve that asymmetry without meaningful protections.

304. The Investment Advisory Agreement lacked protections that would have aligned compensation for Defendant's services with realized stockholder value, including meaningful breakpoints, total-return limitations, clawbacks for incentive fees earned on uncollected PIK or deferred income and valuation safeguards sufficient to prevent Defendant from receiving current cash compensation on values or income that later proved unrealized. Because of the absence of those protections, the fees Defendant received were grossly disproportionate to the services provided, misaligned with ARCC's actual economic performance, and could not have been the product of arm's-length bargaining considering all surrounding circumstances.

## COUNT I

## ICA SECTION 36(b) BREACH OF FIDUCIARY DUTY (EXCESSIVE INVESTMENT ADVISORY FEES)

305. Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

306. Plaintiff brings this Count for the benefit of ARCC against Defendant for breach of fiduciary duty with respect to the receipt of compensation as defined by Section 36(b).

307. Defendant is the investment adviser to ARCC. Under Section 36(b), Defendant owes a fiduciary duty to ARCC with respect to Defendant's receipt of investment advisory fees from ARCC.

308. Defendant breached its fiduciary duty under Section 36(b) by failing to put the interests of ARCC and its stockholders ahead of its own interests and charging investment advisory fees to ARCC that are so disproportionately large that they bear no reasonable relationship to the

value of the services provided by Defendant and could not have been the product of arm's-length bargaining.

309. Plaintiff seeks, pursuant to Section 36(b)(3), the "actual damages resulting from the breach of fiduciary duty" by Defendant, up to and including, "the amount of compensation or payments received from" ARCC, and/or the "other relief" permitted by Section 36(b)(3), including but not limited to the equitable remedies of rescission or reformation of contract.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A. Declaring that Defendant has breached its fiduciary duty under Section 36(b) of the ICA through the receipt of excessive investment advisory fees from ARCC;

B. Preliminarily and permanently enjoining Defendant from further breaches of its fiduciary duty under the ICA;

C. Awarding damages, including, without limitation, rescissory damages and disgorgement, against Defendant in an amount including all investment advisory, supervisory and administrative, distribution and servicing fees paid to Defendant by the Fund for all periods not precluded by any applicable statutes of limitation through the trial of this case, together with interest, costs, disbursements, attorneys' fees, and such other items as may be allowed to the maximum extent permitted by law;

D. An order awarding such equitable relief as the Court deems appropriate to remedy the asymmetrical compensation structure, including, without limitation, relief designed to ensure that advisory compensation is aligned with realized investment performance and does not reward non-cash or unrealized income, and imposing the

clawback of incentive fees paid on deferred income not ultimately realized by the Fund;

E. An order awarding the equitable remedy of rescission of the Investment Advisory Agreement to the extent available under Section 36(b) and Section 47(b) of the ICA, including restitution to ARCC of the excessive investment advisory fees paid by ARCC from one year prior to the commencement of this action on behalf of ARCC through the date of trial, lost investment returns on those amounts, and interest thereon;

F. An order awarding Plaintiff reasonable costs and expenses in this action, including attorneys' fees, expert witness fees, and such other items as may be allowed to the maximum extent permitted by law; and

G. An order awarding such other and further relief in Plaintiff's favor, on behalf of ARCC, as the Court deems equitable and just.

Dated: September 18, 2026

By: s/ *James S. Notis*
**GRANT & EISENHOFER P.A.**
James S. Notis
Meagan A. Farmer
485 Lexington Avenue, 29th Floor
New York, NY 10017
Tel: 646-722-8500
jnotis@gelaw.com
mfarmer@gelaw.com

Michael J. Barry
Christine M. Mackintosh
123 Justison Street
Wilmington, DE 19801
Tel: 302-622-7000
mbarry@gelaw.com
cmackintosh@gelaw.com

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
Mark Lebovitch
Katherine M. Sinderson
1251 Avenue of the Americas
New York, NY 10020
Tel: 212-554-1519
markl@blbglaw.com
katiem@blbglaw.com

**WOOLERY & CO. PLLC**
James Woolery
Derick Pillai
20 East 49th Street
New York, NY 10017
Tel: 212-287-7377
james@wooleryco.com
derick@wooleryco.com

*Counsel for Plaintiff*

1

## VERIFICATION

I, Martin Siegel, hereby verify that I have reviewed the allegations in the Amended Complaint; as to those allegations of which I have personal knowledge, I believe them to be true; and as to those allegations of which I lack personal knowledge, I rely upon the investigation of my counsel and I believe them to be true to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 16, 2026

Martin Siegel

MARTIN SIEGEL